# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PNE ENERGY SUPPLY LLC, on behalf of itself and all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>EVERSOURCE ENERGY, a Massachusetts voluntary association, and AVANGRID, INC., a New York Corporation,<br><br>*Defendants.* | Civil Action No.<br><br><br>**JURY TRIAL DEMANDED** |

# CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.     IN TRODUCTION ................................................................................1

II.    SUMMARY OF ALLEGATIONS ......................................................5

III.   CLASS PERIOD AND RELEVANT MARKETS.....................................13

IV.    JURISDICTION AND VENUE .........................................................13

V.     PARTIES ...................................................................................14

       A.    Plaintiffs.............................................................................14

       B.    Defendants ..........................................................................15

VI.    FACTUAL ALLEGATIONS ...............................................................16

       A.    Overview of Natural Gas Regulation.........................................16

             1.    Early Regulation of the Natural Gas Market ......................16

             2.    The Beginning of Deregulation of the Natural Gas Market. ..............17

             3.    Reconfiguration and Deregulation of the Natural Gas
                   Market....................................................................19

             4.    Establishment of the Secondary Capacity Market ..............21

             5.    The Purchase of Natural Gas .........................................22

             6.    The Price of Natural Gas on the Spot Market.....................23

       B.    Overview of Electricity Regulation .........................................24

             1.    Electricity Regulation .................................................24

             2.    ISOs/RTOs.................................................................25

       C.    The New England Natural Gas and Electricity Market .................26

             1.    NEPOOL and ISO-NE.................................................26

             2.    Natural Gas in New England. .........................................27

             3.    Wholesale Electricity in New England ..............................29

i

a.      Background ...................................................................29

b.      Locational Marginal Prices ......................................30

c.      Day-Ahead Energy Market ......................................32

d.      Real-Time Energy Market ......................................32

4.    The Price of Wholesale Electricity Depends Significantly on the Cost of Natural Gas .................................................................33

D.    Eversource's and Avangrid's Scheme ...........................................35

1.    Eversource and Avangrid own Substantial Natural Gas Business Operations. ..................................................................35

2.    Eversource and Avangrid Own Non-Gas-Fired Electricity Generating Assets that Flourish when Natural Gas Supply Lags. .......36

3.    Eversource and Avangrid Restricted the Supply of Natural Gas .........38

4.    Eversource's and Avangrid's Supply Restriction Caused an Increase in Wholesale Electricity Prices ................................................42

5.    Eversource's and Avangrid's Last-Minute Capacity Releases Were Purposefully Intended to Restrict Natural Gas Supply to Increase Wholesale Electricity Prices ....................................................44

VII.    FRAUDULENT CONCEALMENT ..........................................................51

VIII.    CLASS ACTION ALLEGATIONS ...........................................................53

A.    Federal Class Claims...........................................................................53

B.    Statewide Class Claims .......................................................................54

C.    State Specific Class Claims. ...............................................................54

D.    Allegations Common to All Classes. ................................................55

IX.    VIOLATIONS ALLEGED .......................................................................58

X.    PRAYER FOR RELIEF ...........................................................................68

XI.    JURY TRIAL DEMANDED ....................................................................70

Plaintiff, PNE Energy Supply LLC ("PNE" or "Plaintiff"), a competitive energy supplier located in New England that purchases electricity in the day-ahead and real time wholesale electric market, brings this civil antitrust action under Section 2 of the Sherman Act, Section 4 and 16 of the Clayton Act, and Rule 23 of the Federal Rules of Civil Procedure, for treble damages, costs of suit, and other relief as may be determined as just and proper,[1] on behalf of itself and those similarly situated against Defendants Eversource Energy and Avangrid Inc. for illegally manipulating the supply of pipeline capacity in the "secondary capacity market" in order to artificially inflate New England[2] natural gas and electricity prices.[3]  Based upon personal knowledge, information, belief, and investigation of counsel, Plaintiff specifically alleges:

## I.      INTRODUCTION

1.      Eversource Energy and Avangrid Inc. are two of the largest energy companies in New England.  Eversource is comprised of a family of interrelated companies, including six wholly-owned subsidiaries[4] (Eversource Energy and its six wholly-owned subsidiaries are

---

[1]     Plaintiff also asserts antitrust and consumer protection claims under the state laws of Massachusetts and New Hampshire.

[2]     The New England market for gas and electricity, as discussed herein, includes the following six states: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.

[3]     The term "secondary capacity market" refers to all short-term transactions for pipeline capacity, including the gas "spot market" for bundled transportation and commodity transactions and the "excess capacity release market" administered by the pipeline for gas transportation capacity, exclusive of the physical commodity. In contrast to the "primary capacity market," which includes long-term contracts for pipeline capacity between the pipeline and a primary contract holder transacted at FERC-regulated prices, transactions on the "secondary capacity market" are not regulated by FERC.  By restricting the availability of pipeline capacity on the Algonquin Gas Transmission pipeline (*i.e.*, withholding capacity from the secondary capacity market), Eversource and Avangrid were able to directly increase the spot market price for gas.

[4]     Eversource operates in New England through six wholly-owned subsidiaries: NSTAR Electric Company, NSTAR Gas Company, Western Massachusetts Electric Company, The

referred to collectively herein as "Eversource").  Avangrid Inc. is comprised of a family of interrelated companies including seven subsidiary and affiliate companies.  (Avangrid Inc. and its seven subsidiaries and affiliates are referred collectively herein as "Avangrid").[5]  As set forth herein, Eversource and Avangrid (collectively referred to herein as "Defendants") each coordinated the activities of their member companies to restrict the supply of natural gas, thereby driving up the prices of natural gas, with the purpose and intent of raising prices and realizing excessive profits on their sales of electricity in New England's wholesale electricity market.

2.      The anticompetitive conduct described in this Complaint is also the subject of actions filed by retail electricity consumers currently pending in this District.[6]  However, while the allegations in this Complaint stem from the same misconduct, the allegations differ in certain respects.  The purpose of this introduction is to highlight a few of those differences.

3.      The *Breiding* plaintiffs represent end use consumers.  PNE represents entities who purchased electricity directly in the wholesale electricity market that was targeted by Defendants' anticompetitive conduct.

4.      PNE is a competitive energy supplier, sometimes referred to as an electricity marketer.  Unlike companies like Eversource and Avangrid, competitive energy suppliers do not

---

Connecticut Light and Power Company, the Public Service Company of New Hampshire, and Yankee Gas Services Company.  According to Eversource Energy, Western Massachusetts Electric Company merged into NSTAR Electric Company effective December 31, 2017.

[5]      The Seven Avangrid family companies operating in New England include The Berkshire Gas Company, The United Illuminating Company, The Southern Connecticut Gas Company, Connecticut Natural Gas Corporation, Central Maine Power Company and Main Natural Gas Corporation.

[6]      *See Breiding, et al. v. Eversource Energy, et al.*, and *Cordeiro v. Eversource Energy, et al.,* Civil Action No. 17-cv-12274 (DJC), ECF No. 33 (the "Breiding Complaint").

generate electricity but instead purchase electricity in the wholesale electricity market in New England and then resell it to retail consumers in direct competition with, among others, Defendants' subsidiaries.

5.      In deregulated electricity markets like New England, PNE, and companies like it, provide essential services that assist in making the market competitive.  Not only can competitive energy suppliers provide retail consumers with competitive and flexible pricing options including fixed price contracts, they also often offer ancillary benefits such as excellent customer service to distinguish themselves in the marketplace.

6.      PNE, and companies like it, are the first purchasers in the wholesale electricity market and therefore, the entities that were most directly injured by Defendants' anticompetitive conduct.  The purpose of Eversource's and Avangrid's illegal restriction of natural gas available to gas-powered electric generators was to artificially raise the price of wholesale electricity. PNE and the class it represents were forced to pay supracompetitive prices for wholesale electricity as intended victims of the Defendants' anticompetitive conduct.  The sharp and unanticipated rise in wholesale electricity prices caused by Defendants' misconduct had severe financial ramifications for these entities.

7.      By targeting the wholesale electricity market, Defendants not only increased the revenue they earned through their electricity generating subsidiaries, as discussed at length both herein and in the Breiding Complaint, but they also financially injured some of their chief competitors in the retail electricity market – competitive energy suppliers.  It is essential to the proper functioning of the market that these purchasers of wholesale electricity be compensated.

8.      Even though Plaintiff's damages are based on prices in the wholesale electricity market, they do not implicate any regulatory authority or related doctrines.  The prices paid in

the wholesale electricity market are wholly derivative of transactions that were not subject to jurisdiction of the Federal Energy Regulatory Commission ("FERC").

9.      Understanding how wholesale electricity auction pricing is derived is essential to understanding why FERC authority is not implicated by the claims asserted by Plaintiff.  Simply put, in the auction process, electricity generators submit bids indicating the prices at which they will supply electricity.  These bids are comprised of three components: (1) fuel costs (fuel cost x plant efficiency); (2) fixed costs; and (3) startup costs (if the facility is idle).  Defendants' anticompetitive conduct targeted only one component, fuel costs - and specifically, fuel costs paid by gas-fired generators.

10.     Gas-fired generators who submit bids to supply electricity will usually not purchase the gas needed unless and until their bid is accepted.  Therefore, when submitting a bid, gas-fired generators estimate the cost of obtaining gas (component 1 above) when they submit their bid.  That estimate is typically based upon the Algonquin Citygate Price – an index that represents the average price paid for natural gas on the unregulated spot market on any given day.  Therefore, Defendants knew that by driving up the price of natural gas in the unregulated spot market they drove up the Algonquin Citygate Price and the corresponding bids submitted by gas-powered generators in the electricity auction.  Of the utmost importance is that the spot market for natural gas is not regulated by FERC.

11.     In sum, the illegal conduct challenged here is manipulation of the non-FERC approved price – the spot market price for natural gas and the related Algonquin Citygate Price – with full knowledge that the overcharge would be included, without FERC oversight, in the bids submitted under the current electricity auction framework.  In other words, the court is simply not being asked here to "undo or second guess a determination that was specifically made by

FERC,"[7]  Plaintiff does not challenge the auction process, merely the artificially inflated input that was not FERC-approved.

12.     In addition, PNE is the best situated  plaintiff to bring this antitrust action.  The fact that Defendants' misconduct originated in the secondary capacity gas market and PNE is a purchaser in the wholesale electricity market is not an obstacle to PNE's standing.  Defendants used the market power they have in the secondary capacity gas market to artificially raise the spot market price of natural gas *for the specific reason* of raising wholesale electricity prices.[8] Accordingly, PNE is a purchaser in the targeted market and is the first purchaser downstream from the Defendants.

13.     To be sure, Eversource's and Avangrid's illegal conduct drove up the cost of electricity for all New Englanders and the retail consumer cases that are currently pending seek to remedy much of that wrong.  However, because PNE and the members of the class it seeks to represent are not retail consumers in that they purchased in the wholesale electricity market and then resold to retail consumers, they will not have a remedy for the large financial losses they sustained as the result of the Defendants' misconduct absent the filing of this lawsuit.  Therefore, for the reasons set forth herein, PNE brings this action.

## II.     SUMMARY OF ALLEGATIONS

14.     Eversource and Avangrid have significant operations in the electricity and natural gas industries in New England.  Eversource and Avangrid each serve many retail gas customers.

---

[7]      *See, e.g., E. & J. Gallo Winery v. Encana Corp.*, 503 F.3d 1027, 1045-48 (9th Cir.2007).

[8]      *See Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.,* 253 F.Supp.2d 262, 272-73 (D.Ct. 2003) (Plaintiffs who purchased milk, cream and butter had standing to bring claim against defendants who fixed the price of butter traded on the Chicago Mercantile Exchange (the "CME Butter Market") because the purpose of price-fixing in the CME Butter Market was to artificially inflate prices in the milk, cream and butter markets.).

As part of their retail gas operations they own scarce transport capacity on the Algonquin Gas

Transmission pipeline (the "Pipeline"), which they primarily use to serve gas retail customers,

and to sell gas into the secondary market. They also own a mix of fossil-fuel powered (primarily

coal and oil) and renewable powered (primarily solar and wind) generators that sell electricity

into the New England wholesale market, where those generators compete against gas-powered

merchant generators.

15.     By coordinating the operations of their subsidiary companies, Eversource and

Avangrid were willing to forego profits they could have earned (and shared with gas ratepayers)

from selling their excess capacity on the Pipeline in order to reap significantly more profits from

their electricity generating operations by driving up wholesale electricity prices.  By unlawfully

exploiting the New England energy market, Eversource and Avangrid were able to realize

unlawful profits to the detriment of New England wholesale electricity purchasers who have paid

billions of dollars in overcharges since 2013.

16.     Eversource owns a portfolio of electricity generators that use more expensive

fuels, predominantly coal and oil.  Avangrid owns a portfolio of electricity generators powered

by renewable resources such as wind and solar.  As gas-powered generators became more

competitive, Eversource's coal- and oil-powered electricity generating units became less

competitive and Avangrid's renewable-powered electricity generating units became less

profitable.  As the competitiveness of Defendants' electricity generators diminished, they lost

sales.  Eversource's electricity generators were at times not even called upon to produce

electricity[9] meaning they were left dormant or at least underutilized, which further decreased

---

[9]     When a generator is called on to produce electricity it is "dispatched."  Since electricity
cannot be stored in power lines, the entity coordinating operation of the power grid must
continuously adjust the output of available power plants to meet electricity demand. This process

their profitability.  Avangrid's renewables, which are almost certain to be dispatched[10] when

generating, became less profitable as a result of lower market-clearing prices.  Defendants did

not simply accept this dynamic as the result of open competition, instead they each developed a

scheme to capitalize on their control of capacity in the natural gas market to disadvantage their

rival gas-powered electric generators.

17.     Eversource and Avangrid were each separately able to exert control over New

England's natural gas supplies as a result of the operations of their respective gas utility

subsidiaries.  Defendants' Local Distribution Companies ("LDCs")[11] have long-term natural gas

supply and transportation contracts, guaranteeing them a set amount of capacity on the Pipeline.

Eversource and Avangrid are not alone in this regard, LDCs typically enter into long-term

guaranteed capacity (and supply) contracts to ensure that they will always have enough capacity

to service their customers, even on days where demand is the highest.  However, because

demand for natural gas is cyclical, there are many days where LDC contract holders, including

Eversource and Avangrid, own the rights to more capacity than they need.  On days when

---

is called the "dispatch" of power plants. To balance the varying customer demand for electricity (also referred to as the "load") and the generators' ability to supply electricity, the system control center (referred to as a "dispatcher") will coordinate all the utility power supply operations and decide which generators to run and at what power level.  As the demand for electricity changes, the dispatchers must adjust the amount of electricity produced by various generation units. *See also* § VI (B)(2) *infra* (discussing when and how ISO-NE "dispatches" generating capacity).

[10]    The New England electricity market uses an economic algorithm to dispatch generators, which solves the least-cost optimization problem of how to generate a certain amount of electricity given a portfolio of generators and subject to a set of transmission constraints. Renewable generators operate at very low marginal cost, so they are almost certain to be dispatched, so long as they are not subject to a transmission constraint.

[11]    LDCs are essentially gas utilities that supply natural gas to residential and commercial customers.

capacity holders have more capacity than they need, they are expected to, and typically do, release their unutilized "excess" capacity in the unregulated excess capacity release market or use the excess capacity to supply gas to the unregulated spot market.  This excess capacity is then used to transport natural gas to purchasers who do not have long-term capacity supply contracts – these are typically entities whose natural gas needs are variable and less predictable, such as gas-fired electricity generators.  In New England, those purchasers buy the majority of their natural gas needs in the unregulated "spot market."

18.     Excess capacity releases by LDCs are supposed to take place throughout the trading day with companies that need short-term supply buying capacity to meet their needs for the day and LDCs whose demand is higher or lower than expected, adjusting their released Pipeline capacity in real time.  The Pipeline allows LDCs to adjust their capacity releases three times the day before it is scheduled for delivery and up to once per hour (or 24 times per day) during the gas delivery day.  This type of structure is intended to ensure efficiency by maximizing Pipeline capacity utilization.

19.     This structure also leaves pricing in the "spot market" to the rules of supply and demand.  Therefore, the greater the available supply of natural gas or the lower the demand for natural gas, the lower the spot market price for natural gas.  Conversely, the lower the available supply or the higher the demand, the higher the spot market price for natural gas.

20.     Supply of natural gas for electricity generators is dictated, in large part, by the amount of capacity available in the secondary capacity market.  This amount of capacity can vary depending upon certain factors such as the weather.  For example, in the colder months, consumers use more natural gas and, accordingly less capacity gets released to the secondary capacity market.  This spike in the demand for gas by LDC customers (and related decrease in

the supply of gas available in the secondary capacity market) means that entities who control capacity on the Pipeline could, on any given day, own the vast majority of excess capacity that could potentially be released into the secondary capacity market.

21.     With this dynamic in mind, Eversource and Avangrid realized that by over-scheduling and withholding their excess capacity, they could drive up natural gas generators' input costs so that Defendants' non-gas-fired electric generators would become more competitive.  Unlike the normal process where capacity is released throughout the day, Eversource and Avangrid behaved anti-competitively on certain days, releasing their excess capacity only at the very end of the trading day when it was too late to be resold.  In other words, by preventing their excess capacity from being used, Eversource and Avangrid effectively decreased the supply of natural gas available to electric generators.

22.     By undertaking this strategy, Eversource and Avangrid consciously chose to forego the sale of some of their excess capacity.  That particular decision, in and of itself, had little impact on Defendants' bottom line because state regulations required that most of the profits Eversource and Avangrid earned from sales of excess capacity had to be refunded to ratepayers.  Accordingly, in exchange for the small amount of revenue they lost by refusing to sell their excess capacity, Eversource and Avangrid were able to significantly impact the supply of Pipeline capacity on certain days and therefore, drive up the price of natural gas in the spot market on those days.

23.     However, as noted below, the same regulatory restriction on retaining profits did not apply to Defendants' earnings from their wholesale electricity sales.[12] By driving up the price

---

[12]     Gas-utility regulators do not consider EGU profits. For regulatory purposes, each firm's gas pipeline capacity contracts and electric generating units are owned by separate affiliates. As such, a greater share of EGU profit accrues to shareholders.

of natural gas in the spot market on certain days, Eversource and Avangrid were able to drive up their electric generator competitors' costs and secure greater sales at higher prices in the wholesale electricity market.  Therefore, by increasing profits that they could keep in the wholesale electricity market while foregoing profits they could not keep in the excess capacity release market, Eversource and Avangrid increased their company-wide profits.

24.     Eversource's course of conduct demonstrates that Eversource engaged in this conduct with the express intent of restricting supply in the secondary capacity market.  For example, Eversource primarily engaged in this anticompetitive activity when the supply of excess capacity from other sources was low due to high gas demand (*e.g.*, during the coldest winter months) and therefore, when withholding its excess capacity from the market would have its greatest impact. In contrast, Avangrid did this year-round because their strategy did not hinge on affecting electricity dispatch.  As the owner of electricity generators fueled by renewables, Avangrid's generating facilities were always dispatched and therefore, it was always advantageous for Avangrid to have higher gas prices.

25.     In addition to actually driving up the price that gas-fired generators paid for fuel, Eversource and Avangrid artificially increased the Algonquin Citygate Price – the average price paid for natural gas on the spot market in any given day.  This was significant because it led directly to an increase in the amount paid for electricity in the wholesale electricity market.

26.     In New England, wholesale electricity is typically sold through "uniform clearing price" auctions run by Independent System Operator -New England ("ISO-NE")[13] where electricity generators submit bids indicating how much electricity they can produce at the needed

---

[13]     ISO-NE is discussed in Section VI (C)(1), *infra*.

times and the minimum price they would accept.  The bids submitted by electricity generators are comprised of set component parts: (1) fuel costs per MWh[14] (the product of fuel cost per million British thermal units ("MMBTUs") and "heat rate" (*i.e.*, the number of MMBTUs required to generate one MWh by the particular plant)); (2) fixed costs; and (3) startup costs (if the facility is idle).

27.     Looking at these components of a bid, "fuel costs" would directly reflect the generators' cost for natural gas and/or alternative fuel, such as coal.  However, most gas-fired generators do not purchase natural gas until such time as they are called upon to generate the electricity and therefore, they estimate the fuel costs when submitting a bid.  The estimate of the gas commodity costs (*i.e.* the cost per MMBTU) is typically based upon the Algonquin Citygate Price, which is the best indicator of what it will cost generators to buy gas if they are dispatched.  Therefore, Defendants' driving up of the Algonquin Citygate Price directly and foreseeably increased the "bids" submitted by gas-powered electricity generators.

28.     Bids submitted in the auction are "stacked" by cost (lowest to highest) and then matched against expected electricity demand.  The generators who submit the lowest bid are accepted first until the supply equals the demand.  The result is that generators with the lowest bid (lowest in the "stack") are most likely to be called on to sell all of their capacity, while a generator higher in the stack may be underutilized in the sense of only being called on to sell some of its capacity or, if its bid is above the point in the stack where supply and demand balance, it may not be called upon to sell any of its capacity, leaving the facility dormant.

---

[14]     Megawatt hour, abbreviated as "MWh," is a unit of energy representing 1,000,000 watts of power being used or generated for one hour.  Megawatt hours is the standard unit in which power is bought and sold at the wholesale level.

However, most significantly, the price paid for the last unit of electricity purchased from the supply "stack" is the amount paid to all suppliers whose bids are accepted (this is known as a "uniform clearing price").  In other words, an electricity generator is paid the highest accepted bid price, even if its own bid was lower.

29.     Defendants benefitted in multiple ways by driving up the bids submitted by gas-fired electricity generators.  Because Eversource's costs for electricity generated at its coal-fired power plants were unaffected, they were now lower (*i.e.*, more competitive) in the stack in comparison to the now inflated bids of gas-fired generators.  This meant that Eversource was more likely to be called on to sell all of its capacity (generation plants become more profitable when they can operate at or near full capacity).  Also, because the increase in the cost of the bids in the stack caused higher uniform clearing prices, Eversource and Avangrid realized increased profits for all the electricity they sold.

30.     The net effect of this misconduct for Defendants was increased company-wide profits.  Unfortunately, the net effect of this misconduct for New England wholesale electricity purchasers was electricity prices that were driven up, on average, by 20 percent.  In fact, it is estimated that New Englanders have been overcharged for electricity by more than $3 billion since the Defendants' scheme was put in place. Defendants' misconduct is particularly unconscionable because, due to the way the natural gas market operates, their anticompetitive actions are most effective in driving up gas prices when the relevant supply of natural gas is the lowest – during winter months when temperatures drop and consumption increases.  For example, Defendants' scheme had perhaps its biggest impact during the polar vortex of 2013 and 2014 when their misconduct resulted in over $1.8 billion in overcharges to New England wholesale electricity purchasers.

### III.    CLASS PERIOD AND RELEVANT MARKETS

31.    *The class period*. Defendants' unlawful conduct began no later than December of 2012, continues through the present, and will continue until the date the effects of its anticompetitive conduct end.

32.    The relevant natural gas market is the "secondary capacity market" which includes the spot market for the sale of natural gas and the related "excess capacity release" market for gas transmission services (*i.e.*, incorporating the excess capacity release market and other short-term capacity transactions, whether bundled with the physical commodity or not). This short-term "secondary capacity market" is distinct from the long-term primary pipeline capacity market.  The short-term market has its own set of buyers and sellers who trade in their own unregulated marketplace.

33.    The relevant wholesale electricity markets include two energy markets, the day-ahead energy market and the real-time energy market, both of which are run by ISO-NE. Approximately 95% of the electricity generated in New England is transacted through the day-ahead energy market, with the remainder traded through the real-time energy market.

### IV.    JURISDICTION AND VENUE

34.    The Court has subject matter jurisdiction over the Plaintiff's federal antitrust claims, under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26.  The Plaintiff's federal antitrust claims arise under federal law under 28 U.S.C. §§ 1331 & 1337, and specifically under federal statutes regulating commerce and trade.

35.    The Court has supplemental jurisdiction over the Plaintiff's state law claims under 28 U.S.C. § 1367.

36.     The Court also has subject matter jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1332(d).  The amount of damages incurred by the classes of plaintiffs, as a result of the Defendants' unlawful conduct, exceeds $5 million, exclusive of interest and costs, and the classes of plaintiffs includes citizens of a state different from Defendant.

37.     The Court has personal jurisdiction over Eversource under Section 12 of the Clayton Act, 15 U.S.C. § 22, because it is a Massachusetts voluntary association with its headquarters in Boston.  In addition, Eversource conducts a substantial amount of business in the state of Massachusetts and engaged in its electric and natural gas utility business in Massachusetts specifically, and throughout New England generally.

38.     The Court has personal jurisdiction over Avangrid under Section 12 of the Clayton Act, 15 U.S.C. § 22, because Avangrid conducts a substantial amount of business in the state of Massachusetts and because it engaged in its electric and natural gas utility business in Massachusetts specifically, and throughout New England generally.

39.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under the federal venue statute, 28 U.S.C. § 1391, because Eversource is a resident of this District, because Avangrid and Eversource transact business in this District and because a substantial part of the events giving rise to this claim occurred in this District.

## V.     PARTIES

**A.     Plaintiff.**

40.     PNE Energy Supply LLC ("PNE") is a New Hampshire corporation with a principal place of business at 1087 Elm Street, Suite 414, Manchester, NH 03101.  PNE is a "Competitive Energy Power Supplier" that purchased wholesale electricity on an hourly basis in the Real-Time and Day-Ahead electricity markets during the Class Period.  PNE provides its

customers with electricity by way of fixed price plans, block and index plans, and real time and

day ahead pricing.  As a result of the unlawful, anticompetitive, and unfair conduct described

herein, PNE was forced to pay artificially inflated prices for electricity.

**B.     Defendants.**

41.     Eversource Energy is a Massachusetts voluntary association. Eversource

maintains a headquarters in Boston, Massachusetts. Eversource is a public utility holding

company primarily engaged in the energy delivery business, at least in part through six wholly-

owned subsidiaries: NSTAR Electric Company, NSTAR Gas Company, Western Massachusetts

Electric Company,[15] The Connecticut Light and Power Company, Public Service Company of

New Hampshire, and Yankee Gas Services Company. Collectively, Eversource and its

subsidiaries serve more than 3.1 million electricity customers in 500 New England communities

and more than half-a-million natural gas customers in 120 New England communities.

Eversource operates the largest energy delivery system in the region and it also owns (or owned

during the class period) a number of power plants in Massachusetts, New Hampshire, and Maine.

Eversource operations generate approximately $8 billion in revenue each year.

42.     Avangrid, Inc. is a New York corporation headquartered in New Haven,

Connecticut. Avangrid's direct, wholly-owned subsidiary, Avangrid Networks, Inc., directly

owns electric generation, transmission, and distribution companies and natural gas distribution,

transportation, and sales companies in New York, Maine, Connecticut, and Massachusetts –

specifically, The Berkshire Gas Company, The United Illuminating Company, The Southern

Connecticut Gas Company, Connecticut Natural Gas Corporation, Central Maine Power

---

[15]     According to Eversource, Western Massachusetts Electric Company merged into NSTAR
Electric Company effective December 31, 2017.

Company, and Maine Natural Gas Corporation. Collectively, through its subsidiaries and/or affiliates, Avangrid serves more than 950,000 electricity customers and more than 415,000 natural gas customers in New England. Through another wholly-owned subsidiary, Avangrid Renewables Holdings, Inc., Avangrid owns electricity generating facilities in many states, including Massachusetts and New Hampshire.

## VI.   FACTUAL ALLEGATIONS

### A.   Overview of Natural Gas Regulation.

#### 1.   Early Regulation of the Natural Gas Market.

43.   Before 1938, natural gas pipelines companies operated as "merchant carriers," offering bundled transmission and sales services – that is, they bought gas from producers, transported it, and then resold it downstream to retail distributors for a single price that encompassed both the transportation service and the commodity itself.  In 1938, Congress passed the Natural Gas Act ("NGA") which granted regulatory oversight of the burgeoning interstate transmission market to the Federal Power Commission ("FPC") and established rules and rates for the "bundled" pipeline transportation and sales services.

44.   Originally, because the NGA instituted no specific regulatory oversight of sales of natural gas from producers to the pipelines, wellhead prices were unregulated.  However, based on several rulings by the Supreme Court, it was determined that wellhead prices for natural gas sold on the interstate market were subject to regulatory oversight by the FPC.

45.   Beginning in the 1940s and continuing through the 1970s, the FPC imposed controls on wellhead pricing in the interstate market.  The FPC regulated both (1) the cost of interstate *transmission* of natural gas (*i.e.*, the prices charged for transporting natural gas from a wellhead to a buyer) *and* (2) the wellhead prices of natural gas *itself* (*i.e.*, the commodity price).

A traditional cost-plus ratemaking system – a system where natural gas producers were allowed to charge prices high enough to cover their actual costs of producing natural gas, plus a "fair" profit – was imposed.  The FPC decided what was a "fair profit."

46.     The restrictive pricing regime implemented by the FPC created clear and costly market distortions.  Because the maximum allowable FPC price was often well below the competitive equilibrium price, the quantity demanded surged.  Meanwhile, natural gas producers had no incentive to explore new natural gas reserves because the selling price was too low. In addition, because price controls only applied in the interstate market, there was incentive to sell on the intrastate market, but not in the interstate market.  As a result of these distortions, there were significant shortages in non-producing states while demand was satisfied in producing states.  These inefficiencies led to additional regulations and additional problems.  Over the period 1968-1970, it is estimated that the net loss in the United States energy market resulting from the wellhead price controls was roughly $20 billion.

**2.     The Beginning of Deregulation of the Natural Gas Market.**

47.     Congress decided to take action after the energy crisis resulting from the Arab Oil Embargo of 1973-74 left the country facing a nationwide natural gas shortage.  In 1977, the "Department of Energy Organization Act" was passed, establishing the Department of Energy as a cabinet-level agency, eliminating the FPC and in its place, creating a new agency, the Federal Energy Regulatory Commission ("FERC").

48.     The following year, in 1978, Congress enacted the Natural Gas Policy Act (NGPA) which, among other things, further refined FERC's role in regulating energy markets and abolished the cost-plus system of wellhead pricing. Instead, under the NGPA, competitive

forces (*i.e.*, the balance of supply versus demand) determined the wellhead price of natural gas. This was the first step in deregulation of natural gas wellhead pricing.

49.     The NGPA had essentially three main goals: (1) creating a single national natural gas market; (2) equalizing supply with demand; and (3) allowing market forces to establish the wellhead price of natural gas.  Under the NGPA, increased price ceilings were set to incentivize producers to search for and produce new natural gas and those price ceilings on wellhead sales of new production were designed to be phased out over seven years.  In addition, the NGPA helped to break down the barriers between interstate and intrastate natural gas as FERC was authorized to approve the transportation of natural gas by an interstate pipeline on behalf of intrastate pipelines and local distribution companies.

50.     The NGPA spurred the discovery of new natural gas reserves leading to an increase in supply.  However, partial decontrol of wellhead prices ushered in by the NGPA led to an increase in prices which then caused a corresponding decrease in demand.  Pipelines, who were used to having their operations curtailed, signed up for long-term "take-or-pay" contracts that required them to pay for a certain amount of contracted gas whether they needed it or not. These "take-or-pay" contracts now obliged pipelines to purchase supply that was no longer needed in light of the decrease in demand.  As a result of excess supply stored by pipelines, an unregulated spot market was created where unbundled gas could be sold at lower prices than the price paid for contract gas.   Natural gas customers seeking reduced prices in general tried to unbundle the purchase of the transportation of the natural gas from the price of the natural gas commodity itself.

### 3.   Reconfiguration and Deregulation of the Natural Gas Market.

51.     As it became clear that the partial decontrol policy of the NGPA led to excess capacity, declining technical efficiency and an overall lack of productivity growth in the natural gas industry, FERC embarked on a market restructuring.  FERC sought to increase competition and efficiency in the natural gas market by, among other things, having pipelines abandon the bundling of transportation and sales (the "merchant carrier" model) and instead encouraging pipelines to become open-access "common carriers" where they would transport gas owned by others. Because it was unclear whether FERC had the authority to *order* pipelines to transition to a "common carrier" model, FERC instead took actions to incentivize pipelines to take these actions on their own accord.

52.     FERC took several steps to reconfigure the natural gas market including issuing FERC Order No. 436, the Natural Gas Wellhead Decontrol Act, and eventually FERC Order No. 636.

53.     FERC Order No. 436 (October 1985), aptly titled "Regulation of Natural Gas Pipelines after Partial Wellhead Decontrol," began the process of decoupling the sale of gas from the sale of transmission services.  Order No. 436 gave existing pipelines the option to apply for "blanket transportation certifications" to provide open-access transportation of gas owned by shippers.  In the open-access model, no preferences were given to a pipeline's own merchant services but instead transmission capacity was allocated on a non-discriminatory, first-come-first-served basis.  In addition, FERC offered optional *expedited* certification of any *proposed* pipeline project if the pipeline operator agreed to provide fully open-access, transportation services on the new infrastructure.  The expedited certification was very attractive because FERC's normal approval process for certification of a new pipeline was notoriously slow.

54.     In addition, Order No. 436 addressed rates.  Historically, pipelines designated rates as a two-part tariff where customers were charged: (1) a fixed *capacity charge* for access to the pipeline (this was typically a set monthly charge); and (2) a variable *commodity charge* per unit of gas purchased via bundled transportation and sales services (this number varied based upon the amount purchased and associated costs).  Order No. 436 kept the two-part tariff but instead of the "capacity charge," open-access pipelines adopted a *reservation* charge for transportation on the pipeline that reflected a premium paid for guaranteed transmission capacity. Two measures were also introduced to incentivize open pipeline transmission by maximizing the use of capacity and thereby increasing transportation revenues: (1) pipelines were given the ability to discount the commodity charge from the maximum rate down to variable cost, and (2) any pipeline capacity not in use at a given point in time was required to be made available for *interruptible transmission (IT) service*, the charge for which was set in relation to the pipeline's reservation and commodity charges so that fixed and variable costs could be recovered.  This freed up buyers and sellers to engage separately in transactions related to the gas itself and the transportation of the gas.

55.     While the NGPA began the process of deregulating wellhead prices of natural gas, that process was not complete until passage of the Natural Gas Wellhead Decontrol Act of 1989 ("NGWDA").  The NGWDA eliminated FERC's authority to set prices at the wellhead by removing "first sales" from FERC's rate-setting jurisdiction.  In essence, "first sales" are sales of natural gas that are not preceded by a sale to an interstate pipeline, intrastate pipeline, local distribution company, or retail customer.  Sales by pipelines, local distribution companies, and their affiliates could still be first sales so long as they were selling natural gas that they produced.

The removal of FERC's jurisdiction to set prices for first sales left wellhead natural gas prices to market forces.

56.     Then, on April 8, 1992, FERC issued Order No. 636, which finalized the market restructuring efforts that were originally set in motion by Order 436. Order No. 636 changed the unbundling of the sale of transportation services from the sale of natural gas itself from optional to mandatory.  To effectuate this goal, Order 636 required the production and marketing arms of interstate pipeline companies to be restructured as arms-length affiliates who could not have an advantage (in terms of price, volume, or timing of gas transportation) over any other potential user of the pipeline.  In addition, the Order nullified existing bundled contracts, separating them into distinct sales and transportation contracts.

**4.      Establishment of the Secondary Capacity Market.**

57.     Because of the mandatory switch to a "common carriage" model, consumers could purchase natural gas at the wellhead in an unregulated first sale and then arrange to transport the natural gas via the interstate pipelines, paying separately for the transportation service.  In addition, FERC issued blanket "sale certificates" to interstate pipelines that allowed those pipelines to sell unbundled natural gas at market-based rates rather than at rates filed with FERC.  Because Order No. 636 gave all sellers of natural gas equal footing in transportation of that gas from the wellhead to the customer, the customer could then choose the most efficient method of obtaining its own gas.

58.     In addition, because utilities and LDCs were concerned that the restructuring of the industry that occurred under Order No. 636 could impact on the reliability of the natural gas supply needed to meet their customers' needs, the Order required interstate pipelines to offer certain services that would allow for the efficient and reliable delivery of natural gas to end

users.  "No-notice" transportation, access to storage facilities, increased flexibility in receipt and delivery points, and "capacity release" programs were among those services that were included.

59.     No-notice transportation contracts give an LDC the power to reserve space, or transmission capacity on the pipeline for a given day and time, then adjust that reservation upward or downward at the last minute without penalty. Non-LDCs that reserve pipeline capacity can still suffer penalties if they do not use the full capacity they reserved, or if they have to reserve additional capacity at the last minute.

60.     Capacity release programs allow pipeline customers to resell pipeline capacity they reserved but do not need.  Order No. 636 required interstate pipelines to set up electronic bulletin boards to show the available and released capacity on the pipeline.  These bulletin boards were required to be accessible by all customers on an equal basis.  Any customer requiring pipeline transportation could then refer to the bulletin boards to determine if there is any unsold capacity available on the pipeline or if there is any released capacity available for purchase from an entity that had already contracted for the capacity but no longer needed it. Order No. 636 also paved the way for bilateral short-term capacity sales outside of the pipeline-administered capacity release programs.

### 5.     The Purchase of Natural Gas.

61.     There are essentially two ways that natural gas is bought and sold: a natural gas producer can sell gas futures, or it can sell the natural gas in a so-called "spot market."  A futures contract allows a gas producer to agree to sell a specific quantity of gas at some predetermined future time. Often purchasers with steady natural gas demand – like LDCs – enter into futures

contracts.[16]  However, gas-fired electricity generators' natural gas needs are typically much more variable and less predictable, they therefore prefer to purchase much of their gas in the secondary wholesale "spot market."

62.     The spot market allows for natural gas to be bought and sold "right now." It accommodates entities, such as LDC's, that purchase natural gas under long-term or futures contracts and often find themselves holding title to excess amounts of natural gas, and traders or marketers who may place bets on future prices for natural gas by securing the right to gas supplies in advance so that they can later sell those supply rights when prices rise.

**6.     The Price of Natural Gas on the Spot Market.**

63.     The spot-market price of natural gas is not regulated. Instead, it is determined solely by the economics of supply and demand: the spot price of natural gas increases when the amount of available natural gas on the spot market is lower.[17]  While the states do regulate some purchases by LDCs, they do not regulate or oversee transactions in the unregulated secondary spot market where gas-fired power plants purchase much of their gas.

64.     The economics of the natural gas spot market follow the basic laws of supply and demand: the greater the available supply or the lower the demand, the lower the price of natural gas and conversely, the lower the available supply or the higher the demand, the higher the price

---

[16]     These natural gas futures are bought and sold on the New York Mercantile Exchange (NYMEX).

[17]     The prevailing price reference point is called the "Henry Hub index" – the price of natural gas at a hub in the hamlet of Henry, in Erath, Louisiana, near one of the key wellheads in the United States. But spot markets operate at each of more than 30 hubs around the country, and the price of natural gas differs across the major hubs, depending on the current supply and demand at that location. The difference between the Henry Hub price and the price at a different location is called the location differential.

of natural gas.  Supply of natural gas for electricity generators is dictated, in large part, by the amount of capacity available in the secondary capacity market.  In the colder months, more natural gas transportation capacity is utilized to satisfy the increase in residential and commercial consumer demand for gas for heating.  Because more capacity is utilized by LDCs, there is less capacity available in the "secondary capacity market." When less capacity is available to deliver gas to the spot market, the spot market price of gas rises to the point where demand intersects the scarce supply.

**B.      Overview of Electricity Regulation.**

       **1.      Electricity Regulation.**

      65.      Interstate electricity markets are regulated by the federal government pursuant to the Federal Power Act ("FPA"), originally passed in 1935.  The FPA created the Federal Power Commission and when the law was changed in 1977, power over certain electricity markets was transferred to FERC.  Today, FERC oversees interstate wholesale energy markets and transmission systems under the authority of the FPA.

      66.      Of paramount importance is maintaining reliability of the electrical "grid."  The "grid" is essentially an interconnected network for delivering electricity from producers to consumers containing power stations, high-powered transmission lines that carry power from the distant sources to more local demand centers, and distribution lines that connect the demand centers to individual customers.  Because electricity cannot be warehoused like traditional commodities, the amount of power generated must be able to meet customer demand every second of the day.  This can be difficult because electricity generators cannot adjust how much electricity they generate as fast as consumer demand changes and unexpected breakdowns

(called "forced outages") require another electrical generator to immediately step in and fill the void.

67.    To provide power in a consistent way, groups of grid participants (generators, transmission providers, utilities, etc.) sometimes create a "power pool" that acts as an administrator of the grid ensuring reliability and attempting to reduce costs and maximize efficiency.  These "power pools" are created by members signing onto an agreement that sets the terms and conditions of being a part of the pool.

68.    Traditionally, many states' electricity markets were served by vertically integrated monopolies.  Under this traditional regulated model, vertically-integrated utilities were responsible for the entire flow of electricity to consumers – they owned the generation, transmission and distribution systems used to serve electricity consumers.

69.    Over the past few decades, many states (including the New England states) have moved towards restructured competitive markets that separate electricity generation, transmission and sales to consumers.  In 1996, FERC issued Order No. 888 which encouraged the creation of Independent System Operators ("ISOs") or Regional Transmission Organizations ("RTOs") to run and oversee these restructured competitive markets.  After FERC issued Order No. 888, many "power pools" sought to create ISOs to take over the administration of the grid.

**2.    ISOs/RTOs.**

70.    An ISO's/RTO's primary responsibility is to guarantee system reliability (*i.e.* prevent blackouts) and help electricity transmission run efficiently (*i.e.* coordinate between buyers and sellers to make sure that the proper amount of electricity supply is on the grid to meet demand at any given time).

71.     ISOs/RTOs reduce the risk that outages will result in customers not having electricity because they can coordinate or connect the operations of many different generating plants.  ISOs/RTOs decide how to "dispatch" each generator – that is increasing or decreasing its power output (once it has committed to supply power).  "Dispatching" essentially tells each generator to produce different amounts of electricity.  ISOs/RTOs dispatch each generator to make sure that the output of electricity is equal to the consumption which varies from second to second.

72.     In addition, ISOs/RTOs engage in future planning to make sure there are reserves of generating capacity, or "operating reserves," available so that at every moment of every day, there are generators ready to provide electricity at a moment's notice if asked to do so.  If one power plant needs routine maintenance, or suddenly breaks down, ISOs/RTOs are able to call on other generating plants to meet customer demand.

**C.     The New England Natural Gas and Electricity Market.**

**1.     NEPOOL and ISO-NE.**

73.     NEPOOL is the acronym for the "New England Power Pool."  NEPOOL was established in 1971 and consists of participants in the New England energy market including electricity generators, owners of transmission, and customers.  NEPOOL originally performed the grid administration functions now performed by ISO-NE.  In 1997, after FERC issued Order No. 888, NEPOOL created ISO-NE to take over those functions.

74.     ISO-NE is the ISO that has responsibility for grid operation, market administration, and power system planning in New England.   ISO-NE has a control room in Holyoke, Massachusetts from where it operates the electricity grid for the New England

market.[18]  ISO-NE oversees the operation of over 81 large power generation facilities in New England who provide electricity to over 13 million New England electricity customers.   ISO-NE decides which generators are on and off each hour of the day for the entire year to meet those customers' electricity needs.  In addition, ISO-NE also oversees the wholesale electricity markets in New England.

75.     ISO-NE is an independent, nonprofit corporation that is governed by its own Board of Directors.  NEPOOL is the official stakeholder group of ISO-NE and consults with ISO-NE in advance of any rule changes in the way that the New England electricity markets are operated.

### 2.     Natural Gas in New England.

76.     Natural gas is predominantly delivered to and distributed within New England by pipeline. The Algonquin Gas Transmission Pipeline – the Pipeline – is a major pipeline that supplies New England. The Algonquin Pipeline is owned by Spectra Energy Partners, Eversource, and National Grid; and operated by Enbridge, Inc., a Canadian oil and gas pipeline company that is Spectra's parent company.

77.     The Algonquin Pipeline transports 3.08 Bcf/d[19] of natural gas through 1,129 miles of pipeline through New Jersey, New York, Connecticut, Rhode Island and Massachusetts. As such, the Pipeline is a critical conduit for the supply of natural gas in the New England electricity market.

---

[18]     In accordance with fn. 2, *supra*, the ISO-NE "market" includes the following six states: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.

[19]     "Bcf/d" means billion cubic feet per day, a unit of measurement used for large production rates of natural gas.

78.     In New England, some capacity on the Pipeline is secured by long-term fixed-capacity contracts with LDCs.  These contracts allow the LDCs to make daily orders of natural gas pipeline capacity in advance, one day before the capacity will be used.  If the LDCs do not use the full capacity they have ordered, or if they use more capacity than they have ordered, they can be charged penalties by the Pipeline operator.

79.     However, the contracts usually allow the LDCs to adjust their Pipeline capacity orders once per hour throughout the day on which that capacity was ordered, including the last few hours of the day - just before the previously-ordered capacity would otherwise have been used.  The excess capacity released by LDCs and other shippers throughout the day comprises the excess capacity release market.  Because natural gas pipeline (transmission) capacity is limited, the LDCs who possess the capacity rights control how much capacity is available in the secondary capacity market for other natural gas purchasers such as power plants.

80.     Other non-contract holders purchase in the unregulated spot market.  The price of natural gas on the spot market in New England is typically determined by the real-time price at which it can be purchased at various points along the Pipeline and then distributed to a particular delivery point.[20]  The spot price of natural gas is largely a function of how much gas may be available for sale along the Pipeline at the time it is needed (*i.e.* supply and demand).

---

[20]     Points at which gas can be injected into or withdrawn from a pipeline are known as receipt and delivery "nodes," respectively. There are 117 delivery nodes located along the Pipeline. LDCs, including Eversource and Avangrid, operate 95 of those nodes. Natural gas pipeline nodes are different from wholesale electricity market "nodes," which are local geographic areas over which electricity demand is aggregated for the purpose of determining a local "nodal" price.

3.      **Wholesale Electricity in New England.**

   *a.      Background.*

81.      Although retail electric and natural gas companies in each state are regulated by public utility commissions, the overall electricity market in the region is overseen and facilitated by ISO-NE.  However, in 1999, New England became one of the first of the deregulated, competitive electricity markets.

82.      As described below, ISO-NE sets wholesale electricity prices in New England based on market forces via a "multi-settlement" system – a set of auctions that includes both a "day-ahead" electricity auction and a "real-time" electricity auction.[21]

83.      Like any commodity market, the wholesale electricity market consists of buyers and sellers and the matching of supply and demand.  Power plants generate and sell electricity.  Electric utilities or suppliers buy it wholesale in the market and sell it to retail consumers who buy it from their local utility company[22] or from an independent supplier and use it in their businesses or homes.

84.      The electricity market follows the basic economic law of supply and demand.  A price is established at which supply is willing to produce electricity and demand is willing to consume it.  However, unlike other commodities, electricity must be produced at nearly the same instant it is consumed, requiring a continuous and instantaneous balancing of supply and demand.

---

[21]      ISO-NE, Day-Ahead and Real-Time Energy Markets, https://www.iso-ne.com/marketsoperations/markets/da-rt-energy-markets.

[22]      Utility companies that supply electricity to residential and commercial customers are known as Load Servicing Entities or LSEs.

85.     Establishing a wholesale "market price" for electricity provides the basis for trading among participants in the market.  To determine the wholesale price, generators offer prices and quantities of electricity (that is, supply) they are willing to produce and schedule.  At the same time, buyers (usually LSEs)[23] place bids for the quantity they will take at various price points (or, the demand).[24]

86.     Pricing in the wholesale electricity marketplace is calculated at about 900 load nodes (specific points on the transmission system), eight load zones (aggregations of load nodes), and the Hub (a collection of locations in central New England where little congestion is evident). Supply offers from generators are submitted at a nodal level, while demand bids from LSEs are submitted at a zonal level.  ISO-NE then matches up the offers and bids to set the Locational Marginal Price ("LMP," defined below) to reflect the relevant market clearing price. The interaction of these offer curves ensures that the right amount of power is produced and consumed at a price determined by competition.  At high levels of capacity utilization electricity supply can be quite inelastic. Since demand is typically highly inelastic, small changes in supply can result in significantly higher electricity prices.

### b.     *Locational Marginal Prices.*

87.     Locational marginal pricing is a way for wholesale electric prices to efficiently reflect the value of electricity at different locations, accounting for the patterns of load (demand), generation (supply), and the physical limits of the transmission system.

---

[23]     LSEs stands for Load Serving Entities which are essentially electric utility companies that secures energy and transmission service to serve the electrical demand and energy requirements of end-use customers.

[24]     Wholesale electricity is bought and sold in megawatt-hour ("MWh") units.  Accordingly, offers and bids in the wholesale electricity market are usually expressed as dollars per MWh.

88.     LMP represents the cost to serve the next megawatt of system load, using the lowest production cost of all available generation. This means the last bid of supply needed to meet the last unit of demand sets the LMP for all megawatts of power delivered for the hour.

89.     The LMP consists of three components, all with their own settlement: 1) The system energy price is the marginal cost of electricity, as established by ISO-NE's economic (least-cost) dispatching; 2) Transmission congestion represents the cost of constraints within the transmission system; and 3) Transmission losses represent the cost of transmission-related losses at the individual pricing points.  The congestion and losses components are what make LMP unique from one node (*i.e.* pricing point) to the next.[25] However, and importantly, the raw system electricity price (the price of electricity without accounting for transmission cost adjustments) will always be the same across the entire system.

90.     New England's wholesale electricity marketplace includes two electric energy markets that work together in what's called a "multi-settlement" system.  As described below, LMP is settled twice, first in the Day-Ahead market and then again in the Real-Time market (in the Real-Time market, ISO-NE will commit the lowest cost generators based on the required demand hourly, producing 24-hourly clearing prices):

> a.     The Day-Ahead Energy Market lets market participants commit to buy or sell wholesale electricity one day before the operating day, to help avoid price volatility.  This market produces one financial settlement.
>
> b.     The Real-Time Energy Market lets market participants buy and sell wholesale electricity during the course of the operation day.  The Real-Time Energy Market balances the differences between the day-ahead commitments and the actual real-time demand for and production of electricity.  The Real-Time Energy Market produces a separate, second financial settlement.  It establishes the real-time LMP that is either paid or

---

[25]     In New England, wholesale electricity prices are identified at more than 1,000 pricing points (*i.e.*, electricity nodes) on the bulk power grid.

charged to participants in the Day-Ahead Energy Market for demand or generation that deviates from the day-ahead commitments.

91.     Electric utility companies acquire the electricity they need to manage their daily production and delivery of wholesale electricity throughout New England by participating in the day-ahead market and the real-time market.  Approximately 95% of the electricity generated in New England is transacted through the day-ahead energy market, with the remaining 5% traded through the real-time energy market.

### c.     Day-Ahead Energy Market.

92.     The day-ahead market allows participants to buy and sell electricity the day before the operating day.  LSE electricity buyers, acting on behalf of end-users may submit energy demand "bids" and schedules, which express their willingness to buy a quantity of electricity at prescribed prices.  Electricity sellers (suppliers) have the option to submit day-ahead supply offers, which express their willingness to sell a quantity of electricity at prescribed prices.

93.     The LSE bids and generators' offers indicate the willingness to buy or sell a quantity of electric energy in the day-ahead market at that location.  ISO-NE commits the lowest cost generators based on the required demand, producing 24-hourly clearing prices. This provides generators with notice of their generation expectations for the next operating day while also providing some price certainty to the load.

### d.     Real-Time Energy Market.

94.     The real-time energy market is the physical market in which generators sell, and LSEs purchase, electricity during the operating day.

95.     The real-time market acts as a balancing market where the day-ahead commitments are balanced against actual demand and system constraints. The generation offers

are updated and used to make real-time dispatching decisions. This hourly adjustment to the supply and demand for electricity generation also produces 24-hourly clearing prices.

96.     The real-time prices are not known until the full hour has passed. A higher amount of price volatility can occur in the Real-Time market as dispatching is adjusted to the Real-Time system load and outages. When the "two-settlement system" is performing well, the Real-Time price will clear similar to the Day-Ahead price.[26]

### 4.     The Price of Wholesale Electricity Depends Significantly on the Cost of Natural Gas.

97.     Forty-eight percent of the electricity generated in New England – 49,198 out of 102,534 GWh[27] in 2017 – came from gas-fired power plants. This should be good news for New England's electricity grid considering the fact that natural gas production has increased over the past several years – the result should be a more reliable grid and adequate supply available to meet demand while keeping wholesale electricity costs down.

98.     Given the ubiquity of natural-gas-generated electricity in New England, it is not surprising that gas-fired generators frequently set the price in both the day-ahead and real-time electricity auctions. Gas-fired generators set the real-time price of electricity about 75% of the time in 2016 and 70% of the time in 2017. Gas-fired generators also set the day-ahead price more often than any other type of power plant in both years.

---

[26]     The difference between the Day-Ahead and Real-Time market clearing prices is often referred to as the DART spread. It will typically be small, unless demand is significantly higher or lower than predicted (e.g., hotter than anticipated temperature) or there is an unanticipated supply shock (e.g., a power plant outage).

[27]     Gigawatt hours, abbreviated as "GWh", is a unit of energy representing one thousand Megawatt hours (MWh).  Gigawatt hours are often used as a measure of the output of large electricity power stations.

99.     Because natural gas itself is the most important variable cost for gas-fired power plants, the price paid by plant owners for natural gas directly affects the electricity sales price at which the plant bids into the ISO-NE supply stack each day.

100.    The purchase and sale of natural gas works very differently than the purchase and sale of electricity. There is no centralized, rule-bound auction process designed to force the natural gas market towards efficiently supplying the commodity. And, most importantly, there is no federal regulator responsible for the spot-market price for the commodity or for prices in the secondary capacity market.

101.    Most gas-fired power plants calculate the marginal cost of producing electricity (and therefore the price they will bid in an auction) based upon the price they predict they will have to pay for natural gas – usually the Algonquin Citygate Price. Most generators do not have a steady stream of natural gas on reserve, but rather purchase it in the unregulated spot market only if their bid is accepted into the supply stack and their plant is called upon (dispatched) by ISO-NE to generate electricity.  In other words, there is a direct relationship between the unregulated spot-market price of natural gas and the price at which natural gas-fired power plant operators bid electricity sales into the ISO-NE wholesale electricity market.

102.    Because so much of New England's electricity is generated by natural-gas-fired power plants, the unregulated spot market price of natural gas heavily influences the wholesale price of electricity. If there is a shortage in natural gas supply, the unregulated spot price of natural gas will go up, and so, too, will electricity prices. In fact, as the below chart shows, when the price for natural gas spikes, the effect of the gas price on the electricity price becomes even more apparent as a result of the effect of higher natural-gas-fired electricity generators' bids on the supply stack (and market-clearing electricity price).



**D.    Eversource's and Avangrid's Scheme.**

    **1.    Eversource and Avangrid Own Substantial Natural Gas Business Operations.**

103.    Both Eversource and Avangrid own and operate substantial natural gas utilities, or LDCs. Of the eight largest LDCs in New England, half are owned by Eversource (NSTAR Gas Co. and Yankee Gas Co.) and Avangrid (Connecticut Natural Gas Co. and Southern Connecticut Gas Company).

104.    Eversource's and Avangrid's LDCs serve hundreds of thousands of natural gas customers in New England. Eversource serves more than 500,000 natural gas customers, while Avangrid serves more than 400,000. In order to meet their customers' demand, they have developed substantial control over the natural gas transmission and distribution system within the

region, through ownership in, and/or contractual rights to, capacity along various pipelines – including the all-critical Pipeline.

105.    As a result of their LDC operations, Eversource and Avangrid possess a large number of no-notice contracts for natural gas transmission capacity along the Pipeline. These contracts give them power to reserve transmission capacity on the Pipeline for a given day and then adjust that reservation upward or downward at the last minute without penalty.

106.    For example, suppose Firm X reserved enough capacity on the Pipeline to move a total of 2400 cubic feet of natural gas through the Pipeline at a steady rate over the course of a 24-hour period (*i.e.*, 100 cubic feet per hour). Firm X might realize, after receiving only 400 units of natural gas (in the first 4 hours of the 24-hour period), that it did not want or need any more natural gas, and cancel the remaining 20 hours of reserved capacity. In most cases, cancelling capacity at the last minute would be problematic because the ordered gas that is not being shipped would result in storage charges or other extra costs.  However, if Firm X was Eversource or Avangrid (or one of their LDCs) with a "no-notice contract," they would not incur any extra costs as a result of their last-minute change.

107.    Having control of capacity on the Pipeline gave Eversource and Avangrid the ability to restrict supply in the secondary capacity market particularly on days when capacity was already scarce.  On those days, Eversource and/or Avangrid could possess the vast majority of excess Pipeline capacity.

## 2.    Eversource and Avangrid Own Non-Gas-Fired Electricity-Generating Assets that Flourish when Natural Gas Supply Lags.

108.    If having control of capacity on the Pipeline gave both Eversource and Avangrid the ability to individually restrict supply in the secondary capacity market, their ownership of power plants that were not fueled by natural gas gave them the motivation to do it.

109.     Large-scale natural gas production from shale began around 2000.  By 2008, the United States supply of natural gas had increased significantly as a result of shale gas production (see chart A below).  This increase in the supply of natural gas led to a significant drop in the United States market price for natural gas.  (see chart B below):



Chart A (showing the increase in U.S. supply of natural gas)



Chart B (showing significant decrease in U.S. natural gas prices beginning in 2008)

110.    Because natural gas represents the most significant cost for gas-fired electricity generators, as natural gas supply increased and prices dropped, gas-fired electricity generators became more competitive in the wholesale electricity market and they were typically able to bid lower in the stacked auction.

111.    The fact that the gas-fired generators were able to lower their bids made the bids submitted by the Eversource and Avangrid non-gas-fired generating facilities comparatively more expensive.  It also drove down the market-clearing price in the day-ahead and real-time electricity markets during many hours of the year, which made Eversource and Avangrid's non-gas-fired generating facilities less profitable even when they were dispatched.

112.    By increasing the spot market price for natural gas, Eversource and Avangrid forced their competitors to increase their bid submissions in order to cover their increased input costs.  This made the bids submitted by Eversource and Avangrid more competitive and increased market-clearing prices, boosting the profitability of their facilities.

**3.    Eversource and Avangrid Restricted the Supply of Natural Gas.**

113.    As explained above, when there is less natural gas pipeline capacity, the price of wholesale electricity in the New England market increases. However, in contrast to price

increases that result from natural capacity shortages that arise through infrastructure issues, New England wholesale electricity purchasers were faced with capacity shortages that were created and/or exacerbated by Eversource and Avangrid's self-serving impositions of market power.

114.    On any given day, because the Pipeline's capacity is fixed (a little more than 3 billion cubic feet), the amount of natural gas available to power plants and other industrial users in New England is limited by the amount of Pipeline's capacity supplied to the secondary capacity market. Industry reports indicate that, some days, 90 to 95% of the Pipeline capacity is reserved.  That means the volume reserved by Eversource, Avangrid, and their LDCs (and other LDCs with contractual transmission capacity rights) affects how much capacity is available in the secondary capacity market.

115.    When Eversource and Avangrid adjust their capacity reservations downward during the last hours of the gas day, unused capacity during the hours that the Pipeline operated partially empty cannot be retroactively sold.  For example, if Eversource only used half its reserved capacity through a gas day, but waits to cancel its unused reserve capacity until the final hour, the unused capacity cannot be resold because the Pipeline would have been running partially empty for the preceding 23 hours.

116.    There is a difference between a downward adjustment of a capacity reservation and the release of capacity. Merely shrinking a reservation does not make that now-empty capacity available to be filled by others. Instead, the capacity must be affirmatively released by the contract-holder before the Pipeline may resell that capacity. This is because the contract holder may choose to increase its order again in the same gas day. The potential for upward reservation adjustments requires the Pipeline to hold onto the contract holder's full capacity

rights even if less than that full capacity is nominated in any given order – unless or until the contract holder formally releases capacity.

117.     Eversource's and Avangrid's last-minute cancellations effectively diminished the Pipeline capacity available in the secondary capacity market, even if there was enough demand to reserve the full Pipeline capacity for the full day. That is because, as noted, the nature and timing of such cancellations did not allow the unused Pipeline capacity to be used by other actors in the market. Not only were the cancellations made too late in the day to allow for other transactions to be arranged, but, as discussed below, capacity cancellations under no-notice contracts did not allow the Pipeline to release that capacity to other buyers and sellers wishing to fulfill demand in the market. By contrast, Eversource and Avangrid could have, but did not, formally release their capacity in the "capacity release market" in a timely fashion – an alternative course of action that would have allowed other actors in the market to use the released capacity to fulfill otherwise unmet demand for capacity (relieving price pressure on the spot market price of gas).

118.     Publicly available data points for a period between mid-2013 and mid-2016 demonstrate that Eversource and Avangrid routinely scheduled day-ahead quantities of Pipeline capacity that substantially exceeded the amount of capacity they ultimately utilized. Then, they routinely reduced their scheduled capacity utilization on the Pipeline at the last minute.  Because their schedule changes were so late in the day, the "released capacity" could not be reallocated and therefore, the Pipeline was consistently run partially empty as a result of Eversource's and Avangrid's actions.

119.    This behavior was brought to light by a study performed by economists hired by the Environmental Defense Fund and first published in October of 2017 (the "EDF Study"). [28] The EDF Study analyzed practices of the parent companies of all LDCs and determined that only two – Avangrid and Eversource – consistently cancelled substantial volumes of transmission capacity in the final hours of the day. Together, Eversource and Avangrid reduced the Pipeline's daily effective capacity by approximately 50,000 MMBtu on average and on 37 days studied, the two firms reduced Pipeline capacity by over 100,000 MMBtu.  Because gas spot-market and wholesale electricity market demand are highly inelastic, particularly during the winter, withholding this amount of capacity from the secondary market resulted in a more than 50% increase in the spot-market price of gas and an almost 20% increase in the wholesale electricity price.

120.    Avangrid, labelled "Firm A" in the EDF Study, cancelled an average of 41,506 MMBtu of Pipeline capacity in the last three hours of the day *every day* during the Class Period. *See* Chart C below.  Eversource, "Firm B," cancelled an average of 8,832 MMBtu of pipeline capacity in the last three hours of the day *every day* during the class period. During the winter months, when excess capacity on the pipeline is at its lowest, Avangrid and Eversource cancelled an average of 37,903 MMBtu and 18,320 MMBtu of daily capacity, respectively.

---

[28]    Levi Marks, Charles F. Mason, Kristina Mohlin & Matthew Zaragoza-Watkins, Vertical Market Power in Interconnected Natural Gas and Electricity Markets (October 11, 2017), https://www.edf.org/sites/default/files/vertical-market-power.pdf.

| LDC | Schedule Change in Last 3 Hours (MMBtu) | Schedule Change (Winter Only) (MMBtu) | Generation Capacity (MW) | Unregulated Capacity (MW) | All Contracts (MMBtu) | NN from TE Contracts (MMBtu) |
|---|---|---|---|---|---|---|
| Firm A | -41,506 | -37,903 | 232 | 77 | 185,300 | 39,200 |
| Firm B | -8,832 | -18,320 | 1,177 | 0 | 632,400 | 105,100 |
| Firm C | -225 | -262 | 33 | 33 | 166,500 | 0 |
| Firm D | -4 | -10 | 0 | 0 | 32,000 | 0 |
| Firm E | 5 | 8 | 0 | 0 | 1,300 | 800 |
| Firm F | 7 | 36 | 0 | 0 | 24,500 | 0 |
| Firm G | 17 | 38 | 116 | 116 | 42,200 | 19,700 |
| Firm H | 21 | 56 | 23 | 0 | 7,600 | 5,000 |
| Firm I | 108 | 146 | 1,008 | 1,008 | 12,500 | 0 |
| Firm J | 177 | 227 | 10 | 0 | 768,900 | 167,100 |
| Firm K | 298 | 3 | 0 | 0 | 156,700 | 44,300 |

Not shown: 14 electricity generation firms and 2 industrial end users that operate nodes on Algonquin

Chart C.

121.     Diminished natural gas supply means less natural gas available on the spot market and, therefore, higher spot-market prices. Those higher prices on the unregulated spot market mean higher prices for wholesale electricity, and higher retail prices for electricity for New England consumers. So, by using their ability to restrict secondary capacity market supply and increase the spot market price of natural gas, Eversource and Avangrid raised the price of electricity throughout New England.

**4.      Eversource's and Avangrid's Supply Restriction Caused an Increase in Wholesale Electricity Prices.**

122.     Reduced natural gas supply, caused by the Eversource's and Avangrid's last minute downward adjustments of reservations, resulted in prices on the unregulated natural gas spot-market that were, on average, 38% higher than they would otherwise have been during the Class Period. During the cold winter months of the polar vortex in 2013-2014, Eversource's and Avangrid's conduct resulted in unregulated spot-market prices that were nearly 70% higher than they otherwise would have been.

123.     The increased natural gas prices forced gas-fired generators to increase their bids, resulting in gas-fired generators setting the energy price in 3 out of every 4 auctions.

Accordingly, the increased natural gas prices in the unregulated spot market caused wholesale electricity prices to be 18% higher on average.

124.    By Eversource and Avangrid constraining pipeline capacity, 8,000–10,000 MWh of natural gas-powered generators were idled in recent winters, resulting in a surge in electric prices.  In testimony before the U.S. Department of Energy Quadrennial Energy Review Meeting on April 15, 2016, Camilo Serna, Vice President of Strategic Planning and Policy for Eversource, admitted that the pipeline constraint caused the observed spike in electricity prices:

> When our pipeline system is unconstrained, New England's wholesale energy prices are competitive with the rest of the nation. However, *when there are constraints our customers pay much more*. For example, the energy market value for the winter of 2013-2014 was over $6.8 billion, which was up from an average of $2.8 billion in the prior three winters. We believe that $3 billion of this increase can be directly attributed to pipeline constraints. This occurred when 8,000 to 10,000 megawatts of our most efficient power plants sat idle without gas supply. This uncertainty in the market caused retail electric prices to increase a staggering 40-60% in the winter of 2015.[29]

125.    Electricity prices in New England are already higher than most of the rest of the country because New England is at the "end of the pipeline" for natural gas supply.  As a result, when New England electricity prices spike the results can be extreme.

126.    This is exactly what happened during the polar vortex of 2013-2014 when Defendants' anticompetitive conduct caused gas and, in turn, electricity prices to spike.  In January 2014, daily natural gas spot market prices along the Pipeline were 1100% higher than the average price under unconstrained conditions.  In turn, New England wholesale electricity

---

[29]    Prepared Statement of Camilo Serna, Vice President of Strategic Planning and Policy for Eversource Energy, delivered to U.S. Department of Energy Quadrennial Energy Review Meeting, April 15, 2016,

cost $5.05 billion in the three-month period from December 2013 through February 2014 – nearly the same cost for wholesale electricity incurred by the region during all of 2012. Eversource and Avangrid have openly acknowledged the role of restricted natural gas supply in creating this problem, but they have failed to admit their own role in creating that restriction.

127.    The winter of 2014-2015 was largely the same, with energy customers enduring enormous increases in their expenses.  While Eversource and Avangrid were artificially constraining natural gas supply in New England, they realized significantly increased profits. Eversource, for example, collected $7.9 billion in revenue during 2015, with nearly $1.8 billion in profit.

128.    Eversource's and Avangrid's conduct did not directly touch any aspect of the New England energy supply chain that ISO-NE oversaw. They did not manipulate ISO-NE's procedures or formula for calculating, establishing, or approving a rate. Instead, they manipulated a single input (the cost of natural gas on the spot market) – skewing the wholesale electricity bids even before they were cast. As far as ISO-NE knew, wholesale electricity auctions worked as intended. In its oversight of the electricity market, therefore, ISO-NE did not consider or approve Eversource's and Avangrid's conduct in the natural gas supply network.

**5.    The Evidence Shows that Eversource's and Avangrid's Last-Minute Capacity Releases Were Purposefully Intended to Restrict Natural Gas Supply.**

129.    Eversource's and Avangrid's last-minute downward adjustments of natural gas pipeline capacity reservations were not just a function of ordinary business practices within the New England natural gas supply network. Their behavior stands in stark contrast to the behavior of similarly situated companies operating within the same business and regulatory backdrop.

130.     Many LDCs changed their Pipeline capacity reservations throughout the trading day, but Avangrid and Eversource were clear outliers in the practice of last-minute releases. The firm with the next highest average last-minute cancellations, designated as "Firm C" in Chart C referenced in Section VI (D)(3), *supra*, cancelled only 225 MMBtu per day. Comparatively, Eversource's last-minute cancellations amounted to nearly 40 times more capacity than Firm C, and Avangrid's last-minute cancellations amounted to more than 184 times more capacity than Firm C. During the cold winter months, Avangrid and Eversource respectively had nearly 144 times and 70 times more last-minute cancellations than their next closest competitor.

131.     Defendants' atypical last-minute cancellation practice cannot be justified as simply a matter of scale, considering the fact that "Firm C" in Chart C is National Grid, a large LDC with a similar number of customers as Defendants that was able to efficiently manage and timely release its excess capacity.

132.     The quantitative difference between Eversource's and Avangrid's conduct and the conduct of their competitors is statistically significant. On 351 days during the period looked at in the EDF Study – nearly 33% of the days reviewed – Eversource made at least one downward adjustment that was more than three standard deviations larger than the average adjustment of all other natural gas companies. On over 1,000 days during the period looked at by the EDF Study – nearly every day reviewed – Avangrid made at least one downward adjustment that was more than three standard deviations larger than the average adjustment of all other gas companies.

133.     Indeed, other firms that had both a natural gas distribution business and electricity generating assets *did not* perform the same type of last-minute downward adjustments. At least one other LDC also held a large number of no-notice contracts for transmission capacity on the Pipeline but that company made only a small fraction of the last-minute capacity order

45

adjustments made by Eversource and Avangrid during the relevant period.  While Eversource's and Avangrid's last-minute order reductions averaged many *thousands* of MMBtu per affected Pipeline "node," the other company made average downward adjustments of only 229 MMBtu at its *most-adjusted* node.

134.    The difference in conduct between defendants and other LDCs is stark.  Most LDCs' adjustment to their natural gas reservations were modest, causing little to no decrease in capacity on the Pipeline and occurred throughout the 44-hour scheduling period (the 44-hour period runs from the timely nomination cycle at 1 p.m. CST the day before the gas day to the end of the gas day).  The following figures show the scheduling pattern of a typical LDC delivery node, with each line representing one gas day:



The scheduling pattern at this delivery and at more other LDC delivery nodes on the Pipeline, is characterized by most adjustments being made shortly after the start of the timely cycle or around the start of the gas day, with only some slight balancing either up or down in the final hours of some days.

135.    However, the scheduling patterns of Avangrid and Eversource at critical Pipeline nodes did not match these typical patterns.  Instead, the data shows that they engaged in a pattern

of consistently down scheduling their nominations in the final 3 hours of the gas day.  The

following charts show the capacity order adjustments at a critical node operated by Avangrid:



Eversource's conduct is even more incriminating.  Whereas Avangrid engaged in this

anticompetitive down-scheduling behavior year-round, Eversource's anticompetitive conduct is

concentrated in the winter when it would have the greatest effect:



136.    Eversource owns (or owned during the class period) electricity-generating

resources fueled by coal, oil, and biomass.  When the unregulated natural gas spot market price

goes up or supply shrinks, these fossil-fuel-fired electricity-generating resources become more

competitive and more likely to be accepted into the supply stack.  Accordingly, it makes sense

that Eversource would concentrate its anticompetitive conduct in the winter because that's when artificially restricting the supply of natural gas would have the greatest impact on gas prices.  As a result of winter seasonal demand, the excess capacity supply of gas is already low, meaning that the gas spot market price is higher than at other times during the year.  By forcing gas-fired generators to raise their wholesale electricity bids even higher to cover their gas costs made it even more likely that their bids would be higher than the bids submitted by Eversource's non-gas generators.  Accordingly, Eversource's bids would be lower in the bid supply stack making it more likely that Eversource's generators would be dispatched rather than remain dormant.[30]

137.    In fact, Eversource's anticompetitive behavior lines up extremely closely with when their fossil-fired plants were being dispatched. Moreover, if gas prices had been lower, analysis of the data suggests that, during many hours, their plants would not have been dispatched at all.

138.    In addition, not only would Eversource have more of their bids accepted and therefore, be dispatched more frequently; but they would make substantially more for each unit of electricity sold.  Because all generating resources in ISO-NE's supply stack are paid the same energy price on a given day (the market clearing price), all generators in the stack benefitted from raising the market-clearing price.

139.    Additionally, by restricting the supply of natural gas Eversource's coal, oil, and biomass generators may be called on to generate electricity simply because regional gas-fired power plants simply cannot access sufficient gas supply.  As ISO-NE has explained, high natural gas prices can cause natural-gas-fired power plants not to operate, which then forces the ISO "to

---

[30]    As previously noted, unlike renewable generation facilities that are always on, fossil fuel powered plants can be shut down when not dispatched.

dispatch more expensive oil- and coal-fired plants," which results "in significant 'uplift' costs and reliability concerns."  The fact that gas-powered generators might not be able to even submit a bid further allowed for Eversource's electricity generators to be operational instead of dormant. As for Avangrid, it owns electricity generating resources that are fueled by renewables.  Because these power plants have zero marginal costs, they are always accepted in the supply stack and dispatched.  However, as noted above, because all generating resources in ISO-NE's supply stack are paid the same energy price on a given day, these renewable generating resources are more profitable when the day's market-clearing price is higher due to higher natural gas prices. In other words, Avangrid could sell roughly the same amount of electricity but received a higher price per unit for no other reason other than the fact that they restricted the supply of natural gas.

140.    There is no legitimate business justification for Defendants' behavior.  Neither Eversource nor Avangrid needed to over-reserve natural gas pipeline capacity and adjust their orders downward at the last minute. They could have gradually released capacity throughout the trading day or ordered a smaller amount of capacity one day in advance, and then gradually increased that order, if necessary, as information about the next day's projected demand evolved. In fact, 7 out of their 9 competitors studied (Firms E through K in Chart C referenced above) did just that.  Accordingly, even if Eversource and Avangrid were worried that they would not be able to secure enough capacity without vastly over-reserving capacity, they could have mitigated the effects of their conduct on the New England electricity market. Instead of cancelling their excess capacity at the very end of the day, they could have released their unutilized "excess" capacity in the unregulated excess capacity release market or use the excess capacity to supply gas to the unregulated spot market.  This alternative would have provided both companies a way to ensure sufficient capacity for themselves, and to avoid creating a restricted natural gas supply.

141.     The economic incentive for Defendants to forego profits in the sale of capacity in the secondary capacity market in exchange for profits in the wholesale electricity market is clear based upon state regulations governing the distribution of profits earned by LDCs from selling capacity into the secondary capacity market.  Regulations required Eversource and Avangrid to return most of the revenue made on the unregulated gas spot market to their LDC customers and therefore, foregoing revenue in that market was significantly impactful on the Defendants' overall company-wide profits.  In the meantime, by raising prices in the wholesale electricity market, they were able to earn excess revenues that otherwise would not have existed but for Eversource's and Avangrid's misbehavior.

142.     The following charts demonstrate the impact that Defendants' overscheduling had on supply and prices, and how Defendants profited.  The chart on the left shows the effect that LDCs failing to release gas capacity would have on the spot market for natural gas.  The chart on the right shows the effect that increased gas prices would have had in the electricity market.  *Gas market revenues* the LDCs sacrificed by withholding their capacity – when considering the amount refunded to ratepayers – is represented by the black rectangle on the left (the diagonal lines represent the amount refunded to ratepayers).  In stark contrast, *extra revenue earned from higher wholesale electricity prices* is represented by the dark shaded area in the chart on the right.  The difference in the size of the two black rectangles represents the extra company-wide revenue the Defendants' would earn from their anticompetitive behavior.



## VII.   FRAUDULENT CONCEALMENT

143.     It was not until the EDF Study was published in August 2017, that Eversource's

and Avangrid's misconduct was exposed.   The authors undertook a literature review, recounted

the structure of the "three interconnected markets" – the market for natural gas transportation,

the wholesale natural gas market, and the wholesale electricity market – the structure of which

enabled the Defendants' schemes. They studied millions of data points across all 117 "nodes" in

the New England natural gas supply network, applying a regression analysis – a commonly-used

and academically-accepted statistical model that enables one to understand which of many

independent variables accounts for an observed phenomenon (*i.e.*, which one many potential

factors caused a particular outcome).

144.     The authors "identif[ied] a major inefficiency spanning the natural gas

transportation and wholesale electricity markets;" "quantif[ied] the extent to which two firms,"

namely *i.e.* Eversource and Avangrid, "withheld pipeline capacity;" and "detail[ed] the

institutional arrangements that allowed these firms to execute their withholding strategy." In

addition, the authors considered and ruled out alternative reasons (*e.g.* risk aversion) that may have explained why Eversource and Avangrid engaged in this conduct.

145.    Plaintiff and members of the proposed classes had no way of knowing they were paying supracompetitive prices for wholesale electricity as a result of the Defendants' conduct. It took sophisticated academic research involving millions of data points and complicated modeling to discover Eversource's and Avangrid's misconduct and its impact on New England's gas and electricity markets.  Accordingly, neither Plaintiff nor any proposed class members could have discovered through the exercise of reasonable diligence that Eversource and Avangrid were engaged in the unlawful and unfair conduct alleged in this complaint before the EDF Paper was released in August of 2017.

146.    Moreover, Plaintiff had no reason to suspect wrongdoing by Eversource and Avangrid. The Defendants attempted to conceal their wrongdoing by repeatedly blaming electricity price spikes during the class period on insufficient natural gas pipeline infrastructure rather than on artificial restriction of existing pipeline capacity.  By blaming natural gas pipeline capacity shortages and electricity price increases on a lack of sufficient infrastructure, Eversource and Avangrid concealed the real reason for electricity price spikes during the Class Period; namely, their own abuse of market power in artificially restricting the natural gas transmission capacity of existing pipeline infrastructure.

147.    Eversource and Avangrid have continued aggressive tactics to conceal the wrongfulness of their conduct.

148.    The misconduct by Eversource and Avangrid alleged in this Complaint were wrongfully concealed and carried out in a manner that precluded detection.

149.    By virtue of the fraudulent concealment by Defendants, the running of any statute of limitations has been tolled and suspended with respect to any claims that Plaintiff and the Class members have as a result of the unlawful conduct alleged in this Complaint.

150.    The foregoing allegations are likely to have evidentiary support after a reasonable opportunity for discovery.

## VIII.   CLASS ACTION ALLEGATIONS

### A.    Federal Class Claims.

151.    Plaintiff brings this action against both Eversource and Avangrid on behalf of itself and as a class action under Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure seeking equitable and injunctive relief on behalf of the following class (the "Federal Injunctive Class"):

> All persons and entities located in ISO-NE electricity market who purchased wholesale electricity in the day-ahead and real-time energy markets from December 1, 2012 through the present. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, and governmental entities.

152.    Plaintiff also brings this action against both Eversource and Avangrid on behalf of itself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking monetary damages on behalf of the following class (the "Federal Damages Class"):

> All persons and entities located in the ISO-NE electricity market who purchased wholesale electricity in the day-ahead and real-time energy markets from December 1, 2012 through the present. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, and governmental entities.

153.    The Federal Injunctive Class and the Federal Damages Class are referred to herein as the "Federal Classes."

**B.      Statewide Class Claims.**

154.    Plaintiff brings a claim for damages and other relief under Massachusetts law against Eversource and Avangrid on behalf of itself and as a class of similarly situated wholesale electricity customers located throughout New England on behalf of the following class (the "Statewide Class"):

> All persons and entities located in the ISO-NE electricity market who purchased wholesale electricity in the day-ahead and real-time energy markets from December 1, 2012 through the present. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, and governmental entities.

155.    As defined above, the Federal Classes and Statewide Class are comprised of the same persons and entities.  Due to the nature of the trade and commerce involved, Plaintiff believes that members of these classes numbers in the hundreds, if not thousands, and that these Class members are geographically dispersed throughout New England so that joinder of all Class members is impracticable.

**C.      State Specific Class Claims.**

156.    In the event that Massachusetts law is not applied to the state-law claims of all members of the Statewide Class, regardless of where they reside, Plaintiff alternatively brings state-law claims against both Eversource Avangrid on behalf of itself and state-specific subclasses (collectively, the "State Specific Classes"), under the relevant laws of Massachusetts and New Hampshire. The State Specific Classes are defined as follows:

*a.      Massachusetts State Law Class:*

> All persons and entities located in Massachusetts who purchased wholesale electricity in the day-ahead and real-time energy markets from December 1, 2012 through the present. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, and governmental entities.

     **b.**     ***New Hampshire State Law Class:***

     All persons and entities located in New Hampshire who purchased wholesale electricity in the day-ahead and real-time energy markets from December 1, 2012 through the present. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, and governmental entities.

157.     Due to the nature of the trade and commerce involved, Plaintiff believes that each of the five State Specific Classes is comprised of hundreds, if not thousands, of members who are geographically dispersed throughout each respective state so that joinder of all Class members is impracticable.

**D.**     **Allegations Common to All Classes.**

158.     The Federal Classes, the Statewide Class and the State Specific Classes are referred to herein as the "Classes."

159.     Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Defendants' conduct, which was generally applicable to all the members of the Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

     a.     Whether Eversource engaged in unfair and anticompetitive conduct in the ISO-NE wholesale electricity market by restricting natural gas transmission capacity along the Pipeline;

     b.     Whether Avangrid engaged in unfair and anticompetitive conduct in the ISO-NE wholesale electricity market by restricting natural gas transmission capacity along the Pipeline

     c.     Whether Eversource engaged in unfair and anticompetitive conduct in the ISO-NE wholesale electricity market by restricting natural gas supplies available for sale on the spot market for natural gas, and therefore increased the spot market price of natural gas available to New England electricity generators;

     d.     Whether Avangrid engaged in unfair and anticompetitive conduct in the ISO-NE wholesale electricity market by restricting natural gas supplies

available for sale on the spot market for natural gas, and therefore increased the spot market price of natural gas available to New England electricity generators;

e.  Whether Eversource's conduct in the ISO-NE wholesale electricity market covertly interfered with natural competitive forces within that market, causing operators of gas-fired power plants to withhold bids that would otherwise be economical or to offer bid generation at artificially high prices into the ISO-NE wholesale market;

f.  Whether Avangrid's conduct in the ISO-NE wholesale electricity market covertly interfered with natural competitive forces within that market, causing operators of gas-fired power plants to withhold bids that would otherwise be economical or to offer bid generation at artificially high prices into the ISO-NE wholesale market;

g.  Whether Eversource's conduct in the New England wholesale electricity market, and covert interference with otherwise competitive forces within that market, caused artificially inflated wholesale electricity prices throughout the ISO-NE market during the class period;

h.  Whether Avangrid's conduct in the New England wholesale electricity market, and covert interference with otherwise competitive forces within that market, caused artificially inflated wholesale electricity prices throughout the ISO-NE market during the class period;

i.  Whether Eversource's conduct caused injury to Plaintiff and members of the Classes;

j.  Whether Avangrid's conduct caused injury to Plaintiff and members of the Classes;

k.  The measure and amount of damages incurred by members of the Classes;

l.  Whether Eversource and Avangrid coordinated their anticompetitive activities as alleged herein;

m.  Whether Eversource fraudulently concealed its anticompetitive conduct; and

n.  Whether Avangrid fraudulently concealed its anticompetitive conduct.

160.  Plaintiff's claims are typical of the claims of the members of the Classes, and

Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff and all members

of the Classes are similarly affected by the Defendants' wrongful conduct in that they paid artificially inflated prices for wholesale electricity.

161.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

162.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

163.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

164.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

165.    Membership for each of the Classes is readily definable and class members are easily identified.  Records of the names and addresses for members of each Class exist in the files of Defendants, ISO-NE and/or NEPOOL.

## IX.    VIOLATIONS ALLEGED

### FIRST CLAIM FOR RELIEF
*(Federal Damage Class: Claims for Damages Under Federal Antitrust Law)*

166.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

167.    Eversource and Avangrid regularly engage in interstate commerce within the ISO-NE market territory.

168.    During the class period, the Defendants each unlawfully monopolized and/or attempted to monopolize trade or commerce within and among the six New England states in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

169.    The Defendants' unlawful conduct in the New England wholesale electricity market involved artificially restricting supply in the secondary capacity market in order to increase the spot market price of natural gas available to electricity generators in the region. This unlawful conduct has allowed Defendants to covertly manipulate natural competitive forces in the New England wholesale electricity market, with the effect of artificially inflating wholesale electricity prices throughout the ISO-NE market during the Class period. The Defendants' conduct caused Plaintiff and members of the Federal Damages Class to pay artificially high prices for wholesale electricity.

170.    During the Class Period, the Defendants' illegal conduct had a substantial effect on interstate commerce.

171.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and members of the Federal Damages Class, have been injured in their business and property and are threatened with further injury.

172.     The anticompetitive acts done by Eversource as part of, and in furtherance of its anticompetitive scheme, were authorized, ordered, or done by its respective officers, agents, employees, or representatives while actively engaged in the management of Eversource's affairs.

173.     The anticompetitive acts done by Avangrid as part of, and in furtherance of its anticompetitive scheme, were authorized, ordered, or done by its respective officers, agents, employees, or representatives while actively engaged in the management of Eversource's affairs.

174.     The subsidiaries and/or affiliates of Eversource and Avangrid comprise a web of entities that are functionally and economically unified under common ownership or control. As a result, there is no realistic possibility that the Defendants and/or their subsidiaries or affiliates will seek to enforce the federal antitrust laws as against one another.  Accordingly, Plaintiff's federal antitrust claims against Eversource and Avangrid for monetary damages does not pose a risk of multiple recoveries.  In fact, Plaintiff's claims will serve as a vital part of the intended antitrust enforcement scheme under federal law.

175.     Plaintiff, on behalf of itself and members of the Eversource and Avangrid Federal Law Classes, seeks all damages and other relief available under the Sherman and Clayton Acts, including but not limited to treble damages, attorneys' fees, and costs of suit, from both Eversource and Avangrid.

## SECOND CLAIM FOR RELIEF
*(Federal Injunctive Class: Claim for Injunctive Relief under Federal Antitrust Law)*

176.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

177.     The Defendants regularly engage in interstate commerce within the ISO-NE market.

178.     During the class period, Defendants unlawfully monopolized and/or attempted to monopolize trade or commerce within and among the six New England states in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

179.     The Defendants' unlawful conduct in the New England wholesale electricity market involved artificially restricting supply in the secondary capacity market in order to increase the spot market price of natural gas available to electricity generators in the region. This unlawful conduct has allowed Defendants to covertly manipulate natural competitive forces in the New England wholesale electricity market, with the effect of artificially inflating wholesale electricity prices throughout the ISO-NE market during the Class period. The Defendants' conduct has caused, and continues to cause, Plaintiff and members of the Federal Injunctive Class to pay artificially high prices for wholesale electricity.

180.     During the Class Period, Defendants' illegal conduct has had a substantial effect on interstate commerce.

181.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff, and members of the Federal Injunctive Class, have been injured in their business and property and are threatened with further injury.

182.     The anticompetitive acts done by Eversource as part of, and in furtherance of its anticompetitive scheme, were authorized, ordered, or done by its respective officers, agents, employees, or representatives while actively engaged in the management of Eversource's affairs.

183.     The anticompetitive acts done by Avangrid as part of, and in furtherance of its anticompetitive scheme, were authorized, ordered, or done by its respective officers, agents, employees, or representatives while actively engaged in the management of Eversource's affairs.

184.    The Defendants and their subsidiaries and/or affiliates comprise a web of entities that are functionally and economically unified under common ownership or control. As a result, there is no realistic possibility that Defendants and/or their subsidiaries or affiliates will seek to enforce the federal antitrust laws as against one another. Therefore, because the Plaintiff's federal antitrust claims against Defendants do not pose a risk of multiple recovery, those claims will serve a vital part of the antitrust enforcement scheme under federal law.

185.    Plaintiff, on behalf of itself and members of the Federal Injunctive Class, seeks injunctive relief under the Clayton Act, 15 U.S.C. § 26, including but not limited to an Order enjoining Defendants from further engaging in the unlawful conduct described in this Complaint.

### THIRD CLAIM FOR RELIEF
*(Statewide Class claim against Eversource under*
*Massachusetts Consumer Protection Act and Massachusetts Antitrust Act)*

186.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

187.    Eversource's unlawful conduct has violated the Massachusetts Consumer Protection Act, MASS. GEN. LAWS ch. 93A, § 1 *et seq.*

188.    Eversource has been served with a demand letter in accordance with MASS. GEN. LAWS ch. 93A § 9.  Such a letter was sent on June 27, 2018 and no response was received by July 27, 2018.

189.    Plaintiff, on behalf of itself and the Statewide Class, alleges as follows:

    a.    Eversource, a Massachusetts voluntary association, maintains a headquarters in Boston and conducts substantial business in the Commonwealth of Massachusetts. During the Class Period, Eversource's unlawful conduct substantially affected Massachusetts commerce and consumers, and it had a substantial impact on the public interests of Massachusetts and its residents, as well as residents of other states within the ISO-NE market.

b.    As a direct and proximate result of Eversource's unlawful conduct, Plaintiff and all members of the Statewide Class have been injured and are threatened with further injury.

c.    Eversource's unlawful conduct has constituted or included unfair methods of competition, and/or unfair or deceptive acts or practices in the conduct of trade or commerce, including trade or commerce within and affecting Massachusetts, in violation of the Massachusetts Consumer Protection Act.

d.    Accordingly, Plaintiff, on behalf of itself and the Statewide Class, seeks all relief that is available and appropriate, including any relief available under the Massachusetts Consumer Protection Act.

190.    Eversource's unlawful conduct has violated the Massachusetts Antitrust Law,

MASS. GEN. LAWS ch. 93, § 1 *et seq.*

191.    Plaintiff, on behalf of itself and the Statewide Class, alleges as follows:

a.    Eversource, a Massachusetts voluntary association, maintains a headquarters in Boston and conducts substantial business in the Commonwealth of Massachusetts. During the Class Period, Eversource's unlawful course of conduct and pattern of activities occurred and had an anticompetitive impact primarily and predominantly within the commonwealth of Massachusetts and the New England region.

b.    As a direct and proximate result of Eversource's unlawful conduct, Plaintiff and all members of the Statewide Class have been injured and are threatened with further injury.

c.    Eversource's unlawful course of conduct and pattern of activities included or constituted an attempt to monopolize trade or commerce, and resulted in harm to persons and entities located in Massachusetts and throughout New England in violation of Section 5 of the Massachusetts Antitrust Act.

d.    Accordingly, Plaintiff, on behalf of itself and the Statewide Class, seeks all relief that is available and appropriate, including any relief available under Section 12 of the Massachusetts Antitrust Act.

## FOURTH CLAIM FOR RELIEF
### *(Statewide Class claim against Avangrid under*
### *Massachusetts Consumer Protection Act and Massachusetts Antitrust Act)*

192.    Plaintiff incorporates by reference as if fully set forth herein the allegations

contained in the preceding paragraphs of this Complaint.

193.    Avangrid's unlawful conduct has violated the Massachusetts Consumer Protection

Act, MASS. GEN. LAW. ch. 93A, § 1 *et seq.*

194.    Avangrid has been served with a demand letter in accordance with MASS. GEN.

LAWS ch. 93A § 9.  Such a letter was sent on June 27, 2018 and no response was received by July

27, 2018.

195.    Plaintiff, on behalf of itself and the Statewide Class, alleges as follows:

     a.    During the class period, Avangrid's unlawful conduct substantially
affected Massachusetts commerce and consumers, and it had a substantial
impact on the public interests of Massachusetts and its residents, as well as
residents of other states within the ISO-NE market.

     b.    As a direct and proximate result of Avangrid's unlawful conduct, Plaintiff
and all members of the Statewide Class have been injured and are
threatened with further injury.

     c.    Avangrid's unlawful conduct has constituted or included unfair methods
of competition, and/or unfair or deceptive acts or practices in the conduct
of trade or commerce, including trade or commerce within and affecting
Massachusetts, in violation of the Massachusetts Consumer Protection
Act.

     d.    Accordingly, Plaintiff, on behalf of itself and the Statewide Class, seeks
all relief that is available and appropriate, including any relief available
under the Massachusetts Consumer Protection Act.

196.    Avangrid's unlawful conduct has violated the Massachusetts Antitrust Law,

MASS. GEN. LAWS ch. 93, § 1 *et seq.*

197.    Plaintiff, on behalf of itself and the Statewide Class, alleges as follows:

a.     During the Class Period, Avangrid's unlawful course of conduct and pattern of activities occurred and had an anticompetitive impact primarily and predominantly within the commonwealth of Massachusetts and the New England region.

b.     As a direct and proximate result of Avangrid's unlawful conduct, Plaintiff and all members of the Statewide Class have been injured and are threatened with further injury.

c.     Avangrid's unlawful course of conduct and pattern of activities included or constituted an attempt to monopolize trade or commerce, and resulted in harm to persons and entities, located in Massachusetts and throughout New England in violation of Section 5 of the Massachusetts Antitrust Act.

d.     Accordingly, Plaintiff, on behalf of itself and the Statewide Class, seeks all relief that is available and appropriate, including any relief available under Section 12 of the Massachusetts Antitrust Act.

## FIFTH CLAIM FOR RELIEF
### *(Plaintiff's Alternative State Law Claims against Eversource under Individual State Consumer Protection and Antitrust Laws)*

198.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

199.     In the event that Massachusetts law is not applied to the claims of all members of the Eversource State Law Class, Eversource's unlawful conduct has violated the individual state consumer protection and/or antitrust laws of Massachusetts and New Hampshire, thereby giving rise to a cause or causes of action under those states' laws.

200.     Eversource's unlawful conduct has violated the Massachusetts Consumer Protection Act, MASS GEN. LAWS ch. 93A, § 1 *et seq.* Plaintiff, on behalf of itself and the Massachusetts State Law Class, alleges as follows:

a.     Eversource, a Massachusetts voluntary association, maintains a headquarters in Boston and conducts substantial business in the Commonwealth of Massachusetts. During the Class Period, Eversource's unlawful conduct substantially affected Massachusetts commerce and consumers, and it had a substantial impact on the

public interests of Massachusetts and its residents, as well as residents of other states within the ISO-NE market.

b.    As a direct and proximate result of Eversource's unlawful conduct, Plaintiff and all members of the Statewide Class have been injured and are threatened with further injury.

c.    Eversource has been served with a demand letter in accordance with MASS. GEN. LAWS ch. 93A § 9.  Such a letter was sent on June 27, 2018 and no response was received by July 27, 2018.

d.    Eversource's unlawful conduct has constituted or included unfair methods of competition, and/or unfair or deceptive acts or practices in the conduct of trade or commerce, including trade or commerce within and affecting Massachusetts, in violation of the Massachusetts Consumer Protection Act.

e.    Accordingly, Plaintiff, on behalf of itself and the Massachusetts State Law Class, seeks all relief that is available and appropriate, including any relief available under the Massachusetts Consumer Protection Act.

201.    Eversource's unlawful conduct has violated the Massachusetts Antitrust Law, MASS. GEN. LAWS ch. 93, § 1 *et seq.*

202.    Plaintiff, on behalf of itself and the Massachusetts State Law Class, alleges as follows:

a.    Eversource, a Massachusetts voluntary association, maintains a headquarters in Boston and conducts substantial business in the Commonwealth of Massachusetts. During the Class Period, Eversource's unlawful course of conduct and pattern of activities occurred and had an anticompetitive impact within the commonwealth of Massachusetts.

b.    As a direct and proximate result of Eversource's unlawful conduct, Plaintiff and all members of the Massachusetts State Law Class have been injured and are threatened with further injury.

c.    Eversource's unlawful course of conduct and pattern of activities included or constituted an attempt to monopolize trade or commerce in Massachusetts and throughout New England and resulted in harm to persons and entities located in Massachusetts in violation of Section 5 of the Massachusetts Antitrust Act.

    d.      Accordingly, Plaintiff, on behalf of itself and the Massachusetts State Law Class, seeks all relief that is available and appropriate, including any relief available under Section 12 of the Massachusetts Antitrust Act.

203.    Eversource's unlawful conduct has violated New Hampshire's Consumer Protection Act, N.H. REV. STAT. ANN. § 358-A:1 *et seq.* Plaintiff, on behalf of the New Hampshire State Law Class, alleges as follows:

    a.      During the Class period, Eversource's unlawful conduct substantially affected New Hampshire commerce and consumers, and it had a substantial impact on the public interests of New Hampshire and its residents.

    b.      As a direct and proximate result of Eversource's unlawful conduct, all members of the New Hampshire State Law Class have been injured and are threatened with further injury.

    c.      Eversource's unlawful conduct has constituted or included unfair competition, or unfair or deceptive acts or practices within and affecting New Hampshire, in violation of the New Hampshire Consumer Protection Act, including N.H. REV. STAT. ANN. § 358-A:2.

    d.      Accordingly, Plaintiff, on behalf of the New Hampshire State Law Class, seeks all relief that is available and appropriate, including any relief available under the New Hampshire Consumer Protection Act.

### SIXTH CLAIM FOR RELIEF
***(Plaintiff's Alternative State Law Claims against Avangrid under Individual State Consumer Protection and Antitrust Laws)***

204.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

205.    In the event that Massachusetts law is not applied to the claims of all members of the Statewide Class against Avangrid, Avangrid's unlawful conduct has violated the individual state consumer protection and/or antitrust laws of Massachusetts and New Hampshire, thereby giving rise to a cause or causes of action under those states' laws.

206.     Avangrid's unlawful conduct has violated the Massachusetts Consumer Protection

Act, MASS. GEN. LAWS ch. 93A, § 1 *et seq.* Plaintiff, on behalf of itself and the Massachusetts

State Law Class, alleges as follows:

a.      Avangrid conducts substantial business in the Commonwealth of
Massachusetts. During the Class Period, Avangrid's unlawful
conduct substantially affected Massachusetts commerce and
consumers, and it had a substantial impact on the public interests of
Massachusetts and its residents, as well as residents of other states
within the ISO-NE market.

b.      As a direct and proximate result of Avangrid's unlawful conduct,
Plaintiff and all members of the Statewide Class have been injured
and are threatened with further injury.

c.      Avangrid has been served with a demand letter in accordance with MASS.
GEN. LAWS ch. 93A § 9. Such a letter was sent on June 27, 2018 and no
response was received by July 27, 2018.

d.      Avangrid's unlawful conduct has constituted or included unfair
methods of competition, and/or unfair or deceptive acts or practices
in the conduct of trade or commerce, including trade or commerce
within and affecting Massachusetts, in violation of the Massachusetts
Consumer Protection Act.

e.      Accordingly, Plaintiff, on behalf of itself and the Massachusetts
State Law Class, seeks all relief that is available and appropriate,
including any relief available under the Massachusetts Consumer
Protection Act.

207.     Avangrid's unlawful conduct has violated the Massachusetts Antitrust Law,

MASS. GEN. LAWS ch. 93, § 1 *et seq.*

208.     Plaintiff, on behalf of itself and the Massachusetts State Law Class, alleges as

follows:

a.      Avangrid conducts substantial business in the Commonwealth of
Massachusetts. During the Class Period, Avangrid's unlawful course of
conduct and pattern of activities occurred and had an anticompetitive
impact within the commonwealth of Massachusetts.

b.     As a direct and proximate result of Avangrid's unlawful conduct, Plaintiff and all members of the Massachusetts State Law Class have been injured and are threatened with further injury.

c.     Avangrid's unlawful course of conduct and pattern of activities included or constituted an attempt to monopolize trade or commerce in Massachusetts and throughout New England and resulted in harm to persons and entities located in Massachusetts in violation of Section 5 of the Massachusetts Antitrust Act.

d.     Accordingly, Plaintiff, on behalf of itself and the Massachusetts State Law Class, seeks all relief that is available and appropriate, including any relief available under Section 12 of the Massachusetts Antitrust Act.

209.   Avangrid's unlawful conduct has violated New Hampshire's Consumer Protection Act, N.H. REV. STAT. ANN. § 358-A:1 *et seq.* Plaintiff, on behalf of the New Hampshire State Law Class, alleges as follows:

a.     During the Class Period, Avangrid's unlawful conduct substantially affected New Hampshire commerce and consumers, and it had a substantial impact on the public interests of New Hampshire and its residents.

b.     As a direct and proximate result of Avangrid's unlawful conduct, all members of the New Hampshire State Law Class have been injured and are threatened with further injury.

c.     Avangrid's unlawful conduct has constituted or included unfair competition, or unfair or deceptive acts or practices within and affecting New Hampshire, in violation of the New Hampshire Consumer Protection Act, including N.H. REV. STAT. ANN. § 358-A:2.

d.     Accordingly, Plaintiff, on behalf of itself and the New Hampshire State Law Class, seeks all relief that is available and appropriate, including any relief available under the New Hampshire Consumer Protection Act.

## X.     PRAYER FOR RELIEF

WHEREFORE, as a result of the unlawful conduct alleged in this Complaint, Plaintiff respectfully requests that the Court enter judgment on its behalf and on behalf of the Classes identified herein, adjudging and decreeing that:

1.     This action may be maintained as a class action under Rule 23(a), Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure with Plaintiff appointed as the designated representative for the Federal Classes and Plaintiff's counsel as class counsel for the Federal Classes;

2.     This action may be maintained as a class action under the laws of Massachusetts with Plaintiff appointed as the designated representative for the Statewide Class and Plaintiff's counsel as class counsel for the Statewide Class;

3.     This action may be maintained as a class action under the laws of Massachusetts and New Hampshire with Plaintiff appointed as the designated representative for each of the State Specific Classes and Plaintiff's counsel as class counsel for Massachusetts State Law Class and the New Hampshire State Law Class.

4.     Defendants have monopolized and/or attempted to monopolize trade or commerce among the several states in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and that Plaintiff and members of the Classes have been injured in their businesses and property, and are threatened with further injury as a result of the Defendants' unlawful conduct;

5.     Defendants' unlawful conduct has violated the consumer protection and/or antitrust laws of Massachusetts and New Hampshire resulting in injury to Plaintiff and members of the Classes;

6.     Plaintiff and members of the Classes are entitled to recover damages sustained by them, as well as restitution or disgorgement, as provided by the relevant federal and state antitrust and consumer protection laws, and that a joint and several judgment in favor of Plaintiff and the Classes be entered against Defendants in an amount to be trebled in accordance with such laws;

7.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the monopolies and unfair business practices alleged herein;

8.      Plaintiff and members of the Classes be awarded prejudgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

9.      Plaintiff and members of the Classes recover their costs of this suit, including reasonable attorneys' fees and costs as permitted by law; and

10.     Plaintiff and members of the Classes receive such other and further relief as is just and proper under the circumstances.

### XI.     JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.


Dated:  August 10, 2018                        Respectfully submitted,

                              By:     */s/ Anthony Tarricone*
                                      Anthony Tarricone (BBO #492480)
                                      Joseph P. Musacchio (BBO #365270)
                                      Elizabeth Tully (BBO #685855)
                                      **KREINDLER & KREINDLER LLP**
                                      855 Boylston Street, Suite 1101
                                      Boston, MA 02116
                                      Phone: (617) 424-9100
                                      Fax: (617) 424-9120
                                      atarricone@kreindler.com
                                      jmusacchio@kreindler.com
                                      etully@kreindler.com

                                      *Local Counsel for Plaintiff PNE Energy*
                                      *Supply LLC and the Proposed Classes*

Austin B. Cohen *(pro hac vice forthcoming)*
Keith J. Verrier *(pro hac vice forthcoming)*
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3997
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
acohen@lfsblaw.com
kverrier@lfsblaw.com

*Counsel for Plaintiff PNE Energy Supply LLC*
*and the Proposed Classes*