# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PNE ENERGY SUPPLY LLC, on behalf of itself and all others similarly situated,<br><br>            Plaintiff,<br><br>   v.<br><br>EVERSOURCE ENERGY, a Massachusetts voluntary association, and AVANGRID, INC., a New York corporation,<br><br>            Defendants. | C.A. No.  18-cv-11690-DJC |

**DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ...................................................................................................... 4

    A.    FERC Exclusively Regulates The Natural Gas Transportation Market Where Defendants' Alleged Conduct Occurred ................................................ 4

    B.    FERC Exclusively Regulates The Wholesale Electricity Market That PNE Claims Was Affected by Defendants' Conduct ..................................... 7

    C.    Plaintiff's Allegations and Theory of Liability .................................... 8

    D.    FERC's Determination of No Anticompetitive Withholding of Capacity ............. 9

ARGUMENT ............................................................................................................ 9

I.    THE FILED RATE DOCTRINE BARS ALL OF PLAINTIFF'S CLAIMS .................. 10

II.    PNE FAILS TO STATE A COGNIZABLE ANTITRUST CLAIM .............................. 16

    A.    PNE Lacks Antitrust Standing ............................................................ 16

    B.    The Complaint Does Not Properly Plead "Monopolization" or "Attempted Monopolization" ............................................................. 18

III.    PNE DOES NOT ALLEGE VIABLE STATE LAW CLAIMS ..................................... 20

CONCLUSION .......................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Algonquin Gas Transmission, LLC*,
   143 FERC ¶ 61,023 (Apr. 4, 2013).........................................................................5

*Ark. La. Gas Co. v. Hall*,
   453 U.S. 571 (1981)..............................................................................................10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................................10

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983)..............................................................................................16

*Bailey v. Allgas, Inc.*,
   284 F.3d 1237 (11th Cir. 2002) ............................................................................19

*Breiding, et al v. Eversource, et al*,
   C.A. No. 17-cv-12274 (DJC) .......................................................................*passim*

*Cahmann v. Sprint Corp.*,
   133 F.3d 484 (7th Cir. 1998) ................................................................................10

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000)..............................................................................................15

*E. & J. Gallo Winery v. EnCana Corp.*,
   503 F.3d 1027 (9th Cir. 2007) ................................................................................5

*Entergy Corp. v. Jenkins*,
   469 S.W.3d 330 (Tex. App. 2015).........................................................................15

*Fitzgerald v. Harris*,
   549 F.3d 46 (1st Cir. 2008).....................................................................................9

*Hughes v. Talen Energy Mktg., LLC*,
   136 S. Ct. 1288 (2016).............................................................................................7

*Kansas v. UtiliCorp United, Inc.*,
   497 U.S. 199 (1990)..............................................................................................16

*Keogh v. Chi. & Nw. Ry.*,
   260 U.S. 156 (1922)..............................................................................................10

*Lipton v. MCI Worldcom, Inc.*,
   135 F. Supp. 2d 182 (D.D.C. 2001).......................................................................10

*Miss. Power & Light Co. v. Mississippi ex rel. Moore,*
    487 U.S. 354 (1988) ................................................................................................15

*Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.,*
    341 U.S. 246 (1951) ................................................................................................10

*New England Power Pool,*
    79 FERC ¶ 61,374 (June 25, 1997), *order on reh'g*, 85 FERC ¶ 61,242
    (Nov. 17, 1998) ........................................................................................................7

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.,*
    555 U.S. 438 (2009) ................................................................................................19

*Pub. Util. Dist. No. 1 of Snohomish Cty. v. Dynegy Power Mktg., Inc.,*
    384 F.3d 756 (9th Cir. 2004) ..................................................................................11

*Richter Concrete Corp. v. Hilltop Concrete Corp.,*
    691 F.2d 818 (6th Cir. 1982) ..................................................................................19

*SAS of P.R., Inc. v. P.R. Tel. Co.,*
    48 F.3d 39 (1st Cir. 1995) .......................................................................................16

*Schneidewind v. ANR Pipeline Co.,*
    485 U.S. 293 (1988) ...........................................................................................5, 14

*Serpa Corp. v. McWane, Inc.,*
    199 F.3d 6 (1st Cir. 1999) .......................................................................................16

*Simon v. KeySpan Corp.,*
    785 F. Supp. 2d 120 (S.D.N.Y. 2011), *aff'd*, 694 F.3d 196 (2d Cir. 2012) ............10

*Spectrum Sports, Inc. v. McQuillan,*
    506 U.S. 447 (1993) ................................................................................................19

*Sterling Merch., Inc. v. Nestlé, S.A.,*
    656 F.3d 112 (1st Cir. 2011) ...................................................................................19

*Tennessee Gas Pipeline Co.,*
    102 FERC ¶ 61,075 (Jan. 29, 2003) .........................................................................7

*Town of Concord v. Bos. Edison Co.,*
    915 F.2d 17 (1st Cir. 1990) .....................................................................................18

*Town of Norwood, Mass. v. New England Power Co.,*
    202 F.3d 408 (1st Cir. 2000) .........................................................................10, 11, 12

*Transmission Agency of N. Cal. v. Sierra Pac. Power Co.,*
    295 F.3d 918 (9th Cir. 2002) ..................................................................................15

*United Distrib. Cos. v. FERC*,
     88 F.3d 1105 (D.C. Cir. 1996) ...........................................................................5

*United States v. United Shoe Mach. Corp*,
     110 F. Supp. 295 (D. Mass. 1953) ....................................................................19

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
     540 U.S. 398, 410 (2004) .................................................................................19

*Watterson v. Page*,
     987 F.2d 1 (1st Cir. 1993) ................................................................................10

*Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*,
     589 F.3d 458 (1st Cir. 2009) ............................................................................15

**Statutes**

15 U.S.C. § 717 *et seq.* .............................................................................................5, 14

15 U.S.C. § 3301(21),  ................................................................................................5

15 U.S.C. § 3431(a)(1)(A) ..........................................................................................5

16 U.S.C. § 824 *et seq.* ...............................................................................................7

Mass. Gen. Laws ch. 93 *et seq.* .................................................................................20

N.H. Rev. Stat. § 358-A:3 ..........................................................................................20

N.H. Rev. Stat. § 374-F:7 ...........................................................................................20

**Other Authorities**

18 C.F.R. § 284.8 (2008) ........................................................................................7, 14

18 C.F.R. § 284.402(a) (2003) ....................................................................................5

57 Fed. Reg. 13,267-02 (Order No. 636) (Apr. 16, 1992) ..................................... *passim*

57 Fed. Reg. 57,952 (Dec. 8, 1992) ............................................................................5

57 Fed. Reg. 36,128-01 (Order No. 636-A) (Aug. 12, 1992) ....................................13

68 Fed. Reg. 66,323 (Nov. 26, 2003)..........................................................................5

123 FERC ¶ 61,286 (Order No. 712) (Jun. 19, 2008)..................................................7

Algonquin FERC Gas Tariff, Part 6, §§ 14.1-14.2 (Version 8.1.0)..............................7

Algonquin Gas Transmission, LLC, FERC Gas Tariff, Sixth Revised Vol. No. 1,
    Rate Schedule AFT-E § 4.3 (Version 10.0)....................................................................6, 13

FERC News Release (Feb. 27, 2018) .............................................................................................9

Fed. R. Civ. P. 11 ...........................................................................................................................3

ISO-NE Tariff, § III.2 ...................................................................................................................11

**PRELIMINARY STATEMENT**

Plaintiff PNE Energy Supply LLC ("PNE") explicitly declares that its complaint "stem[s] from the same misconduct" alleged in *Breiding, et al v. Eversource, et al*, C.A. No. 17-cv-12274 (DJC), Compl. ¶ 2 & n.6, which this Court dismissed in its entirety on September 11, 2018, *Breiding*, Mem. and Order (Doc. 61) ("Mem. and Order").

Like the *Breiding* plaintiffs, PNE alleges that unrelated defendants—Eversource Energy ("Eversource") and Avangrid, Inc. ("Avangrid")—separately violated the anti-monopoly provisions of the Sherman Act to "manipulate" the spot-market price for natural gas bought by wholesale electricity generators.  According to both complaints, the defendants' exercise of rights to make "downward adjustments" of transportation capacity reserved under "no-notice" contracts approved by the Federal Energy Regulatory Commission ("FERC") "restricted" gas supplies available to other shippers on the Algonquin Gas Transmission ("AGT") pipeline, hiked the spot-market price that electric generators paid for fuel, and thereby increased wholesale electricity prices.  There is no principled distinction between the "same misconduct" alleged in both cases.  That requires this case to be dismissed for the same reasons this Court ruled that *Breiding's* allegations did not state a cognizable claim.

*Breiding* held that plaintiffs' state and federal claims premised on the alleged abuse of the defendants "no-notice" contract rights—with a putative downstream effect on wholesale electricity prices—were barred by the "filed rate doctrine."  According to the Court, since "there is no dispute that . . . FERC exclusively regulates the region's wholesale electricity market, including ISO-NE's wholesale electricity auctions and the resulting prices," the plaintiffs' "theory of liability requires the Court to determine the reasonableness of wholesale electricity prices exclusively regulated by FERC," Mem. and Order at 19, which the doctrine precludes. The plaintiffs' claims about the defendants' conduct in the gas transportation market equally "run afoul of the filed rate doctrine."  *Id*. at 22.  The Court dismissed the plaintiffs' claims for injunctive relief because "any meaningful relief would . . . require the Court to enjoin conduct

authorized by the tariff. . . . ."  *Id*. at 20.  Simply put, "FERC *authorized* the business choices"
the plaintiffs challenged, foreclosing any private judicial remedies.  *Id*. at 25 (emphasis added).

Moreover, the Court recognized that defendants' daily adjustments to their capacity
orders under "no-notice" contracts do not affect supply at all.  Because AGT is required under
FERC Order 636 and AGT's Tariff to reserve 100% of a no-notice contract holder's maximum
daily capacity, "[e]ven when LDCs adjust their capacity reservations downward or cancel a
reservation, that capacity is not automatically released for others to use."  Mem. and Order at 7.
Unneeded capacity is made available only when an LDC that holds no-notice contracts (also
referred to as a "no-notice shipper") "affirmatively release[s] the excess capacity it reserved."
*Id*.  But FERC's capacity release regulations do not oblige defendants to release their capacity.
PNE's demand that this Court do so conflicts with FERC's judgments as to how best to regulate
these complex markets.  That extinguishes PNE's theory of the case for the same reasons
articulated in *Breiding*.

*Breiding* also concluded that the plaintiffs' antitrust law claims could not be sustained.
The *Breiding* plaintiffs lacked "antitrust standing" because they were not participants in the gas
transportation market where the anticompetitive conduct allegedly occurred, *id*. at 29-31, and
because any causal connection between the supposed "suppression of natural gas supply" in the
capacity market and plaintiffs' alleged injury in the electricity markets was "attenuated at best."
*Id*. at 31.  The *Breiding* plaintiffs also failed to state a case for monopolization by either
defendant.  Their pleading did not "allege any facts indicating that Avangrid and Eversource
*each separately* have the power to control or raise prices of any product in any market."  *Id*. at 37
(emphasis added).  Plaintiffs' inability to assert the "*individual* market power" of each defendant
was fatal.  *Id*. at 38 (emphasis in original).

Nothing about PNE's complaint justifies a different conclusion.  PNE purports to
distinguish its suit from *Breiding* only by claiming that it is a direct purchaser of wholesale
electricity in New England, Compl. ¶ 3, and by contending that its complaint's "more detailed

and refined" allegations about the "structure" of the relevant markets somehow remove its claims from the scope of the filed rate doctrine.[1]

But those minor differences do not merit a different result.  As the complaint concedes, the critical fact is that PNE's claims stem from the "same misconduct" as alleged in *Breiding*— all of which allegedly *occurred* in the regulated gas transportation market—with ostensible *effects* on unregulated sales.  So the result should be the same.  As in *Breiding*, PNE's essential charge is that the defendants "adjust[ed] . . . downward" their transportation capacity reservations, rather than "formally releas[ing]" gas into the FERC-regulated "secondary capacity market."  Compl. ¶¶ 115-118.  PNE repeats *Breiding's* charge that these business practices in the gas transportation market limited supply and hiked prices in the "unregulated" spot market for natural gas, increasing the prices that gas-fired electric generation plants pay and raising the wholesale price of electricity.  *Id*. at ¶ 121.  Since PNE's "theory of liability" depends equally upon the Court's reversal of FERC-approved conduct and prices, it is equally foreclosed by the "filed rate doctrine."  The addition of "detailed" or "refined" allegations simply cannot and do not change those essential characteristics of PNE's claim, which PNE concedes mirror the factual "underpinnings" of *Breiding.*

PNE's participation as a direct purchaser in the wholesale electricity market also does not change this result.  It supports it.  If anything, PNE's status as a wholesale market participant and a direct purchaser in the ISO-NE auction highlights that PNE's only role is in markets that FERC exclusively regulates.  That shreds PNE claims that "[i]t is essential to the proper function of the market that these purchasers of wholesale electricity be compensated." Compl. ¶ 7.  It is FERC, not this Court, that has exclusive jurisdiction to regulate the proper functioning of the market and its participants.  Indeed, PNE's status as a wholesale market participant gives it an avenue to

---

[1]Eversource and Avangrid each demanded that PNE withdraw its complaint after the Court's ruling in *Breiding,* invoking Fed. R. Civ. P. 11.  The phrases quoted in the text are from PNE's counsel's response.  Copies of the parties' correspondence are attached hereto as Exhibits A-E.

FERC remedies that this Court suggested was lacking for retail plaintiffs in *Breiding. See* Mem. and Order at 25 n.10.

Moreover, like the *Breiding* plaintiffs, PNE is *still* not a participant in the gas transportation market where defendants' alleged anticompetitive misconduct took place, and thus, it lacks antitrust standing. Because it does not generate electricity itself, it is not even a participant in the spot market for natural gas that it claims was affected by defendants' upstream-market conduct. The causal connection between defendants' ostensible misconduct and PNE's alleged injury accordingly remains as "attenuated" as it was in *Breiding*. And in all events, the PNE pleading advances nothing different from *Breiding* about each defendant's *individual* market power. PNE's failure to plead the power of each defendant separately to exert power and control over a relevant market is dispositive.

Accordingly, for the reasons articulated by this Court in *Breiding*, and as set forth below, the PNE complaint should be dismissed with prejudice.

## BACKGROUND

### A.      FERC Exclusively Regulates The Natural Gas Transportation Market Where Defendants' Alleged Conduct Occurred

Eversource is a public utility holding company and Massachusetts voluntary association "primarily engaged in the energy delivery business." Compl. ¶ 41. Eversource's retail gas subsidiaries NSTAR Gas Company ("NSTAR Gas") and Yankee Gas Services Company ("Yankee Gas"), who are not separately named as parties,[2] are local distribution companies ("LDCs") that serve more than half a million retail natural gas customers in New England. *Id.* ¶¶ 41, 103-04. Avangrid's retail gas subsidiaries—also not named as defendants—include The Berkshire Gas Company, The Southern Connecticut Gas Company, Connecticut Natural Gas Corporation and Maine Natural Gas Corporation that serve over 400,000 customers. *Id.* ¶¶ 42,

---

[2] PNE has sued the parent holding companies of a number of wholly owned public utility subsidiaries, each separately incorporated. But only Eversource and Avangrid's LDC's are alleged to have engaged in any conduct at all. The complaint contains no factual or legal basis to hold these parents liable for the alleged actions of its separately incorporated subsidiaries or to "pierce the corporate veil" of those subsidiaries.

104.  Eversource and Avangrid's LDCs purchase both the natural gas commodity that they resell to consumers and the pipeline transportation that delivers that gas to the LDCs.

FERC regulates and has exclusive jurisdiction over the sale of gas transportation services (or "capacity"), including the rates, terms and conditions of those services, under the Natural Gas Act.  *See* 15 U.S.C. § 717(a), (b); *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300-01 (1988).[3]  To meet demand and deliver gas from purchasers to retail customers, the Eversource and Avangrid LDCs maintain contractual rights to transportation capacity on the Algonquin Pipeline (among others), a major pipeline that supplies New England states.  Compl. ¶¶ 76, 104.

The focus of the complaint is on the FERC-approved "no-notice" contracts held by Eversource and Avangrid LDCs, which allow them to reserve transmission capacity on the Algonquin pipeline and adjust their daily capacity orders upward or downward *at any time* during the gas day without penalty.  *See id.* ¶¶ 105-06.[4]  As the complaint admits, FERC has *mandated* that pipelines provide these no-notice firm transportation services to their LDC customers so that LDCs may serve their customers reliably by "receiv[ing] . . . up to their daily contract entitlements on demand."  Order No. 636, 57 Fed. Reg. at 13,279; *see also United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1126 (D.C. Cir. 1996); Compl. ¶ 58 (FERC Order 636 "required interstate pipelines to offer . . . '[n]o-notice' transportation").  FERC determined that delivery on a "no-notice" basis "is in the public interest because it enables pipeline customers to

---

[3] Sections 4 and 5 of the Act grant FERC exclusive jurisdiction over "[a]ll rates and charges" for any interstate transportation of natural gas and "all rules and regulations affecting or pertaining to such rates or charges," 15 U.S.C. § 717c(a), and the responsibility to ensure that any "rate, charge, classification, rule, regulation, practice, or contract" for natural gas transportation and wholesale natural gas is "just and reasonable." 15 U.S.C. § 717d(a). Plaintiff contends natural gas spot market prices—that is, pricing for the commodity as opposed to transportation services—are wholly unregulated by FERC. This assertion is irrelevant since no misconduct took place in the spot market, but it also is incorrect as a matter of law. Congress has deregulated only "first sales." *See* 15 U.S.C. §§ 3301(21), 3431(a)(1)(A). FERC retains its authority under the Natural Gas Act to regulate all other sales for resale. *See generally E. & J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1037-38 (9th Cir. 2007). FERC has exercised its ratemaking authority by granting blanket market certification to allow regulated sales to proceed at market prices. *See* 57 Fed. Reg. 57,952 (Dec. 8, 1992); 18 C.F.R. § 284.402(a) (2003). It also explicitly prohibits anticompetitive behavior and market abuse in the wholesale gas market. *See* 68 Fed. Reg. 66,323 (Nov. 26, 2003).

[4] *See also* NSTAR Gas Company, Contract 93004EC (FERC Filed Agreement) and Yankee Gas Company, Contract 93013EC (FERC Filed Agreement). Algonquin filed these agreements with FERC, and FERC accepted them. *See Algonquin Gas Transmission, LLC*, 143 FERC ¶ 61,023, 61,054 (Apr. 4, 2013).

meet unexpected changes in peak service needs caused, for example, by an unexpected change in temperature."  Order No. 636, 57 Fed. Reg. at 13,726.

The defendants' no-notice contracts are governed by, and incorporate the terms of, Algonquin's FERC-approved tariff, which provides:

> Notwithstanding the quantities nominated by customer and scheduled by Algonquin hereunder, Customer shall be entitled to increase its deliveries up to the MDDO [Maximum Daily Delivery Obligation] *at any point*, up to the MHTQ [Maximum Hourly Transportation Quantity] *during any Hour*, and up to the MDTQ [Maximum Daily Transportation Quantity], *or to decrease its deliveries*.

Algonquin Gas Transmission, LLC, FERC Gas Tariff, Sixth Revised Volume No. 1, Rate Schedule AFT-E § 4.3 (Version 10.0.0) (emphasis added) ("Algonquin FERC Gas Tariff").

Significantly, and as plaintiff concedes, a downward adjustment of a reservation under a no-notice contract does not make the excess capacity available for use by other shippers.  Compl. ¶ 116.  "This is because the contract holder may choose to increase its order again on the same gas day."  *Id.*  This potential for upward reservation adjustments "requires the Pipeline to hold onto the contract holder's *full capacity rights* even if less than that full capacity is nominated in any given order."  *Id.* (emphasis added).  In other words, as mandated by FERC, a no-notice contract reserves all of the no-notice pipeline capacity rights for the no-notice shipper to use during any hour of the day and necessarily does not make that capacity available for use by others.  A no-notice shipper's decision to either increase or decrease its scheduled orders during the day has no effect on the availability of that capacity.  Amending a scheduled order up or down simply does not affect the supply of gas transportation capacity—and therefore can have no effect on price of gas or electricity—because the no-notice contract itself (as approved by FERC tariffs) reserves *all* of its specified quantity regardless of daily or hourly changes to the reservation.

In contrast to a no-notice shipper's FERC-approved authority to modify reservations, FERC regulations and the relevant tariff also permit, *but do not require*, no-notice shippers to

"release" excess capacity for resale and thus use by other shippers. *See* Compl. ¶¶ 58, 60, 116.[5]
Order 636 mandated pipeline capacity release programs by which shippers "can *voluntarily*
reallocate all or part of their firm transportation capacity." 57 Fed. Reg at 13,284 (emphasis
added). Consistent with that order, Algonquin's FERC-approved tariff sets forth the "*sole means*"
by which a shipper with a no-notice contract under the tariff "may release its capacity rights."
Algonquin FERC Gas Tariff, Part 6, Section 14.1 (Version 8.1.0). Under this tariff, a no-notice
shipper "*may* release all or a part of its capacity under an Existing Service Agreement, on a full
Day or a partial Day basis, on a permanent or temporary basis, subject to recall if so specified."
*Id.* at Section 14.2 (emphasis added). But FERC *does not mandate* release of unused capacity by
no-notice shippers. *See, e.g.*, *Tennessee Gas Pipeline Co.*, 102 FERC ¶ 61,075 at ¶ 70 (Jan. 29,
2003). Although the complaint claims the defendants "could" have "formally release[d] their
capacity in the 'capacity release market," Compl. ¶ 117, it does not allege they were required to
do so and identifies no legal obligation to participate in that secondary market.

## B. FERC Exclusively Regulates The Wholesale Electricity Market That PNE Claims Was Affected by Defendants' Conduct

The Federal Power Act ("FPA") also vests in FERC exclusive jurisdiction over wholesale
electricity sales (*i.e.*, sales for resale). *See* 16 U.S.C. §§ 824-824e; *Hughes v. Talen Energy
Mktg., LLC*, 136 S. Ct. 1288, 1292 (2016). FERC has the authority to ensure that the rates for
those sales are just and reasonable. *See* 16 U.S.C. §§ 824d(a), 824e(a). In the six states
constituting the New England region, wholesale electricity is bought and sold in auction markets
administered by the Independent System Operator-New England ("ISO-NE") under a tariff
approved by FERC. *See* Compl. ¶¶ 74, 81. The ISO-NE Transmission, Markets, and Services
Tariff (the "ISO-NE Tariff") governs all aspects of the ISO-NE auctions and market clearing
prices.[6] While ISO-NE markets are designed to result in competitive prices, these markets have

---

[5] *See* Order No. 636, 57 Fed. Reg. at 13,284-86 (approving capacity release in connection with mandating no-notice contracts); Order No. 712, 123 FERC ¶ 61,286 (Jun. 19, 2008); 18 C.F.R. § 284.8 (2008).

[6] *See* 79 FERC ¶ 61,374 (June 25, 1997), *order on reh'g*, 85 FERC ¶ 61,242 (Nov. 17, 1998). Though plaintiff avoids mention of this tariff, it describes the substance of its provisions in setting forth the operation of the markets. *See* Compl. ¶¶ 92-96.

not been "deregulated" as PNE claims, Compl. ¶ 81, since FERC reviews and approves the rules governing the markets and actively polices the market operations under its tariff.

The complaint explains that entities (including affiliates of the defendants) participate in the ISO-NE auction markets in two primary respects: (i) as suppliers, including generators and marketers, that offer and sell wholesale electricity products into the ISO-NE capacity and energy auction markets; and (ii) as distribution utilities, marketers and other load-serving entities ("LSEs") that purchase wholesale electricity products from the ISO-NE capacity and energy auction markets.  *See* Compl. ¶¶ 14, 41, 83, 108 & n.22.  The wholesale prices paid by LSEs and received by generators are set in these FERC-regulated markets.  *Id*. ¶ 91.

### C.    Plaintiff's Allegations and Theory of Liability

According to PNE, the price of wholesale electricity in New England's auction markets depends significantly on the cost of natural gas.  *Id*. at 33.  Eversource and Avangrid own "power plants" in the New England markets "that are not fueled by natural gas."  *Id*. ¶ 108.  These power plants "compete against gas-powered merchant generators" in the New England wholesale electricity markets, *id*. ¶ 14, and "flourish when natural gas supply lags," *id.* at 36.  The potential to profit from inflated wholesale electricity prices allegedly gave defendants the "motivation" to restrict gas transportation capacity on the Algonquin pipeline.  *Id*. ¶ 108.

PNE alleges a scheme in which defendants profited from increased wholesale electricity prices caused by their alleged misconduct in the natural gas transportation markets.  *See id*. ¶¶ 114-16.  PNE theorizes that, acting independently, defendants' LDCs exercised no-notice rights to modify their capacity orders without penalty, reserving more capacity than they needed on certain days and adjusting their reservations downward during the last hours of the trading day.  *Id.* ¶ 115.  These practices allegedly resulted in unused capacity that could not be sold to other willing buyers.  *Id.*  The immediate result, according to PNE, was to restrict the availability of transportation capacity and thus the supply of available gas on the pipeline.  *Id.*  ¶ 117.

PNE is not a purchaser of natural gas transmission capacity.  Nor does it purchase natural gas on the spot market.  PNE instead is a Competitive Energy Power Supplier that purchases electricity at wholesale on the ISO-NE markets and resells to retail customers.  *Id*. ¶ 40.  PNE asserts that the prices it paid for wholesale power were increased when the resulting reduction in natural gas supply caused prices to spike on the natural gas spot markets that many gas-fired generators use to procure fuel for their plants.  *Id*. ¶¶ 12, 122.  Increased natural gas prices "forced gas-fired generators to increase their bids," on the ISO-NE wholesale electricity markets, resulting in a corresponding increase in wholesale electricity prices.  *Id.* ¶¶ 123-24.

PNE claims defendants engaged in this conduct to increase the price paid to electricity generators in the ISO-NE market and thus to make more money on their non-natural gas generated electricity.  *Id*. ¶¶ 138-39.  It asserts that, rather than exercising their no-notice contract rights to modify their daily orders, defendants *should* have released their capacity into the secondary capacity release market, which "would have allowed other actors in the market to use the capacity to fulfill otherwise unmet demand for capacity (relieving price pressure on the spot market price of gas)."  *Id.* ¶ 117.  It seeks monetary and injunctive relief under federal antitrust laws, as well as state consumer protection and unfair business practice laws.

### D.     FERC's Determination of No Anticompetitive Withholding of Capacity

Following publication of the Environmental Defense Fund report on which PNE bases its complaint, FERC investigated the allegations of market manipulation under its jurisdiction over the wholesale natural gas markets.  After an extensive review of public and non-public data, FERC concluded the report was "flawed" and there was "no evidence of anticompetitive withholding" of capacity on the Algonquin pipeline.  *See* FERC News Release (Feb. 27, 2018).

### ARGUMENT

On this Rule 12(b)(6) motion, plaintiff's claims must be dismissed if, accepting all of the well pled allegations of the complaint, they fail as a matter of law.  To survive dismissal, "the complaint must allege 'a plausible entitlement to relief'" as a matter of law. *Fitzgerald v. Harris*,

549 F.3d 46, 52 (1st Cir. 2008) (internal quotation omitted).[7]  Although for "purposes of a motion to dismiss [a court] must take all of the factual allegations in the complaint as true, [it is] not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted).  PNE's complaint fails this standard.

## I.   THE FILED RATE DOCTRINE BARS ALL OF PLAINTIFF'S CLAIMS

Just as in *Breiding*, PNE's claims fail as a matter of law under the "filed rate" doctrine. *See* Mem. and Order at 15-21.  PNE's claims for relief would require this Court to "set aside or second guess [wholesale electricity] rates approved by FERC." *Id.* at 16.  Its theory of liability would require this Court "to enjoin conduct authorized by the tariff governing Defendants' no notice [natural gas transportation] contracts," *id.* at 20, which explicitly permit defendants to engage in the very business practices challenged in the complaint.  To grant relief would require judicial second-guessing of FERC's expert judgments approving the reasonableness of both regulated rates and practices, which is precisely what the filed rate doctrine prohibits. *See Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251 (1951); *Keogh v. Chi. & Nw. Ry.*, 260 U.S. 156, 164 (1922); *Town of Norwood, Mass. v. New England Power Co.*, 202 F.3d 408, 417-20 (1st Cir. 2000).

Where, as here, Congress has committed to a federal agency the authority to approve rates filed under a statutory scheme establishing just and reasonable rates, that filed rate "is made, for all purposes, the legal rate." *Keogh*, 260 U.S. at 163; *see* Mem. and Order at 15-16.  The doctrine protects the primacy of FERC's determinations of wholesale rates: "No court may substitute its own judgment on reasonableness for the judgment of the Commission." *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981).  It applies even where FERC's tariffs permit rates to be set by market forces rather than more traditional cost-based rate setting. *See Norwood*, 202

---

[7] In evaluating this motion, the court may consider "official public records; [] documents central to plaintiffs' claim; or [] documents sufficiently referred to in the complaint." *Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993).  As relevant here, filed tariffs are "the equivalent of a federal regulation," *Cahmann v. Sprint Corp.*, 133 F.3d 484, 488 (7th Cir. 1998), entitled to consideration on this motion, *Lipton v. MCI Worldcom, Inc.*, 135 F. Supp. 2d 182, 186 (D.D.C. 2001), as are orders and records of administrative agencies, such as FERC. *See, e.g.*, *Simon v. KeySpan Corp.*, 785 F. Supp. 2d 120, 124 n.9 (S.D.N.Y. 2011), *aff'd*, 694 F.3d 196 (2d Cir. 2012).

F.3d at 419 (filed rate doctrine applied where "'regulated' [electricity] rates have been left to the free market"); *see Pub. Util. Dist. No. 1 of Snohomish Cty. v. Dynegy Power Mktg., Inc.*, 384 F.3d 756, 761 (9th Cir. 2004).

The crux of the complaint is that defendants' practices in the FERC-regulated natural gas transportation market ultimately resulted in artificially inflated wholesale electricity prices paid by PNE in the FERC-regulated wholesale electricity market. *See supra* at 7-9. But just as in *Breiding*, both the wholesale electricity prices and the conduct that allegedly caused them were explicitly approved by FERC. Accordingly, PNE's claims are foreclosed by the filed rate doctrine for two independent reasons.

*First*, plaintiff's damages claims are explicitly "based on prices in the wholesale electricity market." Compl. ¶ 8. PNE asks this Court to nullify market-based wholesale electricity *rates* that it claims were "artificially high." *Id.* ¶ 169. But as it acknowledges, FERC approved these wholesale electricity rates as part of the tariff governing the ISO-NE. *See id.* ¶¶ 65 ("FERC oversees interstate wholesale energy markets and transmission systems under the authority of the FPA"), 81-96. The auction process described in the complaint was established by a tariff approved by FERC under its authority to determine reasonable wholesale electricity prices. *See id.* ¶ 82 n.2 (citing FERC website on operation of ISO-NE, which notes that "ISO Tariff contains the detailed rules governing the operation of New England's wholesale electricity markets"); ISO-NE Tariff, § III.2.

PNE's claims are precisely what the filed rate doctrine prohibits. *See, e.g., Norwood*, 202 F.3d at 418 (barring antitrust "price squeeze" claims in New England electricity auction markets); *Pub. Util. Dist. No. 1 of Snohomish Cty.*, 384 F.3d at 758-62 (barring claims that defendants withheld electric supply to artificially inflate wholesale electricity prices). As in *Breiding*, "the Court cannot determine Defendants' liability for alleged retail electricity market manipulation without first deciding the reasonableness of wholesale electricity rates approved by FERC as part of the ISO-NE Tariff and auction process." Mem. and Order at 17; *see id.* at 19.

PNE nevertheless seeks to avoid the filed rate doctrine's bar by asserting that it "does not challenge the auction *process*" approved by FERC, but merely an "artificially inflated input that was not FERC-approved," *i.e.,* the spot gas price.  Compl. ¶ 11 (emphasis added).  But that is diversion.  Whether or not PNE challenges the auction *process*, the relief it seeks depends upon seeking to set aside the auction *result*.  As in *Breiding*, to award relief here, "the Court would be required to determine the difference between wholesale electricity rates during the class period and hypothetical rates that would have been charged but for Defendants' purported anticompetitive conduct."  Mem. and Order at 19.  "This is exactly the analysis the filed rate doctrine prohibits."  *Id.* (citing *Wah Chang v. Duke Energy Trading & Mktg., LLC*, 507 F.3d 1222, 1226 (9th Cir. 2007)).

PNE's focus on natural gas spot prices as a component of wholesale electricity rates does not nullify the application of the filed rate doctrine.  The *Breiding* plaintiffs made the same claim, and this Court rejected it.  What matters is not whether natural gas spot prices are regulated by FERC, but whether the relief sought interferes with FERC's authority over the wholesale electricity prices that PNE alleges were inflated.  *See* Mem. and Order at 17-19.

**Second**, the filed rate doctrine also bars PNE's attempts to enjoin the federally approved gas transportation *practices* at the heart of its theory of market manipulation.  PNE alleges that wholesale electricity prices were too high because defendants over-reserved pipeline capacity on the Algonquin pipeline and reduced their orders late in the day to restrict capacity and gas availability for other buyers.  *See, e.g.,* Compl. ¶¶ 116-17, 124.  But FERC not only authorized the flexible scheduling practices that "no-notice" contracts afford, it declared them to be in the public interest.  *See supra* at 5.  As in *Breiding*, PNE asks the Court to "do exactly what the First Circuit declared it cannot, *i.e.,* to alter the terms of tariffs approved by FERC."  Mem. and Order at 21 (citing *Town of Norwood*, 202 F.3d at 420).  Like the *Breiding* plaintiffs, PNE "cannot escape the fact that FERC authorized the business choices that allegedly caused Plaintiffs' injury." *Id*. at 25.

-12-

PNE acknowledges that the FERC-approved no-notice transportation contracts "give an LDC the power to reserve space, or transmission capacity on the pipeline for a given day and time, then adjust that reservation upward or downward at the last minute without penalty." Compl. ¶ 59. These no-notice transportation agreements arise under and incorporate Algonquin's Rate Schedule AFT-E, which grants the LDCs an unfettered right to increase or decrease their deliveries on the Algonquin pipeline "at any point" and "during any Hour" (and in any amount up to their daily allowances) without penalty.  *See* Algonquin Rate Schedule AFT-E, § 4.3.  The contracts give a gas shipper "the flexibility to take delivery of gas greater or less than its scheduled volume."  Order No. 636-A, 57 Fed. Reg. 36,128-01, 36,156 (Aug. 12, 1992).

PNE contends that the defendants' exercise of their no-notice contract rights to amend their reservations downward "during any Hour" resulted in constraints on capacity supply for other shippers, which thus had corresponding effects on the supply and price of gas and downstream electricity.  But this theory is at odds with PNE's own admission that a downward adjustment of a reservation under a no-notice contract does *not* make the excess capacity available for use by other shippers.  Compl. ¶ 116.  As PNE concedes, the LDC's no-notice rights "require[] the Pipeline to hold onto the contract holder's full capacity rights even if less that that full capacity is nominated in any given order."  *Id.*  Thus, an LDC's decision to either increase or decrease its scheduled orders during the day *has no effect* on the availability of pipeline capacity.  *See* Mem. and Order at 7.  Instead, it is the no-notice contract itself (as approved by FERC tariffs) that reserves *all* of an LDC's no-notice capacity *regardless of subsequent changes to the reservation*.

At bottom, PNE's claims do not challenge any particular reservation and amendment decisions of the defendants' LDCs.  Instead, it is the no-notice tariff provisions themselves—in particular, FERC's decision to preserve LDC's flexibility to reliably serve customers—that PNE attacks as anticompetitive.  Plaintiffs' antitrust claims thus go to the heart of FERC's decision to require no-notice service on the Algonquin pipeline—and thus implicate the filed rate doctrine's

bar on challenges to the terms and conditions of service approved by FERC.  This case is thus on all fours with *Breiding* and similarly requires dismissal.

PNE nevertheless seeks to maneuver around the filed rate doctrine by confusing the structure of the relevant markets.  PNE contends throughout the complaint that defendants' conduct manipulated supply in what it calls the "secondary capacity market," which it defines as "all short-term transactions for pipeline capacity."  Compl. at 1 n.3.  PNE alleges that transactions in the secondary capacity market are not regulated by FERC, *id.,* and that the filed rate doctrine is therefore not implicated here.  That is wrong for multiple reasons.

First, PNE's assertion that the "secondary capacity market" (as defined by plaintiff) is not regulated by FERC is incorrect as a matter of law.  FERC exclusively regulates *all* gas transportation transactions under the Natural Gas Act, whether short-term or long-term, and whether primary initial sales or secondary re-sales.  *See* 15 U.S.C. §§ 717(a), (b), 717c(a); *Schneidewind*, 485 U.S. 300-01.  FERC actively regulates the terms and conditions of gas transportation capacity releases.  *See* 18 CFR § 284.8 (regulating terms, conditions, and rates for capacity releases).  Indeed, the "excess capacity release market," which plaintiff describes as a key component of the "secondary capacity market," is, by plaintiff's own description, a creation of FERC regulation.  *See* Compl. ¶¶ 58, 60 (describing FERC Order 636's creation of mandatory capacity release programs).

Second, PNE's claim that defendants *must* be required to release capacity in the secondary capacity market to relieve supply constraints in the gas commodity market is flatly at odds with FERC's decision *not* to mandate such releases.  FERC explicitly gave shippers like LDCs with no-notice contracts the *option* to release excess capacity for use by other shippers, but omitted any *obligation* to release their capacity.  *See* 18 C.F.R. § 284.8; Algonquin Gas Transmission, LLC, FERC Gas Tariff, Sixth Revised Vol. No. 1, Version 8.1.0.[8]  FERC made

---

[8] Relevant state regulators have also explicitly rejected calls to mandate capacity releases.  In 2015, the Connecticut PURA found that the LDCs it regulates had "demonstrated that increasing capacity release would create reliability risks" and "raise prices for firm customers in the aggregate and partially de-fund the natural gas expansion plan." *See* DPUC Consolidated Investigation to Complete Connecticut's Gas Local Distribution Companies' Unbundling

participation in this market voluntary, leaving to the no-notice shippers, such as defendants' LDCs, the discretion whether to revise their orders to meet consumer demand or to release to other shippers. *See supra* at 7; *Tennessee Gas Pipeline Co.*, 102 FERC ¶ 61,075 at ¶ 70 (Jan. 29, 2003). Thus, this Court cannot order defendants to release capacity without countermanding FERC's judgments on how best to regulate no-notice shippers' varied gas requirements.[9]

In any event, none of the misconduct alleged in the complaint took place in this "secondary capacity market." *All* of the alleged wrongful conduct—the over-reserving of capacity and last minute downward modifications of those orders—occurred under defendants' no-notice contracts—in what plaintiff calls the "primary capacity market," which "includes long-term contracts for pipeline capacity between the pipeline and a primary contract holder *transacted at FERC-regulated prices*." Compl. at 1 n.1 (emphasis added). Just as in *Breiding*, PNE claims that this wrongful conduct had *effects* on the spot market for natural gas, by restricting the available supply of gas and thus increasing the price. But these claims cannot proceed without seeking to enjoin the very no-notice transportation practices that FERC has explicitly authorized. The filed rate doctrine forecloses PNE's claims.

---

of Gas Services to Commercial and Industrial Customers, Interim Decision, Docket No. 05-05-10RE01 at 3 (June 4, 2015).

[9] For the same reasons as argued in *Breiding*, PNE's claims are also barred under familiar principles of conflict preemption. PNE seeks to affirmatively require defendants to release capacity where FERC has explicitly left capacity release decisions to the unfettered discretion of the LDCs. PNE also asks this Court to regulate the "proper function" of wholesale electricity markets, notwithstanding FERC's extensive regulation of those markets. Under the "conflict preemption" doctrine, state law claims are preempted where "it is impossible for a private party to comply with both state and federal law" or where the state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000) (citation omitted); *see also Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*, 589 F.3d 458, 472 (1st Cir. 2009). PNE's claims are barred under either prong, and courts have not hesitated to find conflict preemption in similar circumstances. *See Miss. Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 372-77 (1988) (state agency's attempt to alter FERC-ordered allocations of power conflicted with FERC's regulatory authority over the same activity); *Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 928 (9th Cir. 2002); (conflict "readily apparent" where injury stemmed from "the operation of an interstate electricity intertie expressly approved by FERC"); *Entergy Corp. v. Jenkins*, 469 S.W.3d 330, 345 (Tex. App. 2015) (state claims challenging utility purchasing decisions conflicted with discretion to meet capacity needs under FERC tariffs ).

## II.     PNE FAILS TO STATE A COGNIZABLE ANTITRUST CLAIM

PNE's antitrust claims are also fatally flawed.  Simply substituting a wholesale electricity purchaser for the retail electric consumers in *Breiding* does not overcome the complaint's defects.

### A.     PNE Lacks Antitrust Standing

PNE cannot sue under federal or state antitrust laws any more than the *Breiding* plaintiffs can because they too cannot establish "antitrust standing."  *See Breiding, et al v. Eversource, et al*, C.A. No. 17-cv-12274 (DJC), Dkt. 43 (Eversource Mem. Supp. Mot. to Dismiss Plaintiffs' First Amended Class Action Compl.) ("Eversource *Breiding* MTD") at 18-21.  Antitrust standing requires a court to consider a number of factors.  *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983).[10]  Most relevant here is the requirement of "antitrust injury," *i.e.,* injury of a type that Congress sought to redress with the antitrust laws.  Antitrust injury ordinarily arises from effects on competition in the market claimed to be restrained.  *See Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 219 (1990) (dismissing claims on behalf of residential consumers who were indirect purchasers of natural gas because of lack of cognizable antitrust injury).  Consequently, a proper antitrust plaintiff is generally "a customer who obtains services *in the threatened market* or a competitor who seeks to serve that market."  *SAS of P.R., Inc. v. P.R. Tel. Co.*, 48 F.3d 39, 44 (1st Cir. 1995) (emphasis added); *Serpa*, 199 F.3d at 10-11 ("Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injuries.").  That is precisely what this Court held in *Breiding.*  Mem. and Order at 29, 31.

PNE does not claim to be a competitor of Eversource or Avangrid, or even a purchaser in the gas transportation or spot gas markets.  *See* Compl. ¶ 4.  It does not claim to participate in any market in which any defendant allegedly committed anticompetitive acts.  By its own

---

[10] When determining "whether a plaintiff has standing to bring an antitrust action," *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999), courts consider the factors set forth in *AGC*, which include: (1) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ("antitrust injury"); (2) whether the defendant acted with an improper motive; (3) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages.  *Id*. (citing *AGC*, 459 U.S. at 537-45).

account, PNE is a customer in New England's wholesale electricity market, *id.*, several steps removed from the upstream natural gas transportation market plaintiff alleges was restrained by anticompetitive practices.[11]  *See id.* ¶¶ 9-11.  As a wholesale electricity purchaser, PNE's alleged injury is entirely derivative of transactions in the upstream gas markets.  But that is not "antitrust injury."

To be sure, PNE asserts that its status as a purchaser of wholesale electricity (and thus, an *indirect* purchaser of natural gas) "is not an obstacle to [its] standing," and claims it "is the best situated plaintiff to bring this antitrust action."  *Id.* ¶ 12.  But *Breiding* disposed of this argument too.  "Second-best" plaintiffs are disfavored as a matter of law.  *SAS*, 48 F.3d at 44.  And resort to a "second-best" plaintiff is unnecessary where—on PNE's own allegations—other purchasers of gas on the spot market, including electricity generators, could have purchased capacity in the "excess capacity market" had the defendants released it.  *See* Compl. ¶ 117.  If "at least one gas seller or purchaser . . . was consistently deprived the benefits of excess gas transmission capacity due to Defendants' alleged anticompetitive conduct," a directly affected plaintiff with antitrust standing "[s]urely" exists.  Mem. and Order at 29.

Finally, the daisy chain of causation alleged in the complaint is too attenuated to permit relief.  PNE's claims would require the Court to find that misconduct in one upstream market (natural gas transportation), caused prices to increase in a second upstream market (spot natural gas), which, in turn, inflated clearing prices in a third market (wholesale electricity).  Proving even this slightly abbreviated chain of causation would require the Court to second-guess judgments made by regulators, buyers and sellers in numerous complex markets well removed from plaintiff's wholesale electricity purchases.  In turn, that makes damages indirect, speculative, and difficult to apportion.  The complaint never alleges—because it cannot—that gas fired generators *served by Algonquin*, as opposed to gas-fired generators who get their gas

---

[11] To mask its lack of antitrust injury, PNE states it "is the *first* purchaser downstream from the Defendants."  Compl. ¶ 12 (emphasis supplied).  But that is not consistent its own allegations that defendants acted (i) in the gas transportation market, (ii) to inflate prices in the spot market, (iii) which raised prices electric gas-fired generators paid for fuel, and that (iv) only then affected wholesale electricity prices PNE paid.  *Id.* ¶¶ 17-21, 25-30.

elsewhere, ever set the market clearing price for wholesale electricity in the ISO-NE. It simply alleges that bids by most gas-fired generators, regardless of whether their gas came from Algonquin, were "typically based upon the Algonquin Citygate Price," an index that represents the average spot market price. Compl. ¶¶ 10, 101. Indeed, the complaint acknowledges that natural gas-fired generation did not even set the market clearing price in 25-30% of the auctions, *id*. ¶ 98, and that ISO-NE "matches up [generators'] offers and bids to set" prices for each load zone, *id*. ¶ 86.

Plaintiff's claims thus would require the Court to determine—for *every hour* covered by the ISO-NE auction—why each generator that cleared the market bid as it did, whether it might have bid differently had defendants acted differently on that particular day, and what effect that bid differential might have had on the auction market price. It would then have to determine what each market seller should have been paid and what each market buyer should have been charged in the absence of the alleged behavior for the 70-75% of the hours at issue, and then, how any "damages" should be apportioned by allocating these alleged hourly impacts, among PNE and any members of the putative class it purports to represent, and which of the defendants (acting separately) was responsible for what part, if any, of the price increases. This would require the Court to engage in a highly complex hypothetical re-evaluation of the decision-making by the parties directly affected—many of whom are not before the Court—and a hypothetical re-formulation of the entire wholesale ratemaking process, including consideration of the myriad factors that dictate the defendants' scheduling practices, spot market prices, and wholesale electricity prices. This is precisely why *Breiding* held that calculating damages "would be speculative and would present significant concerns regarding apportionment of damages and the risk of duplicative recovery." Mem. and Order at 33.

**B.     The Complaint Does Not Properly Plead "Monopolization" or "Attempted Monopolization"**

Finally, PNE's complaint does not cure the *Breiding* plaintiffs' failure to properly plead the elements of a monopolization or attempted monopolization claim. To state a cognizable

monopolization claim, "a plaintiff must demonstrate (1) that the defendant possesses 'monopoly power in the relevant market,' and (2) that the defendant has acquired or maintained that power by improper means." *Town of Concord v. Bos. Edison Co.*, 915 F.2d 17, 21 (1st Cir. 1990) (citation omitted). Attempted monopolization requires a plaintiff to demonstrate "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

Plaintiff fails to properly plead either claim. Plaintiff first alleges that the relevant natural gas market is the "secondary capacity market," which includes the spot market and the "excess capacity release" market, Compl. ¶ 32, and that the relevant wholesale electricity market includes the day-ahead energy market and the real-time energy market, both of which are run by ISO-NE. *id.* ¶ 33. But, as in *Breiding*, plaintiff fails to identify either defendant's share of those markets. Indeed, PNE does not even claim that either defendant even participates in those markets. To the contrary, it explicitly avers that the defendants caused injury by *not* participating in them.[12] Nor does PNE specifically allege that either Eversource or Avangrid has monopoly power or a dangerous probability of monopolizing any of them.[13] Perhaps most tellingly, the complaint advances the logically impossible contention that Eversource and Avangrid each independently

---

[12] PNE's contention that the defendants engaged in anticompetitive behavior by *not* participating in the "excess capacity market"—which the pleading otherwise does not allege they were required to do – and under circumstances where PNE itself did not participate in that market—is thus a strange breed of a "refusal to deal" claim. But even if it made logical sense, Supreme Court precedent rejects such a "refusal to deal" theory where (i) the alleged refusal involves a regulated firm's failure to provide competitors a service created by regulation; and (ii) a regulatory structure designed to deter and remedy anticompetitive harm exists that can address complaints about insufficient cooperation or excessive rates. *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) (duty to deal with rivals that arises only from regulation does not constitute an antitrust claim for refusal to deal); *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 410 (2004) (insufficient assistance to rivals in the provision of a mandated service "is not a recognized antitrust claim under this Court's existing refusal-to-deal precedents"). Defendants simply had no duty to release gas in the capacity release market or to "supply" the spot market. And that is fatal to plaintiff's claims. *See* Eversource *Breiding* MTD at 16-18.

[13] "Whether a defendant has monopoly power depends on the defendant's 'ability to lessen or destroy competition' in the relevant market." *Sterling Merch., Inc. v. Nestlé, S.A.*, 656 F.3d 112, 125 (1st Cir. 2011) (quoting *Coastal Fuels of P.R., Inc.*. v. *Caribbean Petroleum Corp.*, 79 F.3d 182, 196 (1st Cir. 1996)). Courts virtually never find monopoly power when market share is less than 50 percent. *See, e.g., Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1250 (11th Cir. 2002); *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 826 (6th Cir. 1982); *see also United States v. United Shoe Mach. Corp*, 110 F. Supp. 295, 346 (D. Mass. 1953).

possess monopoly power in the retail electricity market. *See, e.g.*, *Midwest Gas Servs., Inc. v. Ind. Gas Co.*, 317 F.3d 703, 713 (7th Cir. 2003) ("[A] § 2 claim can only accuse one firm of being a monopolist"). As in *Breiding*, the failure to plead the monopoly power of each individual defendant is fatal to plaintiff's monopolization claim. *Breiding* disposed of the plaintiffs' monopolization claim on that very ground—the failure to allege any facts to indicate "that Avangrid and Eversource *each separately* have the power to control or raise prices of any product in any market." Mem. and Order at 37 (emphasis added).

## III.    PNE DOES NOT ALLEGE VIABLE STATE LAW CLAIMS

Plaintiff brings claims as a Statewide Class under Mass. Gen. Laws ch. 93, § 1, *et seq.*, or, in the alternative, as State Specific Class[es] under the consumer protection and antitrust statutes in Massachusetts and New Hampshire. Compl. ¶¶ 187, 199. As in *Breiding*, the "filed rate doctrine applies with equal force" to those claims. Mem. and Order at 38.[14]

## CONCLUSION

For the foregoing reasons, this Court should grant the defendants' motion and dismiss the complaint with prejudice.

---

[14] Massachusetts and New Hampshire's consumer protection statutes exempt from their reach "transactions or actions otherwise permitted under law as administered by any regulatory board or officer acting under statutory authority of the commonwealth or of the United States," Mass. Gen. Laws ch. 93A, § 3, and "[t]rade or commerce that is subject to the jurisdiction of" several regulators, including the "[P]ublic [U]tilities [C]ommission" (the "PUC"), N.H. Rev. Stat. § 358-A:3, which has the power to regulate "competitive energy suppliers," N.H. Rev. Stat. § 374-F:7. Similarly, Massachusetts' Antitrust Law does not apply to "any activities which are subject to regulation or supervision by state or federal agencies; or [ ] any activities authorized or approved under federal, state, or local law." Mass. Gen. Laws ch. 93, § 7(b)-(c).

Dated: September 28, 2018

Respectfully submitted,

/s/ Marguerite M. Sullivan

/s/ John D. Donovan, Jr.

Marguerite M. Sullivan (*pro hac vice*)
Allyson M. Maltas (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh St. NW, Suite 1000
Washington, DC. 20004
Tel: (202) 637-2200
marguerite.sullivan@lw.com
allyson.maltas@lw.com

John D. Donovan, Jr. (BBO #130950)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Tel: (617) 951-7000
Fax: (617) 951-7050
john.donovan@ropesgray.com

U. Gwyn Williams (#565181)
LATHAM & WATKINS LLP
John Hancock Tower, 27th Floor
200 Clarendon Street
Boston, MA 02116
Tel: (617) 948-6000
gwyn.williams@lw.com

Chong S. Park (*pro hac vice*)
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006-6807
Tel: (202) 508-4600
Fax: (202) 508-4650
chong.park@ropesgray.com

*Attorneys for Avangrid, Inc.*

Douglas G. Green (*pro hac vice*)
Shannen W. Coffin (*pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036
Tel: (202) 429-3000
Fax: (202) 429-3902
dgreen@steptoe.com
scoffin@steptoe.com

Duncan R. MacKay (BBO# 556069)
Deputy General Counsel
Eversource Energy
107 Selden Street
Berlin, CT 06037
Tel: (860) 665-3495
Fax: (860) 665-5504
duncan.mackay@eversource.com

*Attorneys for Eversource Energy*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on September 28, 2018.

<u>/s/ *John D. Donovan, Jr.*</u>
John D. Donovan, Jr.