## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

PNE ENERGY SUPPLY LLC, on behalf of itself
and all others similarly situated,

                              Plaintiff,

              v.

EVERSOURCE ENERGY, a Massachusetts
voluntary association, and AVANGRID, INC., a
New York Corporation,

                        Defendants.

Civil Action No. 18-cv-11690-DJC

**ORAL ARGUMENT
REQUESTED**

**LEAVE TO FILE GRANTED ON
OCTOBER 25, 2018**

## PLAINTIFF'S OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS PLAINTIFF'S COMPLAINT

**TABLE OF CONTENTS**

Table of Authorities.................................................................................................................iii

I.     INTRODUCTION .............................................................................................................1

II.    LEGAL STANDARD .......................................................................................................4

III.   FACTUAL BACKGROUND ............................................................................................5

      A.     Defendants' Scheme..............................................................................................5

      B.     The Unregulated Secondary Capacity Market. .....................................................5

      C.     The Wholesale Electricity Auction. ......................................................................7

      D.     Defendants' Withholding of Capacity Drove Up Fuel Costs. ................................8

      E.     The Baked-In Overcharge Moved Unreviewed Through the
           Auction Process. ...................................................................................................9

      F.     Defendants' Conduct Was Intentional and Had No Legitimate Business
           Justification. ..........................................................................................................9

IV.   PNE ALLEGES A CLAIM UNDER SECTION 2 OF THE SHERMAN ACT.................10

      A.     Defendants' Anticompetitive Conduct in the Secondary Capacity Market
           Increased the Fuel Cost Inputs in the Wholesale Electricity Market Auction. ...........10

      B.     Defendants Had Market Power in the Short-Term Secondary Capacity Market. ......11

           1.     PNE Has Adequately Alleged Direct Evidence Defendants Possessed
                 Market Power in the Short-Term Secondary Capacity Market. .....................12

           2.     PNE Has Adequately Alleged Circumstantial Evidence Defendants
                 Possessed Market Power in the Secondary Capacity Market. ..........................14

V.    THE FILED RATE DOCTRINE DOES NOT BAR PNE'S CLAIMS...............................15

      A.     The Filed Rate Doctrine. ....................................................................................15

      B.     The Filed Rate Doctrine Does Not Apply to the Unregulated Short-Term
           Secondary Capacity Market. ...............................................................................16

C.      Defendants' Focus On A "Gas Transportation Market" and "No-Notice"
        Contracts in the Primary Market Are Red Herrings.......................................................17

D.      The Filed Rate Doctrine Does Not Immunize Defendants' Inflation of
        Fuel Costs That Were Incorporated in Wholesale Electricity Rates Without
        Alteration and Passed on to Wholesale Electricity Purchasers....................................20

VI.     PNE IS THE MOST APPROPRIATE PLAINTIFF TO BRING THIS ACTION.............23

A.      The Wholesale Electricity Market Was the Target of the Scheme...............................23

B.      PNE Is the Most Direct Plaintiff. ...............................................................................25

        1.      *Factors 1 & 2* – PNE Was Directly and Intentionally Harmed by
                Defendants' Misconduct in the Targeted Market. ...............................................25

        2.      *Factors 3 & 5* – Directness of the Injury.........................................................26

        3.      *Factors 3 & 4* – The Damages Are Ascertainable, Direct and Can
                Be Proven Class-Wide By Commonly Accepted Methods..............................28

VII.    PNE'S STATE LAW CLAIMS ARE PROPERLY ALLEGED..............................................30

VIII.   REQUEST FOR ORAL ARGUMENT .........................................................................30

IX.     CONCLUSION ..........................................................................................................30

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Am. Gas Ass'n v. F.E.R.C.,*
   912 F.2d 1496 (D.C. Cir. 1990)................................................................................21

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ................................................................................18

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
   459 U.S. 519 (1983) ................................................................................25

*Behrend v. Comcast Corp.,*
   655 F.3d 182 (3d Cir.2011)................................................................................28

*Bell Atlantic v. Twombly,*
   550 U.S. 544 (2007) ................................................................................4

*Bigelow v. RKO Radio Pictures,*
   327 U.S. 251 (1946) ................................................................................28

*Blue Shield of Virginia v. McCready,*
   457 U.S. 465 (1982) ................................................................................25

*Breiding v. Eversource Energy,*
   2018 WL 4344996 (D. Mass. Sept. 11, 2018) ................................................passim

*Broadcom Corp. v. Qualcomm Inc.,*
   501 F.3d 297 (2d Cir. 2007)................................................................................11

*Brown v. MCI WorldCom Network Servs., Inc.,*
   277 F.3d 1166 (9th Cir. 2002) ................................................................................20

*Burke v. Lakin Law Firm, PC,*
   2007 WL 917380 (S.D. Ill. Mar. 26, 2007) ................................................2

*California Motor Transp. Co. v. Trucking Unlimited,*
   404 U.S. 508 (1972) ................................................................................20

*California v. Fed. Power Comm'n,*
   369 U.S. 482 (1962) ................................................................................15

*Cantor v. Detroit Edison Co.,*
   428 U.S. 579 (1976) ................................................................................15

*City of Anaheim v. S. Cal. Edison Co.,*
  955 F.2d 1372 (9th Cir. 1992) ..................................................................23

*Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.,*
  79 F.3d 182 (1st Cir. 1996) .............................................................. 11, 13

*Composite Co. v. Am. Int'l Grp., Inc.,*
  988 F. Supp. 2d 61 (D. Mass. 2013) ..........................................................20

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,*
  370 U.S. 690 (1962) ...................................................................................23

*Díaz Aviation Corp. v. Airport Aviation Servs., Inc.,*
  716 F.3d 256 (1st Cir. 2013) .....................................................................11

*E. & J. Gallo Winery v. EnCana Corp.,*
  503 F.3d 1027 (9th Cir. 2007) ..................................................... 1, 21, 22

*Energex Lighting Indus., Inc. v. N. Am. Philips Lighting Corp.,*
  656 F. Supp. 914 (S.D.N.Y. 1987) .............................................................14

*F.T.C. v. Indiana Fed'n of Dentists,*
  476 U.S. 477 (1986) ...................................................................................12

*Fitzgerald v. Harris,*
  549 F.3d 46 (1st Cir. 2008) .........................................................................4

*Frito-Lay, Inc. v. Bachman Co.,*
  659 F. Supp. 1129 (S.D.N.Y. 1986) ................................................... 10, 13

*Gargano v. Liberty International Underwriters, Inc.,*
  572 F.3d 45 (1st Cir. 2009) .........................................................................4

*Hayden Pub. Co., Inc. v. Cox Broad. Corp.,*
  730 F.2d 64 (2d Cir. 1984) ........................................................................14

*Hosp. Bldg. Co. v. Trustees of Rex Hosp.,*
  425 U.S. 738 (1976) ...........................................................................4, 5, 7

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.,*
  253 F. Supp. 2d 262 (D. Conn. 2003) ...............................................passim

*In re Air Cargo Shipping Servs. Antitrust Litig.,*
  2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ............................................29

*In re Aluminum Warehousing Antitrust Litig.,*
  833 F.3d 151 (2d Cir. 2016) ..........................................................24, 26, 27

*In re Asacol Antitrust Litig.,*
    233 F. Supp. 3d 247 (D. Mass. 2017) ..................................................................... 18, 23, 26

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.,*
    256 F.R.D. 82 (D. Conn. 2009) ................................................................................... 2, 29

*In re Nexium Antitrust Litig.,*
    777 F.3d 9 (1st Cir. 2015) ................................................................................................ 26

*In re Nexium (Esomeprazole) Antitrust Litig.,*
    968 F. Supp. 2d 367 (D. Mass. 2013) ............................................................................. 11

*In re Scrap Metal Antitrust Litig.,*
    527 F.3d 517 (6th Cir. 2008) .......................................................................................... 28

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.,*
    2018 WL 563144 (D. Mass. Jan. 25, 2018) .................................................................... 11

*In re W. States Wholesale Nat. Gas Antitrust Litig.,*
    2017 WL 3610553 (D. Nev. Aug. 22, 2017) ................................................................... 27

*In re Western States Wholesale Nat. Gas Antitrust Litig.,*
    715 F.3d 716 (9th Cir. 2013) .......................................................................................... 21

*Int'l Distribution Centers, Inc. v. Walsh Trucking Co., Inc.,*
    812 F.2d 786 (2d Cir. 1987) ........................................................................................... 14

*J. Truett Payne Co. v. Chrysler Motors Corp.,*
    451 U.S. 557 (1981) ......................................................................................................... 28

*M & M Med. Supplies & Serv. v. Pleasant Valley Hosp., Inc.,*
    981 F.2d 160 (4th Cir. 1992) .......................................................................................... 14

*Meijer, Inc. v. Ranbaxy Inc.,*
    2016 WL 4697331 (D. Mass. June 16, 2016) ............................................................ 4, 9, 12

*Merced Irrigation Dist. v. Barclay's Bank PLC,*
    165 F. Supp. 3d 122 (S.D.N.Y. 2016) ............................................................................. 10

*Mishawaka v. Am. Elec. Power Co.,*
    616 F.2d 976 (7th Cir. 1980) .......................................................................................... 26

*Mitchell v. Mass. Dep't of Corr.,*
    190 F. Supp. 2d 204 (D. Mass. 2002) ............................................................................... 4

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma,*
    468 U.S. 85 (1984) ............................................................................................................. 9

*Natural Gas Anti-Trust Cases I, II, III, & IV,* Nos. 4221, 4224, 4226, 4228,
2004 WL 5746134 (Cal. Super. San Diego, Sept. 30, 2004)................................16

*New York v. F.E.R.C.,*
535 U.S. 1 (2002)........................................................................................................15

*Newman v. Lehman Bros. Holdings Inc.,*
901 F.3d 19 (1st Cir. 2018)..........................................................................................4

*Otter Tail Power Co. v. United States,*
410 U.S. 366 (1973)....................................................................................................15

*SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.,*
48 F.3d 39 (1st Cir. 1995)..........................................................................................26

*Scheur v. Rhodes,*
416 U.S. 232 (1974).....................................................................................................4

*Simon v. KeySpan Corp.,*
694 F.3d 196 (2d Cir. 2012)......................................................................................27

*Southaven Land Co. v. Malone & Hyde, Inc.,*
715 F.2d 1079 (6th Cir. 1983)...................................................................................27

*Story Parchment Co. v. Paterson Parchment Paper Co.,*
282 U.S. 555 (1931)....................................................................................................28

*Town of Norwood, Mass. v. F.E.R.C.,*
217 F.3d 24 (1st Cir. 2000)........................................................................................15

*Town of Norwood, Mass. v. New England Power Co.,*
202 F.3d 408 (1st Cir. 2000)................................................................................15, 20

*Tyson Foods, Inc. v. Bouaphakeo,*
136 S. Ct. 1036 (2016)...............................................................................................28

*U.S. v. Gen Dynamics Corp.,*
415 U.S. 486 (1974)....................................................................................................11

*Vazquez v. Surillo-Ruiz,*
76 F. Supp. 3d 381 (D.P.R. 2015)...........................................................................18

*Virgin Atl. Airways Ltd. v. British Airways PLC,*
872 F. Supp. 52 (S.D.N.Y. 1994)............................................................................14

**<u>Rules</u>**

Fed. R. Civ. P. 12 (b)(6) ........................................................................................................................ 4, 28

**<u>Regulations</u>**

18 C.F.R. § 284.8(a) ........................................................................................................................6, 9, 16, 17

## I.   INTRODUCTION

Not surprisingly, the bulk of Defendants' Motion to Dismiss[1] is premised upon their mistaken assertion that the Compliant filed by ***this*** Plaintiff, PNE Energy Supply LLC ("PNE" or "plaintiff"),[2] is indistinguishable from the recently dismissed *Breiding* case. *See Breiding v. Eversource Energy*, No. 17-cv-12274, 2018 WL 4344996 (D. Mass. Sept. 11, 2018).[3] Both allege the same general conduct – restricting the supply of natural gas to drive up the price of wholesale electricity – but PNE has alleged materially different facts.

Nonetheless, Defendants try to shoehorn PNE's complaint into the *Breiding* ruling by blatantly misrepresenting what PNE has alleged.  Some of the critical facts alleged by PNE (and not alleged in *Breiding*) include:

- that Defendants' anticompetitive scheme began in the short-term Secondary Capacity Market[4] – a market that was not alleged or considered in *Breiding*;

- that the short-term Secondary Capacity Market for gas is not regulated by FERC;

- that Defendants manipulated the spot market price for natural gas (and the related Algonquin Citygate Price) with the knowledge and intent that supra-competitive fuel costs would be incorporated in and passed through the ISO-NE wholesale electric auction process unaltered, making the filed rate doctrine inapplicable, *see, e.g., E. & J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1048 n.15 (9th Cir. 2007), discussed in Section V.D, *infra*;

- that Defendants separately possessed market power in the short-term Secondary Capacity Market – the relevant market for assessing market power in this case;

- that PNE was the first purchaser in the market that was the target of the Defendants' illegal conduct, making it the best Plaintiff to bring this action; and

---

[1]   Defendants Eversource Energy ("Eversource") and Avangrid, Inc. ("Avangrid"), collectively "Defendants," filed a joint Motion to Dismiss Plaintiff's Complaint ("Defendants' Motion") and a Memorandum of Law in support thereof ("Def. Brief").  *See* ECF No. 22.

[2]   ECF No. 1.  All citations to the "Complaint" herein are to the PNE Complaint.

[3]   The Court granted Defendants motions to dismiss in *Breiding* on September 18, 2018.  *See Breiding*, 2018 WL 4344996.

[4]   *See* Section III.B, *infra,* explaining contours of short term Secondary Capacity Market, including component spot market.

- that PNE paid supra-competitive fuel costs when it purchased electricity in the wholesale electricity market, and that these overcharges are typical of the types of damages proven in antitrust actions and can be calculated using commonly accepted economics tools, *see, e.g., In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 96 (D. Conn. 2009) (multiple regression analysis using data and information common to a class is accepted tool for proving class wide damages in an antitrust class action).[5]

Ultimately, Defendants seek to paint this case as unmanageably complex with multiple layers of highly regulated markets presenting difficulties that run so deep that dismissal is required because that is their best chance to succeed. Yet, Defendants begin by attempting to rewrite PNE's complaint, completely ignoring allegations regarding the short-term Secondary Capacity Market. Instead, they claim that there is a "gas transportation market" in which all of PNE's claims rise and fall. *See* Def. Brief, at 17 n.11. Yet, Defendants irrelevant[6] "gas transportation market" is fabricated solely so they can use their "no notice contract" defense from *Breiding* as "a procrustean bed" to defeat PNE's claim, ignoring the fact that PNE's allegations simply do not "fit" their defense – PNE has not alleged that there is a "gas transportation market." PNE's complaint speaks for itself and all of Defendants' contrary allegations should be ignored.

Defendants invoke their factual distortions regarding "no-notice" contracts to argue PNE's claims are preempted based upon their mischaracterization of the FERC-approved Algonquin Pipeline Tariff. As explained herein, Defendants' argument fails factually because PNE's claims are not based on alleged abuse of no-notice contracts.[7] Additionally, Defendants' legal argument, that unfettered

---

[5] In fact, the economists who initially brought Defendants' misconduct to light have already done such a calculation on a preliminary basis. *See, e.g.,* Compl., ¶ 119 n.28 (citing Levi Marks, Charles F. Mason, Kristina Mohlin & Matthew Zaragoza-Watkins, *Vertical Market Power in Interconnected Natural Gas and Electricity Markets* (Oct. 11, 2017) ("EDF Study")).

[6] *See Burke v. Lakin Law Firm, PC*, No. 07-cv-0076, 2007 WL 917380, at *2 (S.D. Ill. Mar. 26, 2007) ("The Plaintiff is the master of his complaint and the Defendant cannot simply re-write the complaint.").

[7] As discussed in greater detail in Section V.C, *infra*, Defendants' use of their no-notice contract rights was not an indispensable part of their anticompetitive scheme.

exercise of their "no-notice contracts" rights was "explicitly approved by FERC,"[8] is also false. Despite Defendants selectively quoting from the relevant tariff,[9] an honest review of the Tariff, Rate Schedule and Service Agreement[10] reveals that FERC **explicitly limited Defendants' exercise of no-notice rights** so that Defendants' conduct must still conform with prevailing law, including the antitrust laws.

The wrongdoing alleged by PNE is little more than a run-of-the-mill antitrust case where a defendant leverages its market power in "market A" to intentionally raise the price of a product in "market B." *See, e.g., Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 266 (D. Conn. 2003) (denying a motion to dismiss where plaintiff alleged defendants used their market power to affect the price of butter futures to raise the price plaintiffs paid in the related markets for milk, cream, and butter). [11] At the end of the day, Defendants exploited a regulatory gap: because "market A" (the Secondary Capacity Market) was not subject to FERC oversight, Defendants were able to sow the seeds of their overcharge (inflating the fuel prices and the Algonquin Citygate Gas Price) knowing it would be incorporated in fuel costs passed through the wholesale electricity auction process unaltered and unreviewed, allowing Defendants to reap the rewards of their misconduct in "market B." PNE, a purchaser of wholesale electricity in "market B," was directly harmed by Defendants' misconduct in "market A" and PNE's damages, comprised of fuel cost overcharges, can be easily calculated without infringing on FERC regulated rate setting by use of standard and routine economic models that are widely accepted.

---

[8]   Def. Brief, at 11, 13.

[9]   *Id.* at 6, 13.

[10]   *See* Algonquin Gas Transmission, LLC, FERC Gas Tariff, dated April 1, 2016 (attached hereto as Exhibit "A") ("Tariff"); associated Rate Schedules, dates May 17, 2010 (attached hereto as Exhibit "B") ("Rate Schedule AFT-E"); Sample Service Agreement for Eversource subsidiary NSTAR Gas Company, dated May 3, 2011 (attached hereto as Exhibit "C") ("Service Agreement").

[11]   *See* Section V.D, *infra.*, discussing *Ice Cream* to prove standing and injury.

Based upon the foregoing, and as more fully set forth herein, when viewed under the proper legal standards, it is clear that Defendants' Motion should be denied.

## II.     LEGAL STANDARD

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court "accept[s] as true all well-pleaded facts in the complaint and draw[s] all reasonable inferences in favor of the plaintiffs." *Gargano v. Liberty Int'l Underwriters, Inc.*, 572 F.3d 45, 48 (1st Cir. 2009). *See Newman v. Lehman Bros. Holdings Inc.,* 901 F.3d 19, 25 (1st Cir. 2018) (in addition to complaint and attached exhibits, on a Rule 12(b)(6) motion, the court may consider: documents where authenticity is not disputed; documents central to plaintiff's complaint; and documents sufficiently referred to in the complaint).

The complaint need only "allege 'a plausible entitlement to relief.'" *Fitzgerald v. Harris*, 549 F.3d 46, 52 (1st Cir. 2008). "[A] well-pleaded complaint may succeed even if . . . actual proof of those facts is improbable." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Stated differently, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations and footnote omitted). Accordingly, a motion to dismiss must focus not on whether the plaintiff will ultimately prevail, but whether he or she is entitled to offer evidence to support the claims. *Mitchell v. Mass. Dep't of Corr.*, 190 F. Supp. 2d 204, 208 (D. Mass. 2002) (quoting *Scheur v. Rhodes*, 416 U.S. 232, 236 (1974)).

In addition, courts have found that "[i]n antitrust cases, 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'" *Meijer, Inc. v. Ranbaxy Inc.*, No. 15-cv-11828, 2016 WL 4697331, at *8 (D. Mass. June 16, 2016) (quoting *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976)). As set out herein, applying Rule 12(b)(6)'s "highly deferential

standard of review" to the unique "direct" and "inferential" factual allegations in PNE's Complaint compels denial of Defendants' Motion.

## III.    FACTUAL BACKGROUND

### A.    Defendants' Scheme.

As the Court is surely aware at this point, Defendants have significant operations in both the natural gas industry and electricity generation industry in New England.[12]   *See* Compl., ¶¶ 1, 14-17, 41-42, 103-07.  The misconduct alleged in this case was possible because Defendants were able to abuse their position in the natural gas market to generate increased revenue and therefore increased company-wide profits in the wholesale electricity market.  *Id.,* ¶¶ 1, 15, 17, 21-24, 29-30, 103-42.

### B.    The Unregulated Secondary Capacity Market.

As part of their retail gas operations, Defendants own capacity rights on the Algonquin Gas Transmission pipeline (the "Pipeline").  *Id.,* ¶¶ 17, 104-05.  Companies holding more capacity rights than they will use in a given day are expected to, and usually do, sell that excess capacity in the Secondary Capacity Market[13] so that it can be utilized, allowing the Pipeline to run more efficiently.  *Id.,* ¶¶ 17-18, 60.  There are numerous ways that excess capacity can be sold or transferred, including: direct bilateral transactions between holders of capacity rights and those seeking to purchase short-term capacity; and capacity holders releasing capacity to the Pipeline to be advertised and sold on the Pipeline's "excess capacity release market" (*i.e.* the "Bulletin Board").  *Id.,* at 1 n.3, ¶¶ 18, 32, 60, 140.[14] The Secondary Capacity Market includes a "spot market" for natural gas where short-term purchasers

---

[12]   Plaintiff alleges that the relevant geographic market is New England.  *See, e.g.,* Complaint ("Compl.")., at 1 n.2 (defining New England gas and electricity market), ¶¶ 1, 14, 17, 114 and throughout the Complaint114. Eversource operates in New England through six wholly-owned subsidiaries.  *See id.,* at 1-2 n.4.  Avangrid operates in New England through seven family companies.  *Id.,* at 2 n.5.

[13]   The Secondary Capacity Market as defined in the Complaint, is comprised of short-term transactions for capacity on the Pipeline. *See* Compl., at 1 n.3, ¶ 32.

[14]   As part of the deregulation process, FERC mandated that pipelines establish a Bulletin Board as one means that could be used to resell capacity not being used.  *See* Compl., ¶¶ 60.

of natural gas buy "bundled" transportation and gas. *Id.*, at 1 n.3, at ¶ 32. Collectively, these short-terms transactions comprise the short-term "Secondary Capacity Market." *Id.* This is wholly distinct from the "primary capacity market" which includes long-term contracts for capacity between the Pipeline and primary contract holders, like the Defendants. *Id.*

The spot market price is the driving force for ***all*** short-term purchases of natural gas because, among other things, short-term natural gas purchasers use the Algonquin Citygate Price – an index of the average price paid for natural gas on the spot market – to assess the current (Secondary Capacity Market) price of natural gas. *Id.*, ¶¶ 10, 27, 101.

Pricing of the gas in the Secondary Capacity Market (including the spot market) is explicitly unregulated and therefore, subject only to the rules of supply and demand. *Id.*, ¶¶ 10, 17, 19, 28, 32, 63-64, 80, 101-02, 140; *see also* 18 C.F.R. §§ 284.8(b)(2) ("no rate limitation applies ***to the release of capacity for a period of one year or less***" (emphasis added)), (h)(1)(iv) (any release of capacity of "31 days or less" is exempt from any bidding process set forth in Section 284.8).[15] As a result, the greater the supply of natural gas, or the lower the demand, the lower the spot market price; and conversely, the lower the supply or the higher the demand, the higher the spot market price. *Id.*, ¶¶ 19, 63-64. The supply of natural gas available to electricity generators is dictated, in large part, by the amount of capacity available in the Secondary Capacity Market and varies based upon various factors, including weather. *Id.*, ¶¶ 20. For example, in colder months, consumers use more natural gas and, accordingly, less capacity is available for the Secondary Capacity Market. *Id.*, ¶¶ 20, 126-28, 136.

---

[15]  *See also Natural Gas Anti-Trust Cases I, II, III, & IV*, Nos. 4221, 4224, 4226, 4228, 2004 WL 5746134 (Cal. Super. San Diego, Sept. 30, 2004) (After noting defendants' misconduct took place in the "unregulated spot market for natural gas," the court stated "'there is neither a filed rate nor a federal preemption bar to . . . antitrust claims challenging non rate anticompetitive conduct.' . . . FERC does not and will not regulate spot market prices or address or provide a remedy for Defendants' conspiratorial conduct.").

C.       **The Wholesale Electricity Auction.**

PNE is a competitive energy supplier, also known as an electricity marketer, who purchases electricity directly in the New England Wholesale Electricity Market and then resells it to retail consumers.[16]  *Id.,* ¶¶ 4-6, 12, 40.  Competitive energy suppliers like PNE provide enhanced choice for electricity consumers.  *Id.,* ¶¶ 5, 40.  Because they are often obligated to provide electricity at a set price, they are particularly vulnerable when pricing in the Wholesale Electricity Market unexpectedly rises.  *Id.,* ¶¶ 5, 6, 40.

Purchases in the Wholesale Electricity Market take place through a "stacked" auction process where electricity generators submit bids indicating how much electricity they can supply and at what price.  *Id.,* ¶¶ 26-28.  The bids are "stacked" by cost (lowest to highest) and then matched against expected electricity demand, with the lowest bids being accepted first until the supply equals the demand.  *Id.,* ¶¶ 28.  The price paid for the last accepted unit of electricity in the supply stack becomes the price paid to all suppliers whose bids are accepted – this is known as a "Uniform Clearing Price" (sometimes called the "market clearing price"). *Id.*

The electricity generator bid process is the key to understanding how Defendants' scheme operated.  The bids submitted by electricity generators are comprised of three separate components: (1) the generator's fuel costs per MWh; (2) the generator's fixed costs; and (3) the generator's startup costs (if the facility is idle).  *Id.,* ¶¶ 9-10, 26-28.  "Fuel costs" directly reflects the generators' cost for fuel to run its generating facility, be it natural gas, coal, oil or some other alternative fuel.  *Id.,* ¶¶ 27.  Gas-fired generators do not purchase gas unless or until their bid is accepted and they will be "dispatched."  *Id.,* ¶¶ 10, 27.  Accordingly, gas-fired generators use the spot price for natural gas or

---

[16]    In doing so, PNE competes directly with the Defendants' subsidiaries that service retail consumers.  By engaging in this misconduct, Defendants have also further bolstered their competitive position by financially harming their competitors.  Compl., ¶¶ 7.

Algonquin Citygate Price to determine the fuel costs they put in their bid. *Id.,* ¶¶ 10, 25, 26-27, 101. The fuel cost of the bid used to set the Uniform Clearing Price is simply passed through the auction process unchanged and unreviewed. *Id.,* ¶¶ 11, 25; *see also* Def. Brief at Ex. A, at 2 (Eversource's counsel's letter stating "All other costs – including for fuel – were required to be passed through to customers without markup.").

> ### D.     Defendants' Withholding of Capacity Drove Up Fuel Costs.

Defendants' natural gas operations possess significant long-term contracts – known as no-notice contracts – giving them the power to reserve transmission capacity on the Pipeline for a given day. *Id.,* ¶¶ 17, 105. Defendants' control of capacity on the Pipeline also gave them the ability to restrict supply in the Secondary Capacity Market, particularly on colder days when capacity was already scarce (and demand as high), Defendants could possess the vast majority of excess Pipeline capacity that should have been available to purchasers in the Secondary Capacity Market. *Id.,* ¶¶ 17, 20, 107, 126-28, 136. Defendants intentionally withheld capacity from the Secondary Capacity Market to restrict supply, causing an increase in the spot market price for natural gas and associated Algonquin Citygate Price. *Id.,* ¶¶ 1, 16-25, 29-30, 103-42.

One way that Defendants could withhold supply was by over-scheduling capacity and then failing to timely release it so that it could not be resold by the Pipeline using the Bulletin Board. *Id.,* ¶¶ 21, 24, 60, 114-17, 122, 129-31, 134-35, 140. Unlike the normal process where capacity is released throughout the trading day and made available to companies that need short-term supply, Defendants released their excess capacity only at the very end of the trading day when it was too late to be resold, thereby decreasing the supply of natural gas available in the Secondary Capacity Market. *Id.* In addition, Defendants could have sold their excess capacity in the Secondary Capacity Market through bilateral agreements but chose not to do so, leaving the capacity unused. *Id.,* at 1 n.3, ¶¶ 32, 50, 60-63, 50, 80.

Defendants' withholding conduct, and the resulting spike in the spot market price for natural gas (and related Algonquin Citygate Price), all happened outside the purview of any regulatory agency. Simply put, no one was monitoring or reviewing transactions in the Secondary Capacity Market, nor was anyone reviewing the reasonableness of the spot market price for natural gas.[17]  *Id.,* ¶¶ 8, 10, 17, 19, 28, 32, 63-64, 80, 101-02, 140; *see also* 18 C.F.R. § 284.8(b)(2), § 284.8(h)(1)(iv).

E.      **The Baked-In Overcharge Moved Unreviewed Through the Auction Process.**

Because the spot market price for natural gas and Algonquin Citygate Price were driven up by Defendants' conduct, gas-fired generators included the supra-competitive fuel costs as the first component of their bids in the Wholesale Electricity Market auction.  *Id.,* ¶¶ 9-10, 25-28.  As a result, whenever the Uniform Clearing Price paid by all electricity purchasers was set by reference to a gas-fired generator's bid, the Uniform Clearing Price included, without change or mark-up, the supra-competitive fuel cost that was included in the generator's bid.  *Id.,* ¶¶ 11, 25; *see also* Def. Brief, at Ex. A, at 2.

F.      **Defendants' Conduct Was Intentional and Had No Legitimate Business Justification.**

Defendants' incentive to engage in the alleged misconduct was profit, pure and simple. Defendants increased their overall company-wide profitability by foregoing revenue they could have earned by selling in the Secondary Capacity Market in exchange for earning greater revenues by selling electricity that included supra-competitive fuel costs in the Wholesale Electricity Market.[18]  *Id.,* ¶¶ 23,

---

[17]   Over the years, energy markets have generally moved from highly regulated to deregulated markets such as those in New England, a trend which continues.  For background on this move to deregulation, see paragraphs 43 through 72 of the complaint.

[18]   Defendants attach correspondence initiated by them asking for PNE to withdraw its complaint and threatening to move for sanctions pursuant to Federal Rule of Civil Procedure 11.  *See* Def. Brief, at Ex. D. The sole purpose of Defendants attaching these letters would appear to be their desire to get before the Court Eversource's ***factual*** argument that Plaintiff's allegations regarding Defendants' motive is misplaced.  *Id.* at 2. However, whether or not Defendants' profits increased as a result of their misconduct is a factual issue not appropriate for determination on a motion to dismiss – the fact is that PNE has properly alleged that the

30, 141-42.  Defendants' illicit profits were even larger because their long-term gas contracts were no-notice contracts, meaning that Defendants did not have to pay penalties or fines for down-scheduling at the end of the day.  *Id.,* ¶¶ 59, 105, 106.  However, even if Defendants had not been operating under no-notice contracts, they still could have operated their scheme, it would have just been less profitable.  *Id.,* ¶¶ 59, 106.  There was no legitimate business justification to engage in this conduct as evidenced by the fact that, among other things, similarly situated energy companies did not engage in the same behavior.  *Id.,* at ¶¶ 1, 24, 129-138, 140.

## IV.   PNE ALLEGES A CLAIM UNDER SECTION 2 OF THE SHERMAN ACT.

### A.   Defendants' Anticompetitive Conduct in the Secondary Capacity Market Increased the Fuel Cost Inputs in the Wholesale Electricity Market Auction.

PNE has properly alleged that Defendants used their "market power"[19] in the Secondary Capacity Market to unlawfully raise the spot market price for natural gas and the related Algonquin Citygate Price with the intent of collecting more revenue from purchasers in the New England Wholesale Electricity Market.  *See generally Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 140-41 (S.D.N.Y. 2016) (use of monopoly power to manipulate index causing purchasers in electricity market tied to index to be overcharged).  Defendants' decision to unilaterally withhold capacity from the Secondary Capacity Market had no legitimate business purpose[20] and was done

---

**increase in revenue** in the Wholesale Electricity Market led to **an increase in company-wide profits**. Notably, Eversource's counsel does not dispute this but instead focuses on the related, but not identical, concept of whether Eversource "profited" in the Wholesale Electricity Market. *Id.* at 2.  Discovery will likely reveal that the actual "return on capital" increases as revenues increase, Plaintiffs are entitled to prove that claim.

[19]   "The terms "market power" and "monopoly power" are used interchangeably and, for purposes of the Sherman Act, are defined as "the power to control prices or exclude competition." *See Meijer*, 2016 WL 4697331, at *15.  *See also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 109 n.38 (1984) ("Market power is the ability to raise prices above those that would be charged in a competitive market.").

[20]   Defendants' claims that they needed to retain their excess capacity so they could respond to unexpected changes in the weather by ramping up their deliveries during the day strains credulity and is factually undercut by the terms of the applicable tariff.  *See* 8/1/2018 Hearing Tr., attached hereto as Exhibit "D," at 10:13-18, 15:2-7; *see also* Rate Schedule AFT-E, Ex. B, at §§ 2.1, 2.2 (restricting the amount of capacity that can be utilized

solely for the purpose of putting an unnecessary restriction on competition to drive up the spot market price of natural gas and the Algonquin Citygate Price – the very essence of anticompetitive conduct. *See id.* at 142-43 (noting "anticompetitive" should not be interpreted narrowly – conduct intended to inflate market prices was anticompetitive).  Here, the purpose of Defendants' scheme was to reap more company-wide profits by increasing revenue in the Wholesale Electricity Market than the profit they passed up for selling excess capacity in the Secondary Capacity Market. *See id.* at 130 (defendant Barclays lost $4 million in one market to gain $34.9 million as a result of the price manipulation).

**B.    Defendants Had Market Power in the Short-Term Secondary Capacity Market.**

Defendants claim PNE's allegations are insufficient because the Complaint failed to explicitly "identify" Defendants' "market share."  Def. Brief, at 19.  Assessing market share at the motion to dismiss phase is generally disfavored because the market and effects thereon are fact issues best assessed after allowing for discovery.  *See, e.g., Frito-Lay, Inc. v. Bachman Co.*, 659 F. Supp. 1129, 1139 (S.D.N.Y. 1986) (holding that it would be premature to grant a motion to dismiss a monopolization claim because whether monopoly power exists is a question of fact.); *accord United States. v. Gen Dynamics Corp.*, 415 U.S. 486, 494-510 (1974) (holding that "only a further examination of the particular market – its structure, history and probable future – can provide the appropriate setting for judging . . . probable anticompetitive effect[s]").  That being said, the "relevant market" for assessing market power in this case is the short-term Secondary Capacity Market, where PNE alleges Defendants used their market power to influence the fuel cost price paid in the separate Wholesale Electricity Market.

---

by any one entity on an hourly basis to no more than 0.06 of its maximum daily transportation quantity, MDTQ).  Defendants are large, sophisticated corporate entities whose internal forecasting and modelling is capable of knowing how much natural gas they need to flow throughout the day to service their customers. Even so, Rate Schedule AFT-E heavily limited Defendants from making the type of adjustments they now claim might have been necessary. *See* Rate Schedule AFT-E, Ex. B, at §§ 2.1, 2.2.  By way of example, on a day where Defendants did not schedule their full rights, at some point it becomes mathematically impossible for Defendants to use their full reserved capacity.

Defendants' market power argument misstates the law and the facts: first, they mistakenly assert that Plaintiff must allege market share to show market power; second, they fail to note that Plaintiffs adequately alleged Defendants' share of the Secondary Capacity Market. As this Court has acknowledged, market power may be proved – *either* (1) from direct evidence, meaning the existence of supra-competitive prices and restricted output, *or* (2) inferred from circumstantial evidence regarding the structure and composition of the relevant market (*i.e.,* allegations of a specific market share). *See In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.,* No. 14-md-02503, 2018 WL 563144, *5 (D. Mass. Jan. 25, 2018) (Casper, J.) (citing *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.,* 79 F.3d 182, 196-97 (1st Cir. 1996)); *see also Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297, 307 (2d Cir. 2007). Here, PNE has sufficiently alleged that Defendants possessed market power in the secondary capacity market under *both* standards.

### 1.    PNE Has Adequately Alleged Direct Evidence Defendants Possessed Market Power in the Short-Term Secondary Capacity Market.

"Direct evidence of market power may include evidence of 'actual supra-competitive prices and restricted output.'" *Solodyn Antitrust Litig.,* 2018 WL 563144, at *10 (quoting *Coastal Fuels,* 79 F.3d at 196). A plaintiff who adequately alleges "direct evidence" of market power is *not* required to define a relevant market and is *not* required to allege that a defendant has a dominant share of that market. *Id.* (citing *Díaz Aviation Corp. v. Airport Aviation Servs., Inc.*, 716 F.3d 256, 265 (1st Cir. 2013); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 388 n.19 (D. Mass. 2013)). The logic behind this is straightforward: the purpose of inquiries into "market definition" and "market power" is to act as a "surrogate for detrimental effects." *Meijer,* 2016 WL 4697331, at *15 (citation omitted).

Here PNE has properly alleged that Defendants' misconduct resulted in significant detrimental effects: restriction of supply in the short-term Secondary Capacity Market and resulting increased spot market gas prices and related Algonquin Citygate Prices. *See, e.g.,* Compl., ¶¶ 11, 112,

117, 119, 121, 122.   Accordingly, PNE has adequately alleged "direct evidence" to infer that Defendants possessed market power in the Secondary Capacity Market.

Defendants also claim that market power is not properly alleged because PNE alleges that Defendants did not "participate" in the Secondary Capacity Market.   This argument also misses the point.   The short-term Secondary Capacity Market is comprised of the amount of capacity that is *or should be* available to be resold on a given day, and the amount of gas that Defendants withheld from the market is relevant and knowable.   Therefore, the effects Defendants' refusal to sell had on supply and prices in the Secondary Capacity Market can be determined.

Moreover, Defendants' position was rejected by the *Meijer* court that discussed whether a plaintiff properly alleged market power where "the product never actually reached the market and earned no profits."   2016 WL 4697331, at *15.   The court noted that, like here, proving "market power" by alleging a percentage of market share was unnecessary because:

> The "purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition," and therefore "'proof of actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into market power which is but a 'surrogate for detrimental effects.'"

*Id.* (quoting *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 477, 460-61 (1986) (quoting 7 P. Areeda, Antitrust Law ¶ 1511, p. 429 (1986))).   Accordingly, the court found the "market power" requirement met by allegations, like those made by PNE here, regarding the actual detrimental effects on the market and financial harm to consumers" resulting from defendants' supply restrictions.   *Id.* at *15. The essence of PNE's complaint is that the Defendants' "supply restriction" had a detrimental effect on the Secondary Capacity Market and, in turn, on the Wholesale Electricity Market, with the intended purpose of causing "financial harm" to PNE and the proposed class of wholesale electric consumers.   Accordingly, PNE has properly pled direct evidence of "market power" and Defendants' "we didn't sell in the market" argument fails.

### 2. PNE Has Adequately Alleged Circumstantial Evidence Defendants Possessed Market Power in the Secondary Capacity Market.

PNE has also alleged sufficient circumstantial evidence that Defendants possessed market power. Circumstantial evidence of market power involves showing that the "defendant has a dominant share in a well-defined relevant market." *Solodyn Antitrust Litig.,* 2018 WL 563114, at *5 (quoting *Coastal Fuels,* 79 F.3d at 197 (alterations in original)). PNE has properly alleged a relevant geographic market consisting of the six New England states that are supplied predominantly by Pipeline, *see, e.g.,* Compl. at 1 n.2, ¶¶ 76-80, and a relevant market – the Secondary Capacity Market, *see, e.g., id.* at 1 n.3, ¶ 32. In addition, PNE has adequately alleged that the Secondary Capacity Market is unique in that it has its own set of buyers and sellers who lack reasonable alternatives. *See id.,* ¶¶ 32, 50, 51.

Most importantly, PNE alleges that each Defendant, on their own, controls a "vast majority" of the relevant market on critical days when demand for capacity peaked. *See id.,* ¶ 107; *see also id.* ¶ 120. This is ***not*** an allegation based on a "shared monopoly" theory of liability, it is an allegation with respect to the individual market power of each defendant on a given day. *See, e.g., id.,* ¶¶ 16-17, 107. The data necessary to determine the daily demand, daily supply and the effect each Defendant had on prices in the short-term Secondary Capacity Market is discoverable. Accordingly, PNE should be allowed to substantiate its well pled claims. *See Frito-Lay,* 659 F.Supp. at 1139 (whether monopoly power exists is a question of fact).

Under any reasonable interpretation, Plaintiff's "vast majority" allegation amounts to well over a 50% market share, and a reasonable inference of over 70%. *See Breiding,* 2018 WL 4344996, at *16. That being said, there is no bright line rule regarding market share. Courts have found market share of less than 50% to be sufficient when other circumstances, such as significant barriers to entry (here the limited capacity of the Pipeline) are present. *See, e.g., Energex Lighting Indus., Inc. v. N. Am. Philips Lighting Corp.*, 656 F. Supp. 914, 921 (S.D.N.Y. 1987) (""[A] party may have monopoly power in a

particular market, even though its market share is less than 50%.' . . . [A] 25 percent market share in this particular market may be sufficient for an assertion of monopoly power.") (*quoting Hayden Pub. Co., Inc. v. Cox Broad. Corp.*, 730 F.2d 64, 69 n.7 (2d Cir. 1984).[21]

## V.    THE FILED RATE DOCTRINE DOES NOT BAR PNE'S CLAIMS.

### A.    The Filed Rate Doctrine.

Defendants argue that the filed rate doctrine preempts PNE's claim.  Defendants reach this specious conclusion by again misrepresenting what PNE has alleged (focusing on their "gas transportation market") and by misrepresenting the reach of the filed rate doctrine itself.[22]  Again, the Court's review should be focused on the markets in PNE's complaint – the short-term Secondary Capacity Market and the Wholesale Electric Market.

"The filed rate doctrine 'revolve[s] around the notion that under statutes like the Federal Power Act, utility filings with [a federal agency] prevail over . . . other claims seeking different rates than those reflected in the filings with the agency.'"  *Breiding*, 2018 WL 4344996, at *7 (alteration in original) (quoting *Town of Norwood, Mass. v. F.E.R.C.*, 217 F.3d 24, 28 (1st Cir. 2000)).  The doctrine protects a regulatory agency's authority over tariffs as well as "ancillary conditions and terms included in the tariff."  *Town of Norwood, Mass. v. New England Power Co.*, 202 F.3d 408, 416 (1st Cir. 2000) ("*Town*

---

[21]    *See also M & M Med. Supplies & Serv. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 168 (4th Cir. 1992) (noting that merely alleging a "dominant" market share, **coupled with exclusionary conduct**, may be enough to withstand a motion to dismiss); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 872 F. Supp. 52, 63-64 (S.D.N.Y. 1994) (denying motion to dismiss where complaint alleged market share ranging from 39% - 52% because **"in certain circumstances"** that could be enough to exercise market power); *Int'l Distribution Centers, Inc. v. Walsh Trucking Co., Inc.*, 812 F.2d 786, 792 (2d Cir. 1987), *cert denied*, 482 U.S. 915 (1987) ("[M]arket("market share analysis, while essential, is not necessarily determinative in the calculation of monopoly power.").

[22] Application of the "filed rate doctrine" here is questionable for the simple reason that it is not clear that any of the electricity rates at issue were actually "filed" with any regulatory body.  While the rates paid in the Wholesale Electricity Market are "market-based," they are never actually filed with any regulatory authority. This is in contrast to *Town of Norwood* where the market-based rates were subsequently filed with the Court. *See Town of Norwood*, 202 F.3d at 419.  Although some circuits have been willing to apply the filed rate doctrine without requiring an actual regulatory filing, neither the First Circuit nor the Supreme Court have never ruled that market-based rates that are not filed are subject to the filed rate doctrine.

*of Norwood I*").   However, the filed rate doctrine has no impact on areas beyond those being actively regulated by the agency, nor does it give entities in regulated industries *carte blanche* to violate the antitrust laws.  *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 372 (1973) ("Activities which come under the jurisdiction of a regulatory agency nevertheless may be subject to scrutiny under the antitrust laws.").[23] As discussed below, the Tariff here explicitly mandates that the antitrust laws are followed. *See* Rate Schedule AFT-E, Ex. B, ¶ 8; Tariff, Ex. A, ¶ 17 (emphasis added); NSTAR Service Agreement, Ex. C, ¶ 17 A.

> **B.   The Filed Rate Doctrine Does Not Apply to the Unregulated Short-Term Secondary Capacity Market.**

PNE alleges that Defendants' wrongdoing began by intentionally restricting supply in the unregulated Secondary Capacity Market.  Defendants state that FERC regulates sales in the short-term Secondary Capacity Market by reference only to Bulletin Board sales. Def. Brief, at 7.  Defendants' misstate when and how capacity is made available by the Pipeline under the relevant tariff ignoring the numerous other ways capacity can be "resold."

Importantly, while FERC's regulation mandated the establishment of the Bulletin Board for purposes of making capacity available and to ensure the efficient use of Pipeline capacity,[24] FERC explicitly disavowed regulating transactions in the short-term Secondary Capacity Market.[25] Defendants cite Section 248.8 for the proposition that FERC "actively regulates" capacity releases,

---

[23]   *See also Cantor v. Detroit Edison Co.*, 428 U.S. 579, 596 n.35 (1976) ("[T]here 'there can be no doubt about the proposition that the federal antitrust laws are applicable to electric utilities;'"); *New York v. F.E.R.C.*, 535 U.S. 1, 9 n.6 (2002) (reaffirming application of the antitrust laws to confront anticompetitive conduct in the electric industry).  *See also, California v. Fed. Power Comm'n*, 369 U.S. 482, 485 (1962) (holding Federal Power Commission approval of conduct under the Natural Gas Act does not insulate the parties from antitrust liability).

[24]   *See* 18 C.F.R. § 284.8(a) (requiring establishment of "a mechanism for firm shippers to release firm capacity to the pipeline for resale by the pipeline").

[25]   *See* 18 C.F.R. § 284.8(b)(2) ("no rate limitation applies to the release of capacity for a period of one year or less"); *id.* § 284.8(h)(1)(iv). (any release of capacity of "31 days or less" is exempt from any bidding process set forth in Section 284.8).

but they inexplicably fail to acknowledge that the very same provision specifically states that "no rate limitation applies to the release of capacity *for a period of one year or less* if the release is to take effect before one year from the date on which the pipeline is notified of the release." *Compare* Def. Brief, at 14 *with* 18 C.F.R. § 284.8(b)(2). Accordingly, *all* of the transactions in the Secondary Capacity Market are explicitly *unregulated* by FERC. *See* Compl., at 1 n.3 (a market of short-term transactions), ¶ 32. Thus, Section 248.8 is dispositive: the Secondary Capacity Release market is unregulated.

Defendants also try to misdirect the Court by focusing on conduct upstream in the primary capacity market, *see* Def. Brief, at 3 (allegations regarding "gas transportation market"), ignoring the fact that PNE has alleged that the primary capacity market is a separate and distinct market. *See* Compl. at 1 n.3, ¶ 32. Again, Section 284.8 is dispositive, making it explicitly clear that the Secondary Capacity market is separate and distinct from the primary capacity market. *See, e.g.*, 18 C.F.R. § 284.8. Accordingly, conduct in the primary capacity market has no bearing on the regulatory scheme and applicability of the filed rate doctrine in the unregulated Secondary Capacity Market.

### C. Defendants' Focus On A "Gas Transportation Market" and "No-Notice" Contracts in the Primary Market Are Red Herrings.

Defendants leverage their false claim that PNE is challenging activity in the "gas transportation market" so they can argue Defendants are simply exercising their purported "rights" under no-notice contracts, authorized by FERC and protected by the filed rate doctrine. Defendants' arguments fail both factually and legally.

First, in an effort to make the *Breiding* opinion dispositive, Defendants wrongly state that Plaintiff's claims are based upon Defendant's abuse of no-notice contract rights and that no-notice contract rights exist in the upstream "gas transportation market." Def. Brief, 3. Again, Defendants' argument must be rejected *ab initio* to the extent they simply rewrite PNE's complaint to better fit their argument for dismissal. Indeed, Defendants may be entitled to their own opinions, but they are not entitled to their own facts.

Second, notwithstanding Defendants' mischaracterizations, PNE simply ***does not allege*** that the Defendants' abuse of no-notice contracts is a ***necessary*** part of the conduct comprising Defendants' alleged anticompetitive scheme, which began when Defendants intentionally restricted supply in the Secondary Capacity Market. What PNE does do, however, is, for purposes of providing a full accounting of the motive and incentive behind Defendants' misconduct, explain that no-notice contracts made it possible for Defendants to cancel gas shipments without paying any penalties or incurring any increased costs. *See, e.g.*, Compl., ¶¶ 59 (LDC adjustments under no-notice contracts allowed "without penalty" while others "suffer penalties"), 105 (adjustments "without penalty"), 106 (firms with "a 'no-notice contract,' . . . would not incur any extra costs as a result of their last-minute change").

These background factual allegations are consistent with PNE's burden under Rule 8(a)(2): to allege that Defendants' anticompetitive scheme was not just "possible" but "plausible." *See Vazquez v. Surillo-Ruiz*, 76 F. Supp. 3d 381, 386 (D.P.R. 2015) (citing), *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)) ("[I]n order to comply with Rule 8(a)(2), a complaint must state a 'plausible' claim for relief, as opposed to merely stating a possible claim for relief.").). Accordingly, ***any facts***, even facts that are not part of the actionable conduct, are relevant to the extent that they enhance proof of motive and intent. Here, even if "down-scheduling" in the Primary Market was *per se* immune from antitrust liability, which it is not, it is relevant to the extent that it "illustrate[s] the context and motive underlying the overall anticompetitive conduct." *In re Asacol Antitrust Litig.,* 233 F. Supp. 3d 247, 261 (D. Mass. 2017) (Casper, J.), *rev'd on other grounds*, __ F.3d __, 2018 WL 4958856 (1st Cir. Oct. 15, 2018).

Being able to avoid costs by exercising their no-notice contract rights made the Defendants' alleged anticompetitive scheme more profitable, but that does not mean that the no-notice contracts are relevant when determining the legality of Defendants' scheme. Defendants could have driven up the price for gas in the short-term Secondary Capacity Market even if they were operating under fixed

firm contracts that were not no-notice.  If that were the case, Defendants simply would have had to pay a penalty for the last minute down-scheduling, thereby offsetting some of the profits earned from their scheme.[26]  In sum, the Court could run a blue pencil through *every* allegation in the complaint regarding the no-notice contracts without affecting the illegality of the Defendants' scheme to drive up the natural gas spot market and Algonquin Citygate Prices.

Third, assuming, *arguendo,* that Defendants are correct – that the basis of Plaintiff's claims is Defendants' abuse of no-notice contracts (an assumption Plaintiff vigorously contests) – the filed rate doctrine remains inapplicable because, despite Defendants' repeated misrepresentations to the contrary, FERC explicitly conditioned the exercise of no-notice rights on compliance with governing law, including antitrust laws.  Defendants continue to misrepresent the governing Tariff, Rate Schedule and Service Agreement while relying on conveniently excerpted block quotes taken out of context to bolster their position.  *See* Def. Brief, at 6.

While Plaintiff agrees that FERC approved the use of no-notice contracts in the Tariff, that Tariff does not grant Defendants **unfettered** discretion to exercise no-notice rights. Instead, expressly incorporated **in each and every agreement** is the following: "[t]he service agreement, and all terms and provisions contained or incorporated therein, and the respective obligations of the parties thereunder, **are subject to valid laws**, orders, rules and regulations of duly constituted authorities having jurisdiction."  *See* Rate Schedule AFT-E, Ex. B, ¶ 8; Tariff, Ex. A, ¶ 17 (emphasis added); NSTAR Service Agreement, Ex. C, ¶ 17 A.  In stark contrast to Defendants' claim that FERC granted them the ability to down-schedule at their discretion, FERC explicitly said **they may do so only within the bounds of existing law,** including U.S. Antitrust law.

---

[26]   Likewise, Defendants could have simply used their full capacity allocation to ship gas, taken delivery and then refused to sell it.  Doing that would have been more administratively cumbersome (because they would have needed to park the unsold gas), but they could have achieved the same anticompetitive result.

Thus, the Court would not be asked to question FERC's approval of no-notice contracts in general but instead it would be asked to determine if Defendants' conduct comports with the terms of the Tariff, including its requirement that Defendants conduct not otherwise violate the antitrust laws. That determination is clearly not barred by the filed rate doctrine. *See Town of Norwood I*, 202 F.3d at 416 (finding filed rate doctrine did not bar claims about whether terms of the tariff would apply); *see also Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1171-72 (9th Cir. 2002) (filed rate doctrine "does not preclude courts from interpreting the provisions of a tariff and enforcing that tariff"). In sum, even if Defendants are "legally" permitted to down-schedule under the terms of the Tariff, the fact that the Tariff requires that their conduct must still comply with the antitrust laws means that they can be taken to task if their down-scheduling was part of a scheme intended to achieve an illegal result. *See California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 515 (1972) ("If these facts are proved, a violation of the antitrust laws has been established. If the end result is unlawful, it matters not that the means used in violation may be lawful.").

### D. The Filed Rate Doctrine Does Not Immunize Defendants' Inflation of Fuel Costs That Were Incorporated in Wholesale Electricity Rates Without Alteration and Passed on to Wholesale Electricity Purchasers.

Defendants wrongly claim that PNE cannot recover supra-competitive fuel costs it paid because the fuel costs were part of electric rates approved by ISO-NE. Again, Defendants want to argue the *Breiding* allegations instead of the facts presently before the Court. PNE has not alleged that Defendants "fixed" wholesale electricity prices, instead PNE has alleged that Defendants conduct in the Secondary Capacity Market "fixed" the fuel cost input that was passed through to PNE without alteration as a component of the wholesale electricity price. *See* Def. Brief, Ex. A at 2 (Eversource's counsel admits that fuel costs "were required to be passed through to customers without mark-up."). Accordingly, holding Defendants to account for their anticompetitive conduct does not require the Court to review or engage in second guessing a "regulated rate." *See Composite Co. v. Am. Int'l Grp.*,

*Inc.,* 988 F. Supp. 2d 61, 78 (D. Mass. 2013) (Plaintiffs alleged defendants manipulated input data they "submitted to [regulatory agencies] … for the purposes of calculating rates." Court held filed rate doctrine did not bar plaintiff's claim because "agency procedures and rate calculations are not at issue. What is at issue is the defendants' conduct with regards to the data they supplied to the rate-setting agencies. A decision in favor of plaintiff would not discredit any decision of an administrative agency.").

Defendants are, in essence, asking this Court to extend the breadth and depth of regulatory immunity so far that any conduct touching on a regulatory market would escape antitrust review. However, as the Ninth Circuit explained, such an expansive reading of FERC immunity has no "conceptual core" because it would allow for filed rate immunity to "reach . . . 'contracts for every other possible factor of production – even legal services.'" *In re Western States Wholesale Nat. Gas Antitrust Litig.,* 715 F.3d 716, 732 (9th Cir. 2013) (quoting *Am. Gas Ass'n v. F.E.R.C.,* 912 F.2d 1496, 1507 (D.C. Cir. 1990)). On point here, the *Western States* court noted that interpreting the filed rate doctrine so broadly that it immunizes "price manipulation associated with nonjurisdictional sales would risk nullifying the jurisdictional provisions of [the Natural Gas Act (the 'NGA')]. . . . Under the broad reading of [the NGA] that Defendants propose, there is no 'conceptual core' delineating transactions falling within FERC's jurisdiction and transactions outside of FERC's jurisdiction." *Id.* at 732-33. Accordingly, the filed rate doctrine cannot be interpreted so broadly here that it would swallow up Defendants' anticompetitive conduct that was intended to, and did, fix input costs.

The few courts that have considered similar allegations have applied antitrust law to anticompetitive conduct that falls outside the rate setting authority of an administrative agency. *See Ice Cream*, 253 F. Supp. 2d 262; *Gallo*, 503 F.3d 1027, Both *Ice Cream* and *Gallo* provide useful guidance here. In *Ice Cream*, the defendants concocted an anticompetitive scheme to increase the federally regulated price of milk by inflating the price of butter traded on the Chicago Mercantile Exchange

("CME butter futures"),[27] a component of "a federally regulated formula" used to set milk prices. *Ice Cream,* 253 F.Supp.2d at 266, 268 (explaining how the CME butter future price was used to fix milk prices). The Court rejected defendant's filed rate defense, agreeing with plaintiff that it was not challenging the formula used by the agency to set minimum milk prices, but was instead challenging defendants' manipulation of the underlying components of the formula. *Id.* at 275-76.[28] Accordingly, *Ice Cream* supports PNE's argument that the filed rate doctrine does not shield Defendants from liability and PNE should be allowed to pursue its claim. *Id.* at 278 ("Plaintiff has provided defendants with sufficient notice of the basis for its claim against them that they can adequately provide a defense. Plaintiff should be allowed a reasonable opportunity to develop the facts through discovery.").

In *Gallo,* the court also rejected application of the filed rate doctrine where a plaintiff's claim also involved the intersection of exempt and non-exempt conduct. 503 F.3d at 1045-48.[29] In *Gallo,* the plaintiff paid rates that were pegged to indices that included transactions within FERC's jurisdiction and transactions outside FERC's jurisdiction. *Id.* at 1045. The Court found the reach of FERC's authority was "limited" and could not be extended to cover non-jurisdictional transactions, even where those transactions were used along with FERC-authorized rates to derive anticompetitive rates paid by the plaintiff. *Id.* at 1048. The *Gallo* court also noted that it was "aware of no basis for holding that the Filed Rate Doctrine bars claims based on a reference point for pricing transactions

---

[27]   In *Ice Cream,* the plaintiffs alleged that the defendants controlled a "dominant share" of the CME butter future market. *Id.* at 266; *cf.* Compl., ¶ 107 (alleging that Defendants "possess[ed] the vast majority of excess Pipeline capacity" on critical days).

[28]   In *Ice Cream*, the plaintiffs alleged that defendants' anticompetitive scheme included even more inferential steps than present here. The *Ice Cream* plaintiff alleged that the effect of artificially fixing CME butter futures was to increase regulated milk prices, which were then used as a floor to set the market prices for other dairy products sold by defendants. *Id.* at 276. Here, PNE has alleged that by fixing fuel cost input prices Defendants realized a direct benefit by being permitted to charge the same supra-competitive fuel cost.

[29]   Although the *Gallo* opinion was cited by both Plaintiff and Defendants in the *Breiding* papers, it was not cited for this proposition because the *Breiding* complaint did not allege that the fuel cost overcharge was an isolated component of the wholesale electric price.

22

(be it a trade index, the Consumer Price Index, or the New York Stock Exchange) that is not itself a FERC-approved rate." *Id.* at 1048 n.15. Here, PNE has alleges that Defendants manipulated an input – fuel cost – that is based on a reference point or index (the spot market price for natural gas and/or the Algonquin Citygate Price) that were outside of FERC's jurisdiction. The fact that the supra-competitive fuel charges Defendants engineered were then passed along as a component of the wholesale electric rate does not launder the illegal overcharge and does not entitle Defendants to filed rate immunity.

The fuel cost overcharges PNE seeks to recover were incorporated into the price that wholesale electric purchasers paid, without regulatory oversight and even more importantly, without adjustment. Seeking to recover the fuel cost overcharges does not require the Court to "alter the terms of tariffs approved by FERC,"[30] making Defendants' filed rate argument inapplicable. Accordingly, PNE is entitled to an opportunity to develop factual issues relating to Defendants' scheme.

## VI.   PNE IS THE MOST APPROPRIATE PLAINTIFF TO BRING THIS ACTION.

### A.   The Wholesale Electricity Market Was the Target of the Scheme.

Defendants attempt to argue that PNE lacks standing by focusing their argument solely on the supply restriction in the Secondary Capacity Market. However, this is obviously only half the story. As this Court previously noted, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Asacol*, 233 F. Supp. 3d at 261 (citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S.

---

[30]   The relief requested by PNE does not require the Court to determine a "but for" wholesale electric price that could infringe on FERC jurisdiction. Instead, PNE would be required to prove "but for" fuel costs that were reported to ISO-NE (and passed through to PNE without adjustment) whenever a gas generator set the market clearing price. As discussed *infra*, this type of economic analysis is typical of antitrust claims and it has already been done preliminary by the authors of the EDF Study.

690, 698-99 (1962)).  Accordingly, the Court must determine PNE's standing by "considering [the] individual components [of defendants' conduct] in light of the overall scheme." *Id.* (quoting *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1372, 1376 (9th Cir. 1992)) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect.").  PNE has clearly alleged that the purpose of restricting supply in the Secondary Capacity Market was to force PNE and other wholesale electric purchasers to pay supra-competitive fuel price charges in the wholesale electric market.  In other words, PNE has standing because it "was a participant in the market that was the target of the alleged scheme and in which [it] directly suffered harm." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 159 (2d Cir. 2016).

Before considering the individual factors that support finding standing, it is instructive to review the legal and factual similarities between PNE's claim and the claim in *Ice Cream*, 253 F. Supp. 2d 262, where the court found the plaintiff had standing despite objections from the defendants that mirror many of the objections raised by Defendants here.  As noted above, the *Ice Cream* plaintiffs alleged that the defendants came up with a scheme to fix the price plaintiffs paid for milk, cream and butter by manipulating the price of butter futures in the CME butter futures market.  Defendants then argued that the *Ice Cream* plaintiff lacked standing because it did not "participate" in the CME butter futures market where defendant's anticompetitive conduct took place.  *Id.* at 272.  The Court began its analysis by noting the logical disconnect in defendants argument: "Defendants . . . overlook the fact that, although the alleged conspiracy to fix prices took place in the CME butter market, the purpose of this price-fixing was to artificially inflate prices in the milk, cream, and butter markets in which both plaintiff and defendants were participants – plaintiff and the class members as wholesale purchasers and defendants as sellers." *Id.*  This same logic applies here:  Defendants' purpose in driving up prices in the Secondary Capacity Market was to artificially inflate the price of fuel costs incorporated in wholesale electric prices, where both Defendants and PNE were market participants.

Accordingly, PNE directly participated in the market that was the target of Defendants' scheme and PNE was directly harmed as a result of Defendants' conduct[31] and its injury "flows from that which makes defendants' acts unlawful." *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 484 (1982).

### B.     PNE Is the Most Direct Plaintiff.

The Supreme Court has set forth several factors courts should consider when determining if a particular plaintiff is the "proper party to bring a private antitrust action." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) ("AGC").  The relevant AGC factors here include: (1) the causal connection between the antitrust violation and the harm to the plaintiff, and whether the harm was intended; (2) the nature of the injury, including whether the plaintiff is a consumer or competitor in the relevant market; (3) the directness of the injury, and whether damages are too speculative; (4) the potential for duplicative recovery, and whether the apportionment of damages would be too complex; and (5) the existence of more direct victims. *See AGC*, 459 U.S. at 538-44. In this case, several of the *AGC* factors overlap and, for brevity, can be discussed together even though all of the above factors support finding wholesale electric purchasers who paid supra-competitive fuel costs have standing because, as the intended victims of Defendants' anticompetitive scheme, they are the best positioned party to bring this claim.

### 1.     *Factors 1 & 2 –* **PNE Was Directly and Intentionally Harmed by Defendants' Misconduct in the Targeted Market.**

The facts alleged in the PNE complaint readily satisfy these requirements.  PNE "has alleged an antitrust injury caused by defendants' price-fixing.  [PNE] has further alleged that defendants acted with knowledge that [wholesale electricity] prices . . . would be impacted by this unlawful activity and

---

[31]    In fact, Defendants' attempt to focus the standing analysis on conduct in the Secondary Capacity Market is particularly illogical considering that their misconduct there consisted of ***not*** selling gas.  In other words, Defendants' conduct in the Secondary Capacity Market resulted in negative revenue to the extent that Defendants chose not to sell.  The key is that the Secondary Capacity Market sales revenue Defendants passed-up was more than offset by the gains they made in the wholesale electric market due to the supra-competitive fuel costs PNE and other proposed class members paid.

that, in fact, the prices were impacted substantially." *Ice Cream*, 253 F.Supp.2d at 273 (citation omitted). Accordingly, PNE has sufficiently "alleged a causal connection between the violation and harm and that the harm was intended by defendants," satisfying the first AGC factor. *Ice Cream*, 253 F.Supp.2d at 273.

PNE "has [also] alleged that it was . . . required to pay the excessive, inflated prices charged by Defendants.  This is the type of injury protected by the antitrust laws." *Id.; see also In re Nexium Antitrust Litig.*, 777 F.3d 9, 27-28 (1st Cir. 2015) (overcharge is prototypical antitrust injury). Defendants' emphasis only on their alleged misconduct in the Secondary Capacity Market deceptively ignores the fact that the alleged "overall combined effect" of Defendants scheme was to force wholesale electric purchasers such as PNE to pay supra-competitive fuel costs. *See Asacol*, 233 F. Supp. 3d at 261 (citing *Mishawaka v. Am. Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980)) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect."). Accordingly, PNE has properly alleged that it was injured in the market targeted by Defendants' anticompetitive scheme (i.e., the wholesale electricity market), satisfying the second *AGC* element.

### 2. *Factors 3 & 5 –* Directness of the Injury.

The First Circuit has noted that the thrust of "directness" of injury merely means "that the plaintiff was a participant in 'the very market directly distorted by the antitrust violation.'" *Aluminum Warehousing*, 833 F.3d at 160 (quoting *SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.*, 48 F.3d 39, 46 (1st Cir. 1995)).  Defendants again try to suggest that the market "directly" impacted by the alleged conduct would be the Secondary Capacity Market and that purchasers in that market would be the proper plaintiff.  Again, Defendants' argument fails to recognize the fact that, though the causal chain originated with conduct in the Secondary Capacity Market, the intended result was to force all wholesale electricity purchasers to pay supra-competitive fuel costs, regardless of whether they

purchased from gas powered electric generators or from Defendants' non-gas powered electric generators. *See Aluminum Warehousing*, 833 F.3d at 160. Accordingly, PNE was directly injured by Defendants' scheme because forcing PNE to pay supra-competitive fuel costs "was the precisely intended consequence" of defendants' misconduct. The fact PNE was the "immediate target" of Defendants scheme means that PNE's injury "could hardly have been more 'direct.'" *Id.* at 160-61.[32]

Finally, as the purchasers directly targeted by Defendants' scheme, PNE and the proposed class of wholesale electric purchasers are best situated to pursue Defendants for manipulating wholesale electricity fuel costs. Again, Defendants attempt to compartmentalize the factual components of their alleged anticompetitive scheme, arguing that Secondary Capacity Market purchasers are the proper plaintiff. But restricting supply in the Secondary Capacity Market was a means to achieve an end: increased fuel costs incorporated into wholesale electricity prices paid by PNE and the proposed class. In other words, PNE and the proposed class of wholesale electric purchasers are the proper parties to bring this claim. *See also Ice Cream*, 253 F.Supp.2d at 274. Finally, there is also little to no risk of duplicative claims by allowing PNE and the proposed class of wholesale electric purchasers to recover overcharges they paid for several reasons including, but not limited to the fact that the gas-fired generators who paid inflated fuel costs passed those costs on unchanged as

---

[32]   Even assuming that PNE was not the most "directly" injured as the intended target of Defendants' scheme, the Court should still find PNE has standing. PNE "suffered antitrust injury that is 'inextricably intertwined' with the injury the [Defendants] ultimately intended to inflict." *Aluminum Warehousing*, 833 F.3d at 160-61 (quoting *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1086 (6th Cir. 1983) (noting that a plaintiff who is not the target of an anticompetitive scheme has standing where the plaintiff "manipulated or utilized by [d]efendant as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographical markets" (alterations in original)) ("[S]ometimes the defendant will corrupt a separate market in order to achieve its illegal ends, in which case the injury suffered can be said to be 'inextricably intertwined' with the injury of the ultimate target. Regardless, antitrust injury is suffered by participants in the restrained market (or markets)."); *see also In re W. States Wholesale Nat. Gas Antitrust Litig.*, No. 03-cv-01431, 2017 WL 3610553 (D. Nev. Aug. 22, 2017) (a plaintiff who purchased energy had standing where it alleged Defendants intentionally increased prices by manipulations related to input costs), *rev'd on other grounds*, No. 17-cv-16925, 2018 WL 3639516 (9th Cir. Aug. 1, 2018). Also, "the antitrust laws do not limit standing to only that class of purchasers with the most direct injury." Ice Cream, 253 F. Supp. 2d at 274-75 (finding "that plaintiff has alleged a sufficiently direct injury to allow plaintiff to have standing to pursue this claim").

discussed and therefore, did not occur overcharge injury (they may have lost sales or other forms of damages). *See Simon v. KeySpan Corp.*, 694 F.3d 196 (2d Cir. 2012).

### 3. *Factors 3 & 4* – **The Damages Are Ascertainable, Direct and Can Be Proven Class-Wide By Commonly Accepted Methods.**

Defendants also argue that there are no acceptable means to prove damages here. Again, Defendants' objections oversell and underdeliver. First, in large antitrust cases such as this, courts do not require damages be proven with absolute precision, often allowing damages to be proven on a class-wide basis using accepted statistical modeling tools. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1046 (2016) (noting that statistical evidence or representative evidence is used in various substantive realms of the law to establish liability and damages). For purposes of Defendants' Rule 12(b)(6) motion, the Court need only consider if the allegations in the PNE Complaint support a finding that a regression model could support proving class-wide damages.[33] "The antitrust cases are legion which reiterate the proposition that, if the fact of damages is proven, the actual computation of damages may suffer from minor imperfections." *Scrap Metal*, 527 F.3d at 533. "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 265 (1946). Accordingly, PNE should be allowed to prove the fuel cost input overcharge in the Wholesale Electricity Market resulting from Defendants' supply restriction in the Secondary Capacity Market by use of class-wide industry evidence.

---

[33] Courts do not require class-wide antitrust damages be proven with surgical precision. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 533 (6th Cir. 2008) (citing *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 567 (1981)) ("Once liability is established . . . a plaintiff's proof of damages is evaluated under a more lenient standard."); *Behrend v. Comcast Corp.*, 655 F.3d 182, 203 (3d Cir.2011) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)) ("Given the inherent difficulty of identifying 'but-for world,' we do not require that damages be measured with certainty, but rather that they be demonstrated as 'a matter of just and reasonable inference.'"), *rev'd on other grounds*, 569 U.S. 27 (2013).

Second, Defendants argue that calculating damages here would intrude on the filed rate doctrine, claiming that Plaintiff is asking the Court to "second guess" ISO-NE and determine what the "but-for" wholesale electric price would be.  Again, Defendants try to sow confusion by simply ignoring (or misrepresenting) the allegations in PNE's complaint.  Proving the amount of fuel cost overcharge incorporated in wholesale electric rates does not require the Court to try to second-guess what the ISO-NE but-for price of wholesale electricity should have been.  Instead, the measure of damages here is the elevated fuel cost input price that even Defendant Eversource admits was simply incorporated without change in the wholesale electric price.  *See* Def. Brief, Ex. A at 2 (Eversource's counsel's letter stating "All other costs – including for fuel – were required to be passed through to customers without markup").  And, as noted above, determining the supra-competitive fuel costs does not require the Court to infringe on FERC regulated rate setting processes -- the price-fix here took place in the ***unregulated*** Secondary Capacity Market (and was incorporated without any adjustment in the wholesale electric market clearing price).

Finally, and most importantly, Defendants' claim that determining gas overcharges is so complex that it can't be done ignores the fact that the authors of the EDF Study have already done it on a preliminary basis by applying commonly accepted economic tools to readily available data regarding gas prices in the spot market and fuel costs incorporated in bids used to set wholesale electricity prices.  *See, e.g., In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. at 96 (multiple regression analysis using data and information common to a class is accepted tool for proving class wide damages in an antitrust class action).  Accordingly, despite Defendants' dire warnings, the type of damage analysis that will be used here is typical of the analysis regularly used in antitrust class action cases.  In fact, considering the limited time period, the limited geographic reach of the alleged misconduct and the fact that detailed economic records are centralized and easily accessible, proving damages here may well prove less complex and more reliable than in other antitrust

class actions. *Cf, In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 JG VVP, 2014 WL 7882100, at *9 (E.D.N.Y. Oct. 15, 2014) (At class certification, Court approved class-wide regression damage models in case alleging price-fixing of fuel costs on all air cargo shipments to and from the U.S. over a 6 year period. The proposed damage models included over 30 million transactions assembled from 25 defendants).

## VII.    PNE'S STATE LAW CLAIMS ARE PROPERLY ALLEGED.

At the end of their Brief, Defendants throw in that Plaintiff failed to state a claim under the consumer protection and antitrust statutes in Massachusetts and New Hampshire based solely on the applicability of the filed rate doctrine. *See* Def. Brief, at 20. As discussed at length above, the filed rate doctrine does not bar PNE's claims and therefore, Defendants' motion to dismiss with respect to the state law claims should also be dismissed.

## VIII.   REQUEST FOR ORAL ARGUMENT.

Pursuant to Local Rule 7.1(d), PNE respectfully requests to be heard at oral argument on its Opposition to Defendants' Motion to Dismiss Plaintiff's Complaint

## IX.    CONCLUSION.

For the foregoing reasons, Plaintiff PNE respectfully requests that the Court deny Defendants' Motion to Dismiss in its entirety. However, if the Court finds PNE has not met its pleading standard, then PNE asks for leave to file a more detailed Amended Complaint.

Dated:    October 26, 2018                     Respectfully submitted,

                                        By:    */s/ Austin B. Cohen*
                                               Austin B. Cohen *(Admitted Pro Hac Vice)*
                                               Keith J. Verrier *(Admitted Pro Hac Vice)*
                                               **LEVIN SEDRAN & BERMAN LLP**
                                               510 Walnut Street, Suite 500
                                               Philadelphia, PA 19106-3997
                                               Telephone: (215) 592-1500
                                               Facsimile: (215) 592-4663
                                               acohen@lfsblaw.com
                                               kverrier@lfsblaw.com

Anthony Tarricone (BBO #492480)
Joseph P. Musacchio (BBO #365270)
Elizabeth Tully (BBO #685855)
**KREINDLER & KREINDLER LLP**
855 Boylston Street, Suite 1101
Boston, MA 02116
Phone: (617) 424-9100
Fax: (617) 424-9120
atarricone@kreindler.com
jmusacchio@kreindler.com
etully@kreindler.com

*Counsel for Plaintiff*
*PNE Energy Supply LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, Keith J. Verrier, hereby certify that on October 26, 2018, I caused a copy of the foregoing to be filed electronically via the Court's electronic filing system.  Notice of this filing will be sent to the parties by operation of the Court's electronic filing system and those attorneys who are registered with the Court's electronic filing system may access this filing through the Court's system.


Dated:    October 26, 2018                              */s/ Keith J. Verrier*
                                                        Keith J. Verrier *(Admitted Pro Hac Vice)*

32