**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

| | |
|---|---|
| PNE ENERGY SUPPLY LLC, on behalf of themselves and others similarly situated, )<br><br>Plaintiffs, )<br><br>v. )<br><br>EVERSOURCE ENERGY, a Massachusetts voluntary association, and AVANGRID, INC., a New York corporation, )<br><br>Defendants. ) | Civil Action No. 18-11690 |

_____

## MEMORANDUM AND ORDER

CASPER, J.                                                                                    June 7, 2019

## I.     Introduction

PNE Energy Supply LLC ("PNE"), on behalf of a putative class of wholesale electricity purchasers located in New England, has filed this lawsuit against Eversource Energy ("Eversource") and Avangrid, Inc. ("Avangrid") (collectively, "Defendants"), alleging violations of the Sherman Act, 15 U.S.C. § 2, and various state consumer protection and antitrust laws.  D. 1.  Specifically, PNE asserts that Defendants manipulated pipeline capacity for natural gas transmission and, as a result, artificially inflated the price of natural gas and electricity at wholesale in New England.  Id. ¶ 1.  PNE seeks damages and injunctive relief, including under the Clayton Act, 15 U.S.C. § 26.  Id. (Request for Relief).  Defendants have filed a joint motion to dismiss.  D. 21.  For the reasons set forth below, the Court ALLOWS Defendants' motion.

## II.    Standard of Review

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a pleading must allege claims that are plausible.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  To satisfy this standard, the pleading must provide "for more than a sheer possibility that a defendant has acted unlawfully.'"  Saldivar v. Racine, 818 F.3d 14, 18 (1st Cir. 2016) (quoting Iqbal, 556 U.S. at 678).  A claim must contain sufficient factual matter that, accepted as true, would allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

As with other claims, "it is not enough merely to allege a[n] [antitrust] violation in conclusory terms."  E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc., 357 F.3d 1, 9 (1st Cir. 2004).  Instead, the "complaint must make out the rudiments of a valid claim."  Id. Therefore, "[w]hen the requisite elements are lacking, the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint."  In re Carbon Black Antitrust Litig., No. Civ.A.03-10191-DPW, 2005 WL 102966, at *5 (quoting Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984)).  Still, the Court should dismiss a complaint "only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Id. (citations and internal quotation marks omitted).

III.    **Factual Background**

Unless otherwise noted, the following facts are drawn from complaint, D. 1, and are accepted as true for the consideration of the pending motion.

PNE is an energy supplier that purchases electricity at wholesale to be resold to retail customers in New England.  D. 1 ¶ 4.  The price of natural gas in New England heavily influences the price of wholesale electricity for purchasers like PNE because natural gas-fired power plants generate forty-eight percent of electricity in the region.  Id. ¶¶ 97, 102.  Accordingly, an increase in natural gas prices due to a shortage in natural gas supply will cause the price of wholesale electricity to increase as well.  Id. ¶ 102.  PNE alleges that Defendants used their influence over the transmission of natural gas to New England to restrict the supply of gas available for other purchasers, inflating the commodity market price of natural gas and, in turn, resulting in higher wholesale electricity prices.  See, e.g., id. ¶ 15.  The Court now turns to the New England energy markets purportedly impacted by Defendants' alleged anticompetitive conduct.

A.    **Natural Gas and Electricity Markets**

1.    *FERC's Authority to Regulate Certain Natural Gas and Electric Rates*

As part of the Natural Gas Wellhead Decontrol Act of 1989, Congress eliminated the Federal Energy Regulatory Commission's ("FERC") authority to impose price regulations on "first sales" of natural gas at the wellhead.[1]  Id. ¶ 55.  The commodity price of natural gas thereafter has been determined by market forces.  Id.; see E. & J. Gallo Winery v. EnCana Corp., 503 F.3d 1027, 1038 (9th Cir. 2007).  In 1992, FERC issued Order No. 636, which permanently severed the sale of natural gas as a commodity from the sale of natural gas transportation as a service.  D. 1 ¶ 56.

---

[1] First sales are sales of natural gas not preceded by a sale to an interstate pipeline, intrastate pipeline, local distribution company or retail consumer.  D. 1 ¶ 55.

By contrast to the sale of gas as a commodity, FERC retains the authority to regulate the sale of natural gas transmission services. See 15 U.S.C. § 717(b).

The Federal Power Act ("FPA"), 16 U.S.C. § 791a *et seq.*, authorizes FERC to regulate both the "transmission of electric energy in interstate commerce" and the "sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b)(1). In particular, the FPA obligates FERC to "oversee all prices for those interstate transactions and all rules and practices affecting such prices." F.E.R.C. v. Elec. Power Supply Ass'n, __U.S.__, 136 S. Ct. 760, 782 (2016).

### 2. *Natural Gas Markets*

The natural gas market encompasses two transactions: (1) the purchase of natural gas; and (2) the transmission of natural gas from seller to purchaser. With respect to sales of the commodity itself, natural gas is sold to consumers either directly from gas producers via contracts called "gas futures" or in the "spot market." D. 1 ¶ 61. Futures contracts allow gas producers to sell a specific quantity of gas at some predetermined future time. Id. Purchasers with a steady natural gas demand, such as load distribution companies ("LDCs"), which distribute gas to retail customers, id. ¶ 17 n.11, typically utilize futures contracts, id. ¶ 61. Entities with variable or less predictable natural gas demand, including natural gas-fired electricity generators, purchase gas on the spot market. Id. ¶ 61. LDCs and other direct purchasers often find themselves holding title to excess amounts of natural gas that can be resold to other purchasers on the spot market. Id. ¶ 62. According to PNE, the spot market price of natural gas is not regulated by FERC and is, instead, determined by supply and demand, *i.e.* the spot market price of natural gas increases when the amount of available natural gas decreases. Id. ¶ 63.

As mentioned, purchasers must also pay for the transmission (or transportation) of natural gas to its destination. In New England, a network of pipelines facilitates the transmission of natural

gas from the wellhead to a destination determined by the purchaser.  Id. ¶ 76.  The Algonquin Gas

Transmission Pipeline ("Algonquin Pipeline"), which is partially owned by Defendant Eversource,

is a major pipeline that transmits natural gas to New England.  Id.  Similar to the process for

purchasing natural gas as a commodity, reserving pipeline transmission capacity in New England

differs depending upon the nature of the purchaser.  Id. ¶¶ 78, 80.  According to PNE, purchasers

with long-term capacity needs utilize the primary capacity market whereas short-term capacity

transactions occur in the secondary capacity market.  See id. ¶¶ 32, 78.

a)    Primary Capacity Market

As part of the primary capacity market, LDCs have the option to enter "no-notice"

transportation contracts, which give them the power to reserve transmission capacity on a pipeline

for a given day and time, and to adjust that reservation "upward or downward" throughout the day

without penalty.  D. 1 ¶ 59.  Transmission capacity reservations play an important role in

determining the supply of natural gas available to gas purchasers in New England because there is

a fixed amount of pipeline capacity on any given day.  Id. ¶ 79.  In other words, the transmission

capacity reserved by one purchaser limits how much capacity is available for other purchasers'

natural gas needs.  See id.  Even when LDCs adjust their capacity reservations downward or cancel

a reservation, that capacity is not automatically released for others to use.  Id. ¶ 116 (explaining

that "shrinking [a capacity] reservation does not make . . . now-empty [pipeline] capacity available

to be filled by others;" rather, "capacity must be affirmatively released by the contract-holder" before it can be resold).

        b)      <u>Secondary Capacity Market</u>

Capacity release programs[2] allow LDCs and other pipeline customers who have flexibility to adjust their capacity reservations to release excess capacity into what PNE describes as the "secondary capacity market," <u>id.</u> ¶¶ 60, 64, and this excess capacity is then used to transport natural gas for purchasers in the spot market, including gas-fired electricity generators.  <u>Id.</u>  ¶ 64.  The "secondary capacity market" includes all short-term natural gas and capacity transactions, including the spot market for natural gas and the excess capacity release market through which excess capacity holders can sell or transfer capacity along a given pipeline.  <u>Id.</u> ¶ 1 n.3 (explaining that the "term 'secondary capacity market' refers to all short-term transactions for pipeline capacity, including the gas 'spot market' for bundled transportation and commodity transactions and the 'excess capacity release market' administered by the pipeline for gas transportation capacity, exclusive of the physical commodity"); <u>id.</u> ¶ 32 (explaining that the "'secondary capacity market' . . . includes the spot market for the sale of natural gas and the related 'excess capacity release' market for gas transmission services").  PNE alleges that the secondary capacity market is not regulated by FERC and, instead, is subject to supply and demand.  <u>Id.</u> ¶ 17.

        *3.*     *Wholesale Electricity Market*

Wholesale electricity is typically sold by electricity generators to load serving entities ("LSEs"), which then deliver electricity to retail consumers.  <u>Id.</u> ¶ 83 n.22.  Wholesale electricity is primarily purchased through auctions between electricity generators and LSEs.  <u>See id.</u> ¶¶ 82-

---

[2] Capacity release programs were implemented by FERC as part of Order No. 636.  <u>Id.</u> ¶ 58.

83.  The auctions are administered and overseen by intermediaries called Independent System Operators ("ISOs") or Regional Transmission Organizations ("RTOs"), which are independent non-profit organizations that FERC has charged with facilitating an efficient market for wholesale electricity while also ensuring reliability for consumers.  Id. ¶¶ 70-72.

In the six states constituting the New England region, wholesale electricity is bought and sold in auction markets administered by ISO-New England ("ISO-NE") under a tariff approved by FERC.  See id. ¶ 74.  The auction process is as follows.  ISO-NE first obtains orders from LSEs indicating how much electric energy is needed over a given period of time.  Id. ¶ 85.  It also obtains bids from electricity generators specifying how much electricity can be produced during the relevant time period and how much they propose to charge for it.  Id.  Then, ISO-NE matches the offers and bids to set the Locational Marginal Price ("LMP") to reflect the relevant market clearing price.  Id. ¶ 86.

### B.    Alleged Anticompetitive Conduct

PNE asserts that Defendants "each coordinated the activities of their member companies to restrict the supply of natural gas, thereby driving up the prices of natural gas, with the purpose and intent of raising prices and realizing excessive profits on their sales of electricity in New England's wholesale electricity market."  Id. ¶ 1.  The complaint acknowledges that this alleged anticompetitive conduct "stem[s] from the same [allegations of] misconduct" considered in Breiding v. Eversource Energy et al., 344 F. Supp. 3d 433 (D. Mass. 2018), D. 1 ¶ 2, where this Court dismissed all claims, including state and federal antitrust claims, against Defendants Avangrid and Eversource.  Breiding, 344 F. Supp. 3d at 460.  PNE nevertheless contends that the allegations here differ from those at issue in Breiding in at least the following ways:  (1) whereas the Breiding plaintiffs claimed injury as retail electricity consumers, PNE is a purchaser in the

wholesale electricity market allegedly targeted by Defendants' scheme, id. ¶ 3, (2) PNE alleges that Defendants' anticompetitive conduct occurred in the unregulated "secondary capacity market," which purportedly includes the spot market for natural gas and the excess capacity release market, id. ¶¶ 11-12, 32, and which was not mentioned in the Breiding complaint.[3]

### 1. Defendants' Alleged Market Power

PNE points to several aspects of Defendants' energy businesses to suggest that Defendants controlled New England's natural gas supply and transmission and, therefore, the secondary capacity market that allegedly impacted the price of wholesale electricity. First, New England's principal natural gas pipeline, the Algonquin Pipeline, is owned, in part, by Defendant Eversource. Id. ¶ 76. Second, Eversource and Avangrid also own and operate, through their subsidiaries, substantial "natural gas utilities" known as LDCs—which purchase natural gas directly from gas producers and, in turn, distribute natural gas to retail consumers. Id. ¶ 103. Half of the eight largest LDCs in New England are owned by Eversource or Avangrid.[4] Id. As a result of their LDC operations, Eversource and Avangrid possess a large number of no-notice contracts for natural gas transmission capacity along the Algonquin Pipeline. Id. ¶ 105. These contracts allow LDCs to adjust their transmission capacity reservations upward or downward at any time and without penalty. Id.

---

[3] The complaint in Breiding does not mention the "secondary capacity market" nor does it suggest that the spot market for natural gas and the process for releasing excess capacity together form a single market relevant to the Court's consideration of whether Eversource and Avangrid engaged in anticompetitive conduct through their use of no-notice contracts. See Amended Complaint, Breiding, 344 F. Supp. 3d 433 (No. 17-cv-12274), D. 33.

[4] Eversource owns NSTAR Gas Co. and Yankee Gas Co. and Avangrid owns Connecticut Natural Gas Co. and Southern Connecticut Gas Co. D. 1 ¶ 103.

### 2. Defendants' Alleged Monopolization Scheme

PNE alleges that Defendants artificially restricted natural gas supply by refusing to release excess natural gas transmission capacity into the secondary capacity market, raising wholesale natural gas prices and, in turn, increasing the clearing price of wholesale electricity. Id. ¶¶ 110-12. No-notice contracts for natural gas transmission capacity provided the method by which Defendants perpetuated the alleged scheme. See, e.g., id. ¶ 117. No-notice contracts allow LDCs to reserve natural gas transmission capacity on the Algonquin Pipeline and to adjust such reservations at any time without penalty. Id. ¶¶ 59, 79. Because there is a fixed amount of pipeline capacity on a given day, PNE asserts that the excess capacity reserved and not released by LDCs, including those owned by Defendants' subsidiary companies, restricted the pipeline transmission capacity available to meet the needs of other consumers, including natural gas-fired electricity generators participating in the spot market for natural gas. Id. ¶¶ 115-17.

PNE assert that Defendants' conduct was unique. Id. ¶ 129. As compared to the utility company with the next highest "last-minute" capacity cancellations, Eversource and Avangrid cancelled 40 and 184 times more of their natural gas capacity than this other company, respectively. Id. ¶ 130. In addition, Defendants could have (but did not) release their excess capacity to be sold to other gas purchasers. Id. ¶ 140.

### 3. Market Advantages Stemming from Defendants' Alleged Anticompetitive Conduct

PNE alleges that Defendants artificially increased demand for, value attributed to and prices paid to non-natural gas-fired power plants, including power plants owned by Defendants, by restricting available natural gas supply and increasing the spot market price for natural gas. Id. ¶¶ 108, 136-39.

####	4.	*Plaintiffs' Alleged Injury*

PNE is not a purchaser of natural gas transmission capacity. Nor does it purchase natural gas on the spot market where prices were allegedly inflated. PNE alleges, however, that it was injured by Defendants' anticompetitive conduct to the extent it increased the price of wholesale electricity between eighteen and twenty percent on average. Id. ¶¶ 30, 123.

### C.	Class Definitions

PNE asserts federal and state law claims against Avangrid and Eversource on behalf of itself and similarly situated classes of persons pursuant to Fed. R. Civ. P. 23(a) and Rule 23(b)(2). Id. ¶¶ 151-57. Defendants, their parent companies, subsidiaries and affiliates and governmental entities are excluded from all classes defined below. Id.

####	1.	*Federal Injunctive Class*

PNE seeks equitable and injunctive relief under federal antitrust law on behalf of itself and a class of similarly situated electricity purchasers (the "Federal Injunctive Class"). Id. ¶ 151. The Federal Injunctive Class is defined as "[a]ll persons and entities located in ISO-NE electricity market who purchased wholesale electricity in the day-ahead and real-time energy markets from December 1, 2012 through the present." Id.

####	2.	*Federal Damages Class*

PNE seeks monetary damages under federal antitrust law on behalf of itself and a class of similarly situated electricity purchasers (the "Federal Damages Class"). Id. ¶ 152. The Federal Damages Class is defined as "[a]ll persons and entities located in ISO-NE electricity market who purchased wholesale electricity in the day-ahead and real-time energy markets from December 1, 2012 through the present." Id.

### 3.    Statewide Class

PNE brings claims for damages and other relief under Massachusetts law against Avangrid and Eversource on behalf of itself and a class of similarly situated wholesale electricity customers located throughout New England (the "Statewide Class").  Id. ¶ 154.  The Statewide Class is defined as "[a]ll persons and entities located in the ISO-NE electricity market who purchased wholesale electricity in the day-ahead and real-time energy markets from December 1, 2012 through the present."  Id.

### 4.    State Specific Class

PNE brings claims for damages and other relief under relevant Massachusetts and New Hampshire laws against Avangrid and Eversource on behalf of itself and a class of similarly situated wholesale electricity customers located throughout New England (the "State Specific Classes").  Id. ¶ 156.  The State Specific Classes are defined as "[a]ll persons and entities located in Massachusetts [or New Hampshire] who purchased wholesale electricity in the day-ahead and real-time energy markets from December 1, 2012 through the present."  Id.

## IV.    Procedural History

On August 10, 2018, PNE instituted this action against Defendants.  D. 1.  Defendants have now moved to dismiss.  D. 21.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 31.

## V.    Discussion

### A.    The Filed Rate Doctrine Bars PNE's Claims

This Court recently held that the filed rate doctrine bars federal and state law claims premised on the alleged abuse of Avangrid and Eversource's right to adjust and withhold excess natural gas transmission capacity pursuant to no-notice contracts approved by FERC, even where

such conduct allegedly resulted in increased prices in downstream wholesale and retail electricity markets. See Breiding, 344 F. Supp. 3d at 451 (dismissing antitrust and consumer protection claims against Avangrid and Eversource where the "requested relief would require the Court to determine the reasonableness of [wholesale electricity] rates and tariffs approved by FERC"). Defendants, relying on the Court's ruling in Breiding, contend that the filed rate doctrine similarly bars PNE's claims. See D. 22 at 7-8. PNE asserts that Breiding is not dispositive here because (1) the filed rate doctrine does not bar challenges to anticompetitive conduct in the allegedly unregulated secondary capacity market, D. 26 at 24-25; (2) PNE's claims concern Defendants' anticompetitive business practices (as opposed to the lawful exercise of rights under contracts approved by FERC and protected under the filed rate doctrine), id. at 25-28; and (3) PNE is not asking the Court to alter wholesale electric rates; rather, it seeks to recover "fuel cost" overcharges baked into the price of wholesale electricity as a result of Defendants' anticompetitive conduct, id. at 28-31.

The filed rate doctrine requires that "utility filings with the regulatory agency prevail over . . . other claims seeking different rates or terms than those reflected in the filings with the agency." Town of Norwood, Mass. v. F.E.R.C., 217 F.3d 24, 28 (1st Cir. 2000) ("Town of Norwood II"). This doctrine is a "form of deference and preemption, which precludes interference with the rate setting authority of an administrative agency." Wah Chang v. Duke Energy Trading & Mktg., LLC, 507 F.3d 1222, 1225 (9th Cir. 2007). "The strict application of the [filed rate doctrine] is necessary to promote the congressional policy of preventing unjust discrimination in rates." Town of Norwood v. New England Power Co., 23 F. Supp. 2d 109, 115-16 (D. Mass. 1998), aff'd in part, remanded in part sub nom., Town of Norwood, Mass. v. New England Power Co., 202 F.3d 408 (1st Cir. 2000) (citations and internal quotation marks omitted) ("Town of Norwood I"). The filed rate doctrine bars federal and state antitrust claims, as well as state tort actions, that require

setting aside or second guessing rates approved by FERC. Wah Chang, 507 F.3d at 1225 (describing the filed rate doctrine's fortification against "direct attack" as "impenetrable;" "[i]t turns away both federal and state antitrust actions").

<em>1. The Filed Rate Doctrine's Application to the Secondary Capacity Market</em>

PNE argues that the filed rate doctrine does not bar the claims alleged here because the "secondary capacity market," where Defendants' anticompetitive conduct allegedly restricted natural gas supply and increased prices, is not regulated by FERC. See D. 26 at 24-25. Specifically, PNE asserts the short-term excess capacity release market, which PNE alleges is one component of the secondary capacity market, see D. 1 ¶ 32, is "explicitly *unregulated*," see D. 26 at 25 (emphasis in original). For support, PNE cites 18 C.F.R. § 284.8(b)(2), which states in relevant part that "no rate limitation applies to the release of capacity for a period of one year or less if the release is to take effect on or before one year from the date on which the pipeline is notified of the release." 18 C.F.R. § 284.8(b)(2). As this Court has explained, however, FERC's rendering of rate determinations to market forces is not a dispositive factor in determining whether FERC retains overall authority to regulate a particular energy transaction. See Breiding, 344 F. Supp. 3d at 446 n.5 (explaining that "the Court does not distinguish between market-based rates and rates formally filed with FERC for the purpose of determining whether the filed rate doctrine bars [p]laintiffs' claims"). The Natural Gas Act ("NGA") grants FERC power to regulate "the transportation of natural gas in interstate commerce," 15 U.S.C. § 717(b), and the responsibility of ensuring that market-based rates, including those set in the excess capacity release market, are "just and reasonable," 15 U.S.C. § 717c(a) (explaining that "[a]ll rates and charges made, demanded, or received . . . in connection with the transportation or sale of natural gas subject to the jurisdiction of [FERC], and all rules and regulations affecting or pertaining to such rates or

charges, shall be just and reasonable"). The filed rate doctrine applies with no less force where regulated rates have been left to the free market. <u>Town of Norwood I</u>, 202 F.3d at 419 (rejecting the plaintiff's assertion that the "filed rate doctrine should not apply where 'regulated' rates have been left to the free market").

The Court, however, need not decide today whether FERC's broad regulatory authority over the transportation of natural gas extends to the excess capacity release market (or, by extension, the secondary capacity market). The secondary capacity market is bookended by what PNE describes as the primary capacity market, where Defendants allegedly abused no-notice contracts, and the wholesale electricity market, where PNE allegedly paid supracompetitive prices as a result of Defendants' anticompetitive conduct. There is no dispute that these markets are regulated by FERC. <u>See</u> D. 1 ¶ 1 n.3 (stating that "the 'primary capacity market,' which includes long-term contracts for pipeline capacity between the pipeline and a primary contract holder transacted at FERC-regulated prices"); <u>id.</u> ¶¶ 26, 73 (explaining that the price of wholesale electricity in New England is determined via auctions run by ISO-NE, an entity created in response to FERC Order No. 888). PNE's claims challenging rates and conduct within these markets must comport with the filed rate doctrine. <u>See, e.g.</u>, <u>Ark. La. Gas Co. v. Hall</u>, 453 U.S. 571, 577-78 (1981). Accordingly, the Court turns to PNE's arguments that it challenges neither conduct approved by FERC pursuant to no-notice contracts nor wholesale electric rates within FERC's regulatory authority.

> 2.     *The Filed Rate Doctrine Bars PNE's Challenge to No-Notice Contract Rights Approved by FERC*

Defendants assert that PNE, like the plaintiffs in <u>Breiding</u>, attempts to enjoin transmission capacity reservation practices permitted under the terms of federally approved no-notice contracts. <u>See</u> D. 22 at 18. No-notice contracts grant Defendants and other long-term natural gas purchasers

the power to reserve transmission capacity on a pipeline for a given day and time, to adjust that reservation upward or downward throughout the day without penalty and, at the contract holder's discretion, the power to affirmatively release capacity to be resold via capacity release programs. D. 1 ¶¶ 59, 79, 116-117. The Court recognized in <u>Breiding</u> that "the filed rate doctrine protects not only agency authority over tariffed rates but also 'ancillary conditions and terms included in the tariff,' including, for example, no-notice contracts and relevant provisions allowing LDCs to cancel capacity reservations at any time without penalty." <u>Breiding</u>, 344 F. Supp. 3d at 448 (quoting <u>Town of Norwood I</u>, 202 F.3d at 416).

PNE contends as an initial matter that no-notice contracts are not a "necessary part of the conduct comprising Defendants' alleged anticompetitive scheme." D. 26 at 26. PNE's argument is undermined by numerous allegations in the complaint that suggest the success of Defendants' scheme depended upon the purported abuse of no-notice contracts. <u>See</u> D. 1 ¶ 105 (explaining that "[a]s a result of their LDC operations, Eversource and Avangrid possess a large number of no-notice contracts," which "give them power to reserve transmission capacity on the Pipeline for a given day and then adjust that reservation upward or downward at the last minute without penalty"); <u>id.</u> ¶ 107 (alleging that "[h]aving control of capacity on the Pipeline gave Eversource and Avangrid the ability to restrict supply in the secondary capacity market particularly on days when capacity was already scarce"); <u>id.</u> ¶ 119 (asserting that Eversource and Avangrid, "by reduc[ing] the Pipeline's daily effective capacity" and "withholding this amount of capacity from the secondary market," purportedly caused a "more than 50% increase in the spot-market price of gas and an almost 20% increase in the wholesale electricity price"). Although the Court need not accept conclusory legal conclusions in the complaint as true, it also cannot ignore the factual allegations that form a line between Defendants' alleged capacity reservation practices under no-

notice contracts and PNE's alleged injury in the wholesale electricity market. See id. ¶¶ 105, 107, 119; see also ¶ 102 (explaining that "[b]ecause so much of New England's electricity is generated by natural-gas-fired power plants, the unregulated spot market price of natural gas heavily influences the wholesale price of electricity" such that a shortage of natural gas supply will increase the spot market price of natural gas and wholesale electricity).

Alternatively, PNE contends that it does not question the propriety of no-notice contracts approved by FERC, instead, it asks the Court to consider whether Defendants' anticompetitive exercise of no-notice contract rights violated the operative FERC-approved tariff's mandate that service agreements be consistent with valid laws, including antitrust law. Id. For support, PNE primarily relies upon Brown v. MCI WorldCom Network Services, Inc., 277 F.3d 1166, 1171-72 (9th Cir. 2002) and Town of Norwood I.[5] In Brown, the court held that the filed rate doctrine did not bar the plaintiff's claims challenging conduct that was inconsistent with a tariff filed with the Federal Communications Commission. See Brown, 277 F.3d at 1172 (concluding that the filed rate doctrine did not preclude the plaintiff's antitrust claim since the tariff at issue did not authorize an additional fee that defendants had charged him). Here, by contrast, there is no dispute that FERC authorized Defendants' capacity adjustments pursuant to no-notice contracts. See D. 1 ¶¶ 58-59 (explaining that FERC Order No. 636 authorized no-notice transportation contracts, which "give an LDC the power to reserve space, or transmission capacity on the pipeline . . . then adjust that reservation . . . at the last minute without penalty"). In lieu of enforcing a filed tariff provision or preventing conduct inconsistent with the same (as was the case in Brown), PNE appears to challenge Defendants' business choices with respect to FERC-approved no-notice contracts,

_____

[5] PNE also cites to California Motor Transportation Co. v. Trucking Unlimited, 404 U.S. 508 (1972), but that case does not address the filed rate doctrine's preclusive effect on antitrust laws.

including the routine "down-scheduling" of capacity reservations.  D. 26 at 27.  As the <u>Brown</u> court recognized, however, the filed rate doctrine "bars suits challenging services, billing, or other practices when such challenges, if successful, would have the effect of changing the filed tariff." <u>Brown</u>, 277 F.3d at 1170.  The holding in <u>Town of Norwood I</u> also does not support PNE's position.  There, the First Circuit mostly affirmed the district court's dismissal of plaintiff's antitrust claims, holding that "any meaningful relief as to the [alleged anticompetitive scheme] would require the *alteration* of tariffs."  <u>Town of Norwood I</u>, 202 F.3d at 420 (emphasis in original).  PNE's requested relief likewise requires interfering with Defendants' right to adjust and withhold excess capacity as approved by FERC as part of the operative filed tariff.  In sum, PNE "cannot escape the fact that FERC authorized the business choices that allegedly caused Plaintiffs' injury."  <u>Breiding</u>, 344 F. Supp. 3d at 450.

PNE's claims call into question Defendants' exercise of no-notice transportation practices and, therefore, trigger the filed rate doctrine's bar on challenges to the terms and conditions of tariffs approved by FERC.  In other words, "[t]o the extent [PNE] seek[s] to enjoin Defendants from exercising rights pursuant to contracts subject to a filed tariff, [PNE] ask[s] the Court do exactly what the First Circuit has declared it cannot, *i.e.*, to alter the terms of tariffs approved by FERC."  <u>Breiding</u>, 344 F. Supp. 3d at 448.

    3.      *The Filed Rate Doctrine Prohibits Setting Aside Wholesale Electric Rates*

Even if the filed rate doctrine did not bar PNE's claims because they require altering contracts approved by FERC, such claims are barred for the additional reason that they require the Court to second guess or set aside wholesale electric rates ratified by FERC through the ISO-NE auction process.  PNE alleges injuries stemming from inflated wholesale electric prices caused by the same anticompetitive conduct at the heart of the state and federal antitrust and consumer

protection claims dismissed in <u>Breiding</u>, but nonetheless argues that it does not seek to alter FERC-approved rates. <u>See</u> D. 1 ¶ 8 (alleging that "[e]ven through Plaintiff's damages are based on prices in the wholesale electricity market, they do not implicate any regulatory authority or related doctrines"). According to PNE, it does not seek the adjustment of wholesale electric rates; rather, it challenges "fuel cost" overcharges that were passed on to PNE as a component of wholesale electric rates. D. 26 at 28. PNE alleges that the price of natural gas, *i.e.*, fuel costs, factor into the bids indicating the price at which electricity generators will supply electricity to wholesale electricity purchasers in the ISO-NE auction process. D. 1 ¶ 9. Because fuel costs are a purportedly unregulated component of wholesale electric rates, PNE argues that the filed rate doctrine does not bar claims challenging such fuel costs. D. 26 at 28-29.

To ascertain whether and to what extent fuel costs were artificially inflated by Defendants' alleged anticompetitive conduct, the Court would be required to determine the difference between wholesale electric rates during the class period and hypothetical rates that would have been charged but for Defendants' conduct. The filed rate doctrine prohibits this analysis. <u>See</u> <u>Wah Chang</u>, 507 F.3d at 1226; <u>Transmission Agency of N. Cal. v. Sierra Pac. Power Co.</u>, 295 F.3d 918, 930 (9th Cir. 2002); <u>Cnty. of Stanislaus v. Pac. Gas & Elec. Co.</u>, 114 F.3d 858, 863 (9th Cir. 1997) (quoting <u>Cost Mgmt. Servs. v. Wash. Natural Gas Co.</u>, 99 F.3d 937, 944 (9th Cir. 1996)).

The cases PNE relies on for support do not compel a different result. In <u>Town of Norwood I</u>, for example, the court specifically held that the filed rate doctrine bars claims challenging wholesale electric rates. <u>See</u> <u>Town of Norwood I</u>, 202 F. 3d at 419 (noting that "FERC is still responsible for ensuring 'just and reasonable' rates and, to that end, wholesale power rates continue to be filed and subject to agency review," which "triggers the filed rate doctrine") (citation omitted). PNE's reliance on <u>Gallo</u> does not warrant a different conclusion for the reasons

articulated by Defendants.   D. 29 at 7 (citing Breiding, 344 F. Supp. 3d at 447).   Additionally, the

Court does not share PNE's view of the facts at issue in Ice Cream Liquidation, Inc. v. Land

O'Lakes, Inc., 253 F. Supp. 2d 262 (D. Conn. 2003).   The plaintiffs in that case overpaid for a

wholesale product that was never governed by a federal agency's rate setting authority.   See Ice

Cream Liquidation, 253 F. Supp. 2d at 275-76 (explaining that "plaintiff is not challenging . . . the

minimum milk rates set [under the USDA]" and "concede[s] . . . any claim challenging [USDA]

orders or the rates themselves clearly would be barred by the filed rate doctrine").   By contrast to

plaintiffs in Ice Cream Liquidation, PNE alleges here that Defendants' conduct caused wholesale

electric prices to increase by at least eighteen percent.   Id. ¶¶ 30, 123.   FERC undoubtedly regulates

the "sale of electric energy at wholesale in interstate commerce."   16 U.S.C. § 824(b)(1).   Other

courts have also recognized the limited applicability of Ice Cream Liquidation where "the

difference between what [the plaintiff's] paid and what they would have paid absent Defendants'

conduct" required the court to estimate "the difference between [a] filed rate, and the . . . rate that

. . . would have [been] set had the input data . . . not been inflated by Defendants' actions."   In re

Dairy Farmers of Am., Inc. Cheese Antitrust Litig., 767 F. Supp. 2d 880, 895 (N.D. Ill. 2011)

(distinguishing Ice Cream Litigation where "[p]laintiffs do not propose, nor can the Court conceive

of, a method for calculating damages in either case that would not require the Court to engage in

just the type of ratemaking that the [filed rate] doctrine precludes").   Finally, Composite Co., Inc.

v. Am. Int'l Grp., Inc. is inapposite because that decision did not concern a filed rate.   See

Composite Co., 988 F. Supp. 2d 61, 77 (D. Mass. 2013) (holding that the filed rate doctrine did

not apply because "the experience-modifier at issue in this case is not a filed rate").   Here, PNE

"seeks a refund of some portion of [FERC-approved] rates," but has "failed to explain how the

court could calculate their damages award without first determining the natural gas rate they would

have faced" given that FERC "precludes the court from making such a determination." <u>Jacquet v. Dominion Transmission, Inc.</u>, No. CIV.A. 2:05-0548, 2010 WL 5487248, at *9 (S.D.W. Va. Dec. 30, 2010).

At bottom, PNE requires the Court to question the reasonableness of wholesale electric rates and conduct that FERC mandated as part of no-notice contracts. The Court, therefore, holds that the doctrine bars the claims alleged in the complaint.

### B.      PNE Has Not Stated Cognizable Antitrust Claims

PNE's antitrust claims fail even if the filed rate doctrine did not bar them in the first instance. First, PNE lacks standing to bring its antitrust claims. Federal courts are constitutionally limited to deciding cases or controversies. <u>Merrimon v. Unum Life Ins. Co. of Am.</u>, 758 F.3d 46, 52 (1st Cir. 2014). A plaintiff, therefore, must establish that it has standing in federal court by demonstrating that the complaint alleges a case or controversy recognized under Article III of the Constitution. <u>See</u> <u>Katz v. Pershing, LLC</u>, 672 F.3d 64, 71 (1st Cir. 2012). The "plaintiff must establish . . . injury, causation, and redressability." <u>Id.</u> (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992)). At the pleading stage, "[a]n antitrust plaintiff must show both constitutional standing and antitrust standing." <u>In re Aluminum Warehousing Antitrust Litig.</u>, 833 F.3d 151, 157 (2d Cir. 2016). To determine whether a plaintiff has standing to bring an antitrust cause of action, the Court conducts "an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws." <u>RSA Media, Inc. v. AK Media Grp., Inc.</u>, 260 F.3d 10, 13 (1st Cir. 2001) (quoting <u>Serpa Corp. v. McWane, Inc.</u>, 199 F.3d 6, 10 (1st Cir. 1999)) (internal quotation marks omitted).

Of the factors the Court considers, lack of injury, in particular, will defeat standing. <u>See</u> <u>Sterling Merch., Inc. v. Nestlé, S.A.</u>, 656 F.3d 112, 121 (1st Cir. 2011). A proper plaintiff for the

purpose of alleging antitrust injury is generally "a customer who obtains services in the threatened market or a competitor who seeks to serve that market." SAS of P.R., Inc. v. P.R. Tel. Co., 48 F.3d 39, 44 (1st Cir. 1995). PNE argues that it is an appropriate plaintiff to bring this action because it was injured in the market targeted by Defendants' anticompetitive scheme (*i.e.*, the wholesale electricity market). PNE alleged, however, that Defendants' unlawful conduct "involved artificially restricting supply in the secondary capacity market." D. 1 ¶ 169. PNE is not a customer or a competitor in either market that comprises the secondary capacity market. PNE nonetheless claims support from Ice Cream Liquidation, where the court held that plaintiffs bringing claims under Section 1 of the Sherman Act suffered an antitrust injury despite the fact that defendants were participants in the market in which prices were allegedly fixed and plaintiffs were participants in the market that experienced artificially inflated prices as a result of the alleged price-fixing scheme. Ice Cream Liquidation, 253 F. Supp. 2d at 272-73.

Even assuming that PNE could establish antitrust injury and the remaining antitrust standing analysis,[6] PNE's failure to allege plausibly that Eversource and Avangrid each had monopoly power in the relevant market is fatal to the claims alleged here. Section 2 of the Sherman Act makes it illegal to "monopolize, or attempt to monopolize . . . any part of the trade or commerce" among several states. Díaz Aviation Corp. v. Airport Aviation Servs., Inc., 716 F.3d 256, 265 (1st Cir. 2013) (quoting 15 U.S.C. § 2) (internal quotation marks omitted). "To prove a

---

[6] In Breiding, the Court concluded that retail electricity consumers who had alleged the same anticompetitive conduct against Defendants did not have standing after considering the six factors germane to antitrust standing analysis, especially where plaintiffs' antitrust injury was "indirect and only remotely connected to [d]efendants' alleged anticompetitive conduct" and the "nature of any damages is attenuated" given the uncertainty around reconstructing prices and behavior across multiple, independent natural gas and electricity markets over the course of several years to calculate damages. Breiding, 344 F. Supp. 3d at 455-56.

violation of this statute, a plaintiff must demonstrate (1) that the defendant possesses 'monopoly power in the relevant market,' and (2) that the defendant has acquired or maintained that power by improper means." Town of Concord, Mass. v. Bos. Edison Co., 915 F.2d 17, 21 (1st Cir. 1990). To prove attempted monopolization, a plaintiff must demonstrate "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993). "Market power can be shown through two types of proof," either through "direct evidence of market power," such as "actual supracompetitive prices and restricted output," or "circumstantial evidence of market power." Coastal Fuels of P. R., Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 196-97 (1st Cir. 1996).

PNE asserts that the relevant market for assessing market power in this case is the "secondary capacity market," which includes the spot market for natural gas and the excess capacity release market, id. ¶ 32, and the wholesale electricity market, id. ¶ 33. As Defendants correctly point out, PNE has failed to allege that Eversource or Avangrid individually possess monopoly power in those markets. D. 22 at 25-26; D. 29 at 12-13. PNE instead asserts that "[t]ogether, Eversource and Avangrid" reduced natural gas supply in the secondary capacity market, causing purported supracompetitive prices in wholesale electricity market. Id. ¶ 119. Courts in the First Circuit have rejected monopolization claims based on a "shared monopoly" theory of liability. See PSW, Inc. v. VISA U.S.A., Inc., No. C.A. 04-347T, 2006 WL 519670, at *11 (D.R.I. Feb. 28, 2006) (explaining that "to state any claim under Section Two's actual or attempted monopoly clauses, a claimant is required to assert that the *individual* market power of a defendant is sufficient to constitute a monopoly, in this analysis, the combined monopoly power of competitors is irrelevant and insufficient") (emphasis in the original). The complaint's vague

assertion that "Eversource and/or Avangrid could possess the vast majority of excess Pipeline capacity" when "capacity was already scarce," id. ¶ 107, without more, does not constitute a plausible allegation regarding the Defendants' individual monopoly power in the secondary capacity market, especially where the gravamen of PNE's complaint turns on Defendants' alleged refusal to participate in that market in the first instance.

Accordingly, PNE has not stated cognizable antitrust claims against Defendants.

C.    **PNE's State Law Claims Are Also Dismissed**

PNE also bring claims for damages and injunctive relief under various Massachusetts and New Hampshire antitrust, consumer protection and unfair trade statutes. The filed rate doctrine applies with equal force to PNE's state law claims. See Pub. Util. Dist. No. 1 of Snohomish Cnty. v. Dynegy Power Mktg., Inc., 384 F.3d 756, 761 (9th Cir. 2004) (explaining that the filed rate doctrine preempted antitrust and unfair competition claims grounded in state law where such claims required the court to determine rates that "would have been achieved in a competitive market") (internal quotation marks omitted). PNE's state law claims are also dismissed.[7]

**VI.    Conclusion**

For the foregoing reasons, the Court ALLOWS Defendants' motion to dismiss, D. 21.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

[7] In light of this ruling, the Court does not reach Defendants' additional arguments for dismissal, see D. 22 at 21 n.9.